### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

EUGENE HABICH,

      Plaintiff,

v.

WAYNE COUNTY, CORPORAL
JOHN WOJCIECHOWSKI, and
DEPUTY CHRISTOPHER
MITTLESTAT, in their individual
and official capacities,

      Defendants.

Case No. 2:20-cv-12528

Hon. David M. Lawson

Mag. Judge Anthony P. Patti

---

### MOTION FOR SUMMARY JUDGMENT BY
### DEFENDANTS CHRISTOPHER MITTLESTAT AND WAYNE COUNTY

Pursuant to Fed. R. Civ. P. 56, Defendants Deputy Christopher Mittlestat and Wayne County (collectively "Defendants")[1] move for summary judgment on the claims asserted against them by Plaintiff Eugene Habich ("Plaintiff").  In support of their motion, Defendants rely upon the attached Brief.  Pursuant to E.D. Mich. L.R.

---

[1] Defendant Corporal John Wojciechowski passed away unexpectedly on December 21, 2021. (ECF No. 37).  Under Michigan law, the death of a client generally terminates an attorney's representation save for "reasonable steps" to protect his or her interests in the interim like extending dates or preserving a right to appeal that may lapse if not filed.  *See, e.g., Henritzy v. Gen. Elec. Co.*, 451 N.W.2d 558, 561 (Mich. Ct. App. 1990) ("[A]n attorney's authority to act on behalf of a client terminates upon the death of the client"); *Tokar v. Albery*, 671 N.W.2d 139, 141 n. 1 (Mich. Ct. App. 2003).

7.1(a), on January 6, 2022, counsel for Defendants contacted counsel for Plaintiff,

explained the nature of this motion and its legal basis, and requested but not did not

obtain concurrence in the relief sought.

Dated: January 7, 2022                     Respectfully submitted,

                                           By: /s/ *Davidde A. Stella*
                                           Davidde A. Stella (P69948)
                                           Assistant Corporation Counsel
                                           James W. Heath
                                           Wayne County Corporation Counsel
                                           500 Griswold St., 30th Floor
                                           Detroit MI 48226
                                           (313) 224-5030
                                           dstella@waynecounty.com

                                           *Attorneys for Defendants Christopher*
                                           *Mittlestat & Wayne County*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

EUGENE HABICH,

      Plaintiff,

v.

WAYNE COUNTY, CORPORAL
JOHN WOJCIECHOWSKI, and
DEPUTY CHRISTOPHER
MITTLESTAT, in their individual
and official capacities,

      Defendants.

Case No. 2:20-cv-12528

Hon. David M. Lawson

Mag. Judge Anthony P. Patti

---

**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY
DEFENDANTS CHRISTOPHER MITTLESTAT AND WAYNE COUNTY**

## CONCISE STATEMENT OF ISSUES PRESENTED

1.    Count I: Is Defendant Wayne County Sheriff's Office Deputy Christopher Mittlestat entitled to qualified immunity on the Fourth Amendment civil claims asserted against him under 42 U.S.C. § 1983?

2.    Count II: Is Deputy Mittlestat entitled to qualified immunity on the Fourteenth Amendment civil claims asserted again him under 42 U.S.C. § 1983?

3.    Count III: Has Plaintiff Eugene Habich raised a genuine issue of material fact on a municipal liability claim against Wayne County under 42 U.S.C. § 1983?

## CONTROLLING OR MOST APPLICABLE AUTHORITY

*Burgess v. Fischer*, 735 F.3d 462 (6th Cir. 2013).

*City of Escondido v. Emmons*, 139 S. Ct. 500 (2019).

*City of Tahlequah v. Bond*, – S. Ct. –, 211 L. Ed. 2d 170 (2021).

*Conn v. Gabbert*, 526 U.S. 286 (1999).

*District of Columbia v. Wesby*, 138 S. Ct. 577 (2018).

*Fisher v. Harden*, 398 F.3d 837 (6th Cir. 2005).

*M.J. v. Akron City Sch. Dist. Bd. of Education,* 1 F.4th 436 (6th Cir. 2021).

*Mullenix v. Luna*, 577 U.S. 7 (2015).

*Pearson v. Callahan*, 555 U.S. 223 (2009).

*Peatross v. City of Memphis*, 818 F.3d 233 (6th Cir. 2016).

*People v. Mierzejewski*, 550 N.W.2d 782 (Mich. 1996).

*Rieves v. Town of Smyrna*, 959 F.3d 678 (6th Cir. 2020).

*Spencer v. City of Hendersonville*, No. 20-6168, 2021 U.S. App. LEXIS 30313 (6th Cir. Oct. 8, 2021) (unpublished).

*Thomas v. City of Chattanooga*, 398 F.3d 426 (6th Cir. 2005).

*United States v. Clancy*, 979 F.3d 1135 (6th Cir. 2020).

*United States v. Coleman*, 923 F.3d 450 (6th Cir. 2019).

*United States v. Dunn*, 480 U.S. 294 (1987).

*United States v. Estes*, 343 F. App'x 97 (6th Cir. 2009) (unpublished).

*United States v Galaviz,* 645 F.3d 347 (6th Cir. 2011).

*Wilson v. Morgan*, 477 F.3d 326 (6th Cir. 2007).

**INTRODUCTION**

On August 1, 2020, as a part of a criminal investigation, deputies from the Wayne County Sheriff's Office (the "WCSO") impounded a 2008 Dodge Charger automobile that had been modified to imitate in appearance and capability an unmarked police cruiser, owned by Plaintiff Eugene Habich ("Plaintiff").  Because another deputy had observed Plaintiff activating the vehicle's police-style lights on the freeway two days before, because the deputies' later visual observations of the vehicle on the scene from a public vantage point established the requisite grounds to suspect that Plaintiff had committed at the very least the crime of possessing police-style lights, and because the vehicle was not located within any constitutionally-protected curtilage, the deputies had the legal authority to impound the vehicle under the plain view doctrine.  During the course of this case, the vehicle itself and most of its contents were returned to Plaintiff when they were no longer needed for the criminal investigation.  During April 2021, the WCSO formally requested that criminal charges be brought against Plaintiff; but due to circumstances beyond the WCSO's control, the Wayne County Prosecutor's Office has not yet instituted the state court proceedings.  However, criminal proceedings are fully expected to occur.

As explained further below, because no violation of clearly-established Fourth or Fourteenth Amendment rights occurred, Deputy Christopher Mittlestat is entitled to qualified immunity on the civil claims asserted against him in Counts I and II of

1

the Amended Complaint.  Plaintiff has failed to raise a genuine issue of material fact

on any conceivable municipal liability claim against Wayne County in Count III.

## RELEVANT FACTS

**A.     July 30, 2020: Corporal Paul Spaulding Encounters Plaintiff in an Imitation Police Vehicle on I-275 in the City of Canton.**

At about 6:20 am on July 20, 2020, Corporal Paul Spaulding was on his way

to work at the WCSO facility on Newburgh Road in his personal vehicle travelling

on northbound I-275.  (Ex. 1, Spaulding Decl. ¶ 2).  As he was travelling in the

middle lane, he noticed in his mirror cars shifting from the left lane into the middle

lane, as if the vehicle behind them was attempting to get them out of the way.  (*Id.* ¶

3).  When those cars cleared, he noticed what appeared to be an unmarked police

vehicle, the model appearing to be a white Dodge Charger. (*Id.*). He did not

immediately recognize it as belonging to any jurisdiction.  (*Id.*).  The Charger then

accelerated alongside on his left and passed him.  (*Id.* ¶ 4).  As he looked over, he

noticed that the vehicle was equipped with a variety of police-style equipment. (*Id.*).

Corporal Spaulding moved his vehicle into the left lane behind the Charger to

view its license plate, which appeared to him to be a civilian one.  (*Id.* ¶ 5).  At that

point, the driver of the Charger flashed the vehicle's rear police lights at him.  (*Id.*).

Corporal Spaulding then then moved his vehicle back into the middle lane and pulled

up alongside the Charger.  (*Id.* ¶ 6).  Upon seeing him, the driver of the Charger

shouted something over the vehicle's PA system that was unintelligible because of

the road noise. (*Id*.). Corporal Spaulding took his WCSO badge out, displayed it to the other driver, and asked if he was a police officer. When the driver saw this, he then quickly accelerated away at a speed well beyond the speed limit. (*Id*.).

From his car, Corporal Spaulding called Sergeant Patterson from dispatch to run the license plate. (*Id*. ¶ 7). Sergeant Patterson reported that the license plate was not registered to any police agency. (*Id*.). When Corporal Spaulding arrived at work, he notified a supervisor, Sergeant Brian Glatfelter, of the incident and completed a report. (*Id*. ¶ 8; ECF No. 12-1, 7/30/20 Report).[2] On his shift, Corporal Spaulding located a place of employment for Plaintiff, the registered owner of the vehicle, in Livonia. (*Id*. ¶ 9). Corporal Spaulding went to the location but was unable to locate the vehicle before the end of his shift. (*Id*.).

Plaintiff testified that he encountered Corporal Spaulding after entering the freeway from an on-ramp, and the pickup truck cut over several lanes to get behind him in the left lane. (Ex. 2, Habich Dep. at 88-97). However, he admitted to flashing his police-style lights at Corporal Spaulding and that the latter attempted to show him his badge. (*Id*.). When asked whether he used the vehicle's PA to attempt to communicate with Corporal Spaulding, his attorney instructed him not to answer under the Fifth Amendment. (*Id*. at 95 & 99-100).

---

[2] To avoid filing duplicate copies of documents already in the record, the Motion will refer to exhibits previously filed in this case where appropriate.

After Sergeant Glatfelter was informed of the incident, he assumed the lead on the investigation.  (Ex. 1, Spaulding Decl. ¶ 10; Ex. 3, Glatfelter Dep. at 12-13).

**B.     August 1, 2020: Deputies John Wojciechowski and Christopher Mittlestat Locate the Vehicle at a Residence in the City of Romulus.**

On August 1, 2020, Sergeant Glatfelter instructed Corporal John Wojciechowski to attempt to locate the Charger observed and identified by Corporal Spaulding.  (Ex. 3, Glatfelter Dep. at 12-13 & 58; Ex. 4, Wojciechowski Dep. at 20-21).  Corporal Wojciechowski ran the license plate and Plaintiff's driver's license, both of which came back as registered to a residential address in Dearborn.  (Ex. 4, Wojciechowski Dep. at 21 & 61).

Corporal Wojciechowski called Defendant Deputy Christopher Mittlestat, who was then on his own patrol, to accompany him to the Dearborn address.  (*Id*. 21 & 58).  They approached the house, knocked on the door at least twice, but no one answered.  (*Id*. at 21-22; Ex. 5, Mittlestat Dep. at 19).  As the deputies were leaving the residence, a neighbor approached and told them that Plaintiff was staying at his girlfriend's house for a few days but did not know her name or where she lived.  (Ex. 4, Wojciechowski Dep. at 23-24 & 59-60; Ex. 5, Mittlestat Dep. 36).  At that point, Deputy Mittlestat left the scene to continue his own duties.  (Ex. 5, Mittlestat Dep. at 36).

Corporal Wojciechowski then located and travelled to another address associated with Plaintiff on Olive Street in the City of Romulus. (Ex. 4,

4

Wojciechowski Dep. at 24).[3]  When he arrived at the residence, he could clearly see a white Charger matching the prior description parked in the driveway abutting the residence with the front of the car facing the street.  (*Id*. at 24-25).  A photo of the residence as it appears from the street is attached as Exhibit 6.[4]  From the street, he was also able to observe the front pushbar with an emergency light on it and the police-style lights installed under the front windshield.  (Ex. 4, Wojciechowski Dep at 24-26, 63 & 84).[5]  He then called Sergeant Glatfelter to inform him that he had located a Charger matching the prior description.  (*Id*. at 26 & 67; Ex. 3, Glatfelter Dep. at 15).  He then contacted Deputy Mittlestat for backup and waited in his marked vehicle until the latter arrived.  (Ex. 4, Wojciechowski Dep. at 26-27; Ex. 5,

---

[3] Plaintiff admitted that despite permanently residing at the Romulus address for a number of years, he has used and currently uses his mother's Dearborn address for his car registrations, driver's license, and tax returns out of a concern that the Dearborn would take some kind of action against his mother because of an incident that occurred with the City around 15 years ago.  (Ex. 2, Habich Dep. at 32-34).

[4] The November 2021 Google Maps photo of the Olive Street residence shows a front door facing the street, but that door was added at some time after August 1, 2020.  Plaintiff confirmed at his deposition that there was no door facing the street on August 1, 2020.

[5] Mr. Maishon Cooper, the owner of the car dealership that sold the decommissioned 2008 Dodge Charger during 2017 to Plaintiff, testified that the vehicle was not sold to him with any of the police-style equipment already installed and his dealership did not install any such equipment.  (Ex. 7, Cooper Dep. at 23-24 & 29-30; Ex. 8, Purchase Agreement).  While insisting that he bought the vehicle with the police lights "already there," he did admit that he purchased from the internet the police-style laptop, the laptop software and the video recording equipment and installed it himself.  (Ex. 2, Habich Dep. at 52-63).

Mittlestat Dep. at 20).  When Deputy Mittlestat arrived, he testified that he also observed the police lights on the Charger from the street.  (Ex. 5, Mittlestat Dep. at 20-21 & 43).

After Deputy Mittlestat arrived, they both proceeded up the driveway where they encountered Plaintiff already outside. (Ex. 4, Wojciechowski Dep. at 27).  Corporal Wojciechowski asked for Plaintiff's ID, which was provided.  (*Id*. at 28).  Plaintiff told the Corporal initially that the car belonged to him but later said the car belonged to a security company.  (*Id*. at 28-29).  When the Corporal asked for the company's information, Plaintiff would not provide it and said that that his "boss" would call him.  (*Id*. at 29 & 75-76).[6]  The Corporal and Plaintiff also had a conversation about the July 30 incident with Corporal Spaulding, during which Plaintiff admitted that he flashed the police lights.  (*Id*. at 63-64; Ex. 5, Mittlestat Dep. at 38-40).  At no time did Plaintiff ask the deputies to leave or state that he did not want to talk with them; and at no point did any discussions become argumentative or heated.  (Ex. 4, Wojciechowski Dep. at 64-65; Ex. 5, Mittlestat Dep. at 48).

---

[6] Plaintiff admitted at his deposition that he does not work for any security company. Rather, he works fulltime for Steelcraft Tool in Livonia. (Ex. 2, Habich Dep, at 13-14).  He testified that he had his own business and attempted to make some money on the side by installing residential security systems and patrolling closed or shuttered businesses but could not identify any actual clients at his deposition. (*Id*. at 153-54).

After the Charger's license plate came back a match to the vehicle previously identified by Corporal Spaulding, Corporal Wojciechowski informed Plaintiff that the car was to be impounded as part of a criminal investigation. (Ex. 4, Wojciechowski Dep. at 30). At that point, Plaintiff requested that he be able to remove certain items from the car. (*Id*. at 30-31). Corporal Wojciechowski instructed Deputy Mittlestat to do a safety sweep of the vehicle before permitting Plaintiff to remove any items. (*Id*.). Deputy Mittlestat then swept the interior of the Charger for any weapons or contraband. (Ex. 5, Mittlestat Dep. at 26-28 & 41). After Plaintiff removed a few items from the car, he asked to get into the trunk. (Ex. 4, Wojciechowski Dep. at 68-69; Ex. 5, Mittlestat Dep. at 41). When the trunk was opened, Plaintiff accessed the hard drive located there and attempted to take several memory cards out of it and place them in his pocket. (Ex. 4, Wojciechowski Dep. at 69). The Corporal asked him to turn the memory cards over to him as possible evidence, and Plaintiff complied without protest or incident. (*Id*.; Ex. 5, Mittlestat Dep. at 29-30).

The Corporal provided to Plaintiff a business card for Martin's Towing, where the vehicle would be stored during impoundment, and the telephone number to the WCSO. (Ex. 4, Wojciechowski Dep. at 43-46; Ex. 9, Back of Card). The vehicle was subsequently transported to Martin's Towing, and the vehicle was at no point in the exclusive custody of the WCSO. Under the Wayne County-Martin's Towing

contract, the tow yard is responsible for the custody and care of any impounded vehicle. (Ex. 3, Glatfelter Dep. at 56). The Corporal called Sergeant Glatfelter to inform him that the tow had occurred. (*Id*. at 16).

Plaintiff's version of the encounter, while disagreeing on some points, generally agrees with the same basic facts. He admits that: (1) the deputies approached him by coming up the driveway: (2) a conversation occurred about the incident with Corporal Spaulding;[7] (3) Corporal Wojciechowski provided him the contact information for the tow yard and the WCSO office; (4) he was permitted to retrieve items from the vehicle; (5) he attempted to remove and pocket the video system's memory cards before turning them over upon request; and (6) at no time did he tell the deputies to leave the property. (Ex. 2, Habich Dep. at 112-22).[8]

Both deputies subsequently drafted reports of the incident. (ECF No. 12-4, Wojciechowski Report; ECF No. 12-5, Mittlestat Suppl. Report). Corporal Wojciechowski asked filled out an "Impounded Vehicle Report" and a "Property Report," which recorded possession of the memory cards. (Ex. 11, Vehicle Report; Ex. 12, Property Report). Neither deputy had any further official involvement in the

---

[7] Ms. Sharon Thalacker, who was also present on August 1, 2020, also confirmed that conversation took place. (Ex. 10, Thalacker Dep. at 45-47).

[8] Plaintiff testified that on August 1, 2020, he attempted to claim to the deputies that the police-style lights on his car were legal because they did not flash an inappropriate color. (Ex. 2, Habich Dep. at 144-45). The deputies' position is that no such discussion actually took place.

criminal investigation or the vehicle.  (Ex. 4, Wojciechowski Dep.  40-42 & 55; Ex. 5, Mittlestat Dep. at 46).

Upon application, the 35th District Court approved a search warrant for the interior of the Charger and an examination of the memory cards.  (Ex. 13, Search Warrant; Ex. 3, Glatfelter Dep. at 22-32).  Sergeant Glatfelter conducted the search of the vehicle at Martin's Towing, took photographs of the vehicle, and subsequently produced an inventory of the results of the search and contents of the vehicle. (Exhibit 14, Property Report).  An inspection revealed the following police-style equipment installed on the vehicle: (1) police-style flashing lights in multiple locations, including lights zip-tied to the pushbar, front and rear windshield lights, license plate lights, and lights in the headlights, taillights, and fog lights; (2) sirens; (3) a spotlight; (4) a PA system; (5) video recording equipment including a front camera and a trunk-mounted hard drive to store the video; (6) a police-style CAD dock and computer; and (7) a front police-style pushbar.  (ECF No. 12-2, Photos). Upon inspection, the lights were all fully operable.  (Ex. 3, Glatfelter Dep. at 69; ECF No. 12-3, Video). When Plaintiff was asked if he ever had occasions to activate the police lights or use the vehicle's built-in siren system, Plaintiff refused to answer, claiming a Fifth Amendment privilege against self-incrimination.  (Ex. 2, Habich Dep. at 76 & 100).  However, Ms. Thalacker testified that she had been in the vehicle

when Plaintiff had used the police lights on at least one occasion in her presence to warn a motorcyclist weaving through traffic.  (Ex. 10, Thalacker Dep. at 28).

Plaintiff testified that before retaining an attorney and filing a lawsuit, he attempted to contact the WCSO by phone on a single occasion about the vehicle, the following day, Sunday, August 2, 2020.  (Ex. 2, Habich Dep. at 126-27).  Plaintiff did not attempt to contact Martin's Towing. Plaintiff did not seek any possible remedies in state court for the return of property.  *See People v. Mierzejewski*, 550 N.W.2d 782, 786 (Mich. 1996) (recognizing that Michigan state courts have jurisdiction to determine whether seized property in law enforcement's possession should be returned if not contraband and no longer needed).  Sergeant Glatfelter testified that he received no inquiries or complaints from Plaintiff about the vehicle. (Ex. 3, Glatfelter Dep. at 58-59).  The criminal investigation took some time to complete due to: (1) the ongoing COVID pandemic; and (2) the necessity of retaining specialized personnel from the Michigan State Police to decipher some of the computerized information.  (ECF No. 12-8, Glatfelter Decl. ¶¶ 6-7).

## C.    September 22, 2020: Plaintiff Files the Present Case.

On or about September 22, 2020, Plaintiff filed the present case; and on October 26, 2020 filed an Amended Complaint, claiming that: (1) Corporal Wojciechowski and Deputy Mittlestat violated the Fourth and Fourteenth Amendments by effectuating an illegal seizure of the Charger; and (2) Wayne

10

County had unconstitutional written and unwritten policies condoning unlawful seizures of vehicles. (ECF No. 10). Plaintiff subsequently moved for a preliminary injunction, which Defendants opposed. While that motion was pending, because the Charger itself was no longer needed for the criminal investigation, the parties agreed to return the vehicle. Plaintiff then voluntarily withdrew his preliminary injunction motion. (ECF No. 29, Withdrawal). Per the agreement of the parties, after Wayne County paid a third-party company, Priority One Emergency in Canton, to physically remove the police equipment, and Plaintiff retrieved the Charger from Martin's Towing on or about February 22, 2021. (Ex. 15, Priority One Agreement).

During April 2021, the WCSO submitted a warrant request to the WCPO seeking the recommendation of criminal charges against Plaintiff. Although to date, the WCPO has not made a final decision on the warrant request, it is expected that criminal court criminal charges will issue.

## ARGUMENT

### A. Count I: Deputy Mittlestat is Entitled to Qualified Immunity on the Fourth Amendment Civil Claim Asserted Against Him.

Deputy Mittlestat is entitled to qualified immunity on the Fourth Amendment civil claim asserted against him in Count I. Qualified immunity protects government officials for "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Courts have established a two-part test to evaluate the legal protections afforded to

11

government officials from civil litigation: "(1) whether the alleged facts . . . show that the official's conduct violated a constitutional right, and (2) whether that constitutional right was clearly established." *Rieves v. Town of Smyrna*, 959 F.3d 678, 695 (6th Cir. 2020). The prongs of the test may be analyzed in either order. *See Pearson*, 555 U.S. at 236.

"A right is clearly established when a reasonable [government employee] would know – in the given situation and with the information known to him at the time – that his conduct violated that right." *Rieves*, 959 F.3d at 695 (citation omitted). "If reasonable officials could disagree as to whether the conduct at issue was lawful, then qualified immunity applies." *Id.* (citations omitted). The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018). "[C]ourts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* (citation omitted). "[A] body of relevant case law is usually necessary to 'clearly establish' the [legal] answer." *Id.* (citation and quotation marks omitted); *City of Escondido v. Emmons*, 139 S. Ct. 500, 504 (2019) (same). "[T]he clearly established right must be defined with specificity." *Emmons*, 139 S. Ct. at 503. "It is not enough that a rule be suggested by then-existing precedent; the rule's

12

contours must be so well defined that it is clear to a reasonable [government employee] that his conduct was unlawful in the situation he confronted." *City of Tahlequah v. Bond*, – S. Ct. –, 211 L. Ed. 2d 170, 173 (2021) (quotation marks and citation omitted). A plaintiff has the burden to demonstrate that binding precedent has clearly established a claimed constitutional right. *See Peatross v. City of Memphis*, 818 F.3d 233, 240 (6th Cir. 2016).

1.   <u>Plaintiff Has Failed to Establish a Violation the Fourth Amendment.</u>

Plaintiff cannot demonstrate a violation of the Fourth Amendment because the deputies effectuated a legal seizure under the "plain view" doctrine. Because Michigan law criminalizes the mere possession of police-style lights, Mich. Comp. Laws § 257.698(5),[9] and because the vehicle was not located in any constitutionally-protected "curtilage" of the Romulus residence, the deputies had the constitutional authority to seize the vehicle in connection with an investigation of criminal wrongdoing without the requirement of obtaining a warrant.

For a seizure to satisfy the "plain view" doctrine, three circumstances must generally exist: (1) an officer must perceive the criminality from a lawful vantage point; (2) the "incriminating nature" of the object must be "immediately apparent;" and (3) the officer must have had a lawful right of access to the object itself. *See*

---

[9] A violation of Mich. Comp. Laws § 257.698(5) is a criminal misdemeanor. *See People v. Cartwright*, No. 214589, 2000 Mich. App. LEXIS 2257, *2-3 (Mich. Ct. App. Apr. 25, 2000) (unpublished).

*United States v. Clancy*, 979 F.3d 1135, 1137 (6th Cir. 2020) (citation omitted).  In

evaluating the "lawful vantage point" prong, that question involves whether there is

an argument that the vehicle was in the "curtilage" of the residence for the purposes

of Fourth Amendment, which turns on (1) the proximity of the area to the home; (2)

whether the area is within an enclosure around the home; (3) how that area is used;

and (4) what the owner has done to protect the area from observation. *See United*

*States v. Dunn*, 480 U.S. 294, 301 (1987). A plaintiff has the burden to demonstrate

that the *Dunn* factors weigh in his favor.  *United States v. Witherspoon*, 467 F. App'x

486, 490 (6th Cir. 2012) (unpublished).

　　Here, all three requirements of the plain view doctrine were met.  First, the

deputies could reasonably rely upon a prior description of the vehicle sought for the

investigation from both Corporal Spaulding's encounter as well as the fact that the

address of the residence in Romulus in a database matched one used by Plaintiff.

Second, the deputies were in a legal vantage point both initially on the street and

then on the driveway to view evidence of possible criminal wrongdoing.  Indeed,

Plaintiff himself testified that the door to the residence right next to the vehicle was

the primary entrance to the house itself and the place where packages were delivered.

(Ex. 2, Habich Dep. at 157-160).  In other words, during August 2020, the Romulus

residence had no front door facing the street, and egress and ingress to the house was

done on the side of the house right next to where the Charger was parked.  Finally,

14

it is undisputed that the deputies were able to perceive what appeared to be illegal police lights from both legal vantage points – the street and the driveway.

The Sixth Circuit has repeatedly recognized and held that in materially identical circumstances that: (1) an open, unenclosed, and unobscured driveway abutting a residence does not constitute "curtilage" for the purposes of the Fourth Amendment; (2) officers are permitted to enter onto a driveway for the purposes of asking questions or observing activities in plain view from that vantage point; and (3) the Fourth Amendment does not require a warrant when there is probable cause to seize evidence in plain view. *See United States v. Coleman*, 923 F.3d 450, 456-57 (6th Cir. 2019) (holding that a federal agent did not violate the Fourth Amendment when he entered into a driveway to install a vehicle tracker on a vehicle in plain view where the owner had made no effort to shield its view from the public); *United States v Galaviz,* 645 F.3d 347, 356 (6th Cir. 2011) (holding that a search of vehicle in plain view parked on a driveway with no steps to conceal it from the public did not implicate the Fourth Amendment); *United States v. Estes*, 343 F. App'x 97, 101 (6th Cir. 2009) (unpublished) (recognizing that where officers were legally on a driveway, illegal activity in plain view from that area does not implicate the Fourth Amendment); *see also Copeland v. Sadler*, No. 19-13404, 2021 U.S. Dist. LEXIS 247044, *16 (E.D. Mich. Dec. 28, 2021) (unpublished) ("[A] police officer does not intrude upon the curtilage—and, therefore, does not run afoul of the Fourth

15

Amendment—by merely walking onto such a driveway"); *Spriggs v. Shanlian*, No. 12-14918, 2014 U.S. Dist. LEXIS 32053, *19 (E.D. Mich. Feb. 24, 2014) (unpublished) ("In this case, the car itself was in an unenclosed driveway, and plainly visible to passers-by. In fact, the officers were able to ascertain that the car matched the description that was given them, including the damage to the front end. While the license plate might not have been visible from the street, the residents of the house took no steps to otherwise conceal or thwart observation of the vehicle"). There is no apparent authority from the Supreme Court or the Sixth Circuit supporting Plaintiff's position that vehicle was situated in constitutionally-protected curtilage at the time of the impoundment.

Because Plaintiff cannot establish that Deputy Mittlestat violated his Fourth Amendment rights, the latter is entitled to summary judgment on the basis of qualified immunity.

2.   In the Alternative, Deputy Mittlestat Would Be Entitled to Qualified Immunity Because the Fourth Amendment Law Governing This Particular Situation Was Not "Clearly Established."

Even if there were a reasonable legal debate as to whether the Charger existed in the "curtilage" of the Romulus residence, Deputy Mittlestat would be nevertheless entitled to qualified immunity because there is no prior case law that would "clearly-establish" that the seizure under the facts of this case would violate the Fourth Amendment. The Supreme Court has repeatedly held that prior case law "specificity

16

is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citation omitted). "It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable [government employee] that his conduct was unlawful in the situation he confronted." *Bond*, – S. Ct. –, 211 L. Ed. 2d at 173.

Here, because Plaintiff can point to no case law from the Supreme Court or the Sixth Circuit that has held in his favor in analogous circumstances and in a manner resolving any potential disagreement "beyond debate," qualified immunity would also shield Deputy Mittlestat on this basis.

**B.     Count II: Deputy Mittlestat is Entitled to Qualified Immunity on the Fourteenth Amendment Claim Asserted Against Him.**

In Count II, Plaintiff alleges that the seizure of the Charger violated his Fourteenth Amendment Due Process rights because Deputy Mittlestat: (1) failed to obtain and present a seizure warrant for vehicle; (2) had an unspoken intention of "civilly forfeiting" the vehicle under Michigan's civil forfeiture laws; and (3) failed to inform Plaintiff of the reason for the seizure, of how he could retrieve the vehicle and/or "appeal" the seizure. Deputy Mittlestat is entitled to qualified immunity on these claims.

First, the Supreme Court has expressly recognized that the Fourth Amendment, and not the Fourteenth Amendment, provides the entirety of the legal analysis to evaluate an illegal seizure claim.   Second, there was no intention to invoke Michigan's civil forfeiture laws with regards to the Charger as the seizure was effectuated to further a normal criminal investigation.   Finally, there is no clearly-established law that the Fourteenth Amendment requires the other legal obligations alleged in Count II.

     1.     <u>Because the Fourth Amendment Applies to Claims of Illegal Search & Seizure, a Fourteenth Amendment Claim Premised on the Same Allegations Fails to State a Claim Upon Which Relief Can Be Granted</u>.

To the extent that Plaintiff alleges in Count II that the seizure also violated his Fourteenth Amendment rights, the Supreme Court has held that the Fourth Amendment is the exclusive legal vehicle under § 1983 for asserting such a claim:

> We have held that where another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process.   Challenges to the reasonableness of a search by government agents clearly fall under the Fourth Amendment, and not the Fourteenth.

*Conn v. Gabbert*, 526 U.S. 286, 293 (1999) (citations and quotation marks omitted); *see Soltesz v. City of Sandusky*, 49 F. App'x 522, 527-28 (6th Cir. 2002) (unpublished) ("[T]he plaintiff's claim, no matter how couched, is simply that he was improperly subjected to a warrantless arrest, a claim that implicates the very substance of the Fourth Amendment. The district court, therefore, did not err in

granting summary judgment to the defendants without further discussion of the plaintiff's due process claim"); *Scofield v. City of Detroit*, 490 F. Supp. 3d 1213, 1222 (E.D. Mich. 2020) ("It is well-established that the Fourth Amendment provides the proper analytical framework for evaluating an unreasonable seizure claim, not the Fourteenth Amendment") (citations omitted); *Matthews v. Craige*, No. 16-11680, 2016 U.S. Dist. LEXIS 83383, *9 (E.D. Mich. June 28, 2016) (unpublished) ("Thus, when the Fourth Amendment explicitly protects against the conduct at issue, claims based on that conduct should be analyzed under the Fourth Amendment, rather than the more generalized due process provisions of the Fourteenth Amendment").

Thus, because the Fourth Amendment provides the exclusive and "explicit textual source of constitutional protection" for claimed illegal seizures, Deputy Mittlestat is entitled to qualified immunity on an alleged separate Fourteenth Amendment claim premised on the same alleged wrongdoing. Deputy Mittlestat would alternatively be entitled to qualified immunity because there is no "clearly-established" law regarding the legal standards imposed by the Fourteenth Amendment and how it would independently apply to this situation in the absence of the Fourth Amendment.

    2.    <u>The Deputies Did Not Impound the Vehicle With the Intention of Seeking the Institution of State Court Civil Forfeiture Proceedings.</u>

To the extent that Count II alleges that the deputies actually intended to effectuate a "civil asset forfeiture" under Michigan state law and did not comply with those notice rules, the seizure of the Charger was for the purpose of a criminal investigation, and not to seek to "forfeit" or otherwise to seek a civil judgment of permanent possession of the vehicle.  (Ex. 4, Wojciechowski Dep. at 43 & 69-70).

    3.    <u>To the Extent that Count II Claims That the Fourteenth Amendment Imposes "Other Requirements," There is No "Clearly-Established" Law Requiring the Deputy Mittlestat Do Any of It.</u>

To the extent that Count II seeks to impose additional constitutional obligations on Deputy Mittlestat, no clearly-established law in the Fourteenth (or even the Fourth) Amendment context provides that a law enforcement seizure of property in a criminal matter must be accompanied by: (1) a contemporary verbal explanation of the reason for the seizure; (2) the on-demand provision of an official seizure policy and the policy on "appealing" such seizures; or (3) any of the other activities described in Paragraph 36-37 of the Amended Complaint.  Michigan law provides a state court avenue of redress for those seeking the return of property seized as part of criminal investigations, a remedy that Plaintiff chose not to invoke. *See Mierzejewski*, 550 N.W.2d at 786.

**C.   Plaintiff Fails to Raise a Genuine Issue of Material Fact on Any Municipal Liability Claim Against Wayne County.**

Count III alleges a municipal liability claim on two theories: (1) that Wayne County has a facially-unconstitutional written policy on searches and seizures; and (2) Wayne County has an unwritten "custom" or "practice" of illegally seizing vehicles without warrants.  "A municipality may be held liable only when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts [an] injury." *Spencer v. City of Hendersonville*, No. 20-6168, 2021 U.S. App. LEXIS 30313, at *14 (6th Cir. Oct. 8, 2021) (unpublished) (citation and quotation marks omitted).  The Sixth Circuit recognizes four general theories of municipal liability: (1) a facially unconstitutional written policy; (2) official ratification by decisionmakers with final authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance to known constitutional violations.  *See Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

Plaintiff cannot raise a genuine issue of material fact on either theory for three reasons: (1) he has not established the existence of an underlying constitutional violation; (2) the written policy cited in the Amended Complaint did not and does not apply to this situation; and (3) he has failed to adduce any evidence of any prior similar conduct by its employees for which Wayne County was on notice.

1.     Because Plaintiff Cannot Establish an Underlying Constitutional Violation, a Municipal Liability Claim Fails as a Matter of Law.

The establishment of a cognizable underlying constitutional violation is a necessary prerequisite to a municipal liability claim.  *See M.J. v. Akron City Sch. Dist. Bd. of Education,* 1 F.4th 436, 452 (6th Cir. 2021) ("A municipality can only be held liable if there is a showing of an underlying constitutional violation by its officials") (citation and quotation marks omitted).  Because there was no underlying constitutional violation, Wayne County similarly cannot be held directly liable under § 1983.  *See Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007).

2.     The Written "Policy" Referred to in the Amended Complaint Was Not Applicable to Plaintiff's Situation.

To the extent that the Amended Complaint refers to a Wayne County Sheriff's Office policy entitled "Abandoned/Impounded Vehicles," dated April 3, 2006, this policy does not apply to the seizure of the Dodge Charger.  This policy expressly addresses the procedures for dealing with vehicles that appear abandoned on the road or left on private property without the owner's consent.  Sergeant Glatfelter testified that he was familiar with this policy, and unequivocally testified that it is not applicable to the seizure of evidence for general criminal investigations.  (Ex. 3, Glatfelter Dep. at 41-43).  Nor is there any evidence that Deputy Mittlestat expressly relied upon or acted pursuant to this policy. Therefore, to the extent that the Amended Complaint assumes that this inapplicable policy provided the

departmental rules governing the deputies' expected actions, it does not and cannot form the basis of a municipal liability claim.

> 3.   Plaintiff Cannot Raise a Genuine Issue of Material Fact a "Deliberate Indifference" Theory of Municipal Liability.

To the extent that Plaintiff alleges that Wayne County has an unwritten "custom" or "practice" of illegally seizing vehicles or fails to "train" its employees, he has absolutely no evidence to support that.  To state a viable claim of a municipal "indifference" to constitutional violations, a plaintiff must show "prior instances of unconstitutional conduct demonstrating that the municipality has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005).  A plaintiff "cannot rely solely on a single instance to infer a policy of deliberate indifference." *Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005).

Because there is no evidence in the record that there had been any prior similar instances of allegedly unconstitutional conduct and even if there were that Wayne County was on notice of these and failed to act, Plaintiff cannot raise a genuine issue of material fact on a "failure to train or supervise" or a "deliberate indifference" theory of municipal liability.

**D.     Neither Deputy Mittlestat Nor Wayne County Are Responsible Under the Constitution For Any Alleged Damage to the Vehicle While in the Custody and Control of Martin's Towing or Priority One.**

To the extent that Plaintiff alleges that the Charger was "damaged" while in the custody of Martin's Towing or Priority One,[10] those private businesses would be the proper target of any such claim.   At no point between August 1, 2020, and February 22, 2021, was the vehicle physically at a WCSO location or under the custody of the WCSO.   There was and is no legal barrier for Plaintiff to make a claim against either of these private companies under appropriate state laws.   There is also no case law from the Sixth Circuit that establishes or recognizes under § 1983 that a law enforcement officer or local government is liable on a *respondeat superior* or other basis for the alleged negligence of private business.

For the purposes of qualified immunity, there is certainly no "clearly-established law" that a law enforcement officer can be held responsible under the Fourth or Fourteenth Amendment for alleged damage to seized property while in the custody and control of private two yard under contract with a state or local government.   Because Deputy Mittlestat had nothing to do with the contractual storage arrangement of the vehicle or its care or custody while at Martin's Towing,

---

[10] Any alleged "damage" to the vehicle has never been independently verified. Despite the opportunity, Plaintiff did not report any damage to Martin's Towing or Priority One.   As a result, neither entity was ever provided an opportunity to dispute any claims that they gratuitously damaged the vehicle before Plaintiff took back exclusive possession of the vehicle.   (Ex. 2, Habich Dep. at 128-33).

his lack of personal involvement requires dismissal of such a claim.  *See Murphy v. Grenier*, 406 F. App'x 972, 974 (6th Cir. 2011) (unpublished) (recognizing that personal involvement is a requirement for individual liability under § 1983).

To the extent that such a claim would be directed to Wayne County, at a minimum, for the purposes of a constitutional municipal liability claim, Plaintiff would have to show at a minimum that Wayne County had a "policy" or "practice" of permitting its contractors to damage vehicles in their custody or were deliberately indifferent to known prior incidents of it and did not take any remedial action. Because that evidence does not exist in this case, Plaintiff cannot pursue such a claim against Wayne County directly.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their Motion for Summary Judgment.

Dated: January 7, 2022                    Respectfully submitted,

By: /s/ *Davidde A. Stella*
Davidde A. Stella (P69948)
Assistant Corporation Counsel
James W. Heath
Wayne County Corporation Counsel
500 Griswold St., 30th Floor
Detroit MI 48226
(313) 224-5030
dstella@waynecounty.com

*Attorneys for Defendants Christopher Mittlestat & Wayne County*

25

## CERTIFICATE OF SERVICE

I certify that on January 7, 2022, I filed the *MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS CHRISTOPHER MITTLESTAT AND WAYNE COUNTY,* along with this *Certificate of Service* with the Clerk of the Court via the court's electronic filing system which will send notice to all parties.

<u>/s/Susan Sweetman</u>
Paralegal