# EXHIBIT 2

**Eugene Habich**
**11/04/2021**

1                     UNITED STATES DISTRICT COURT

2                     EASTERN DISTRICT OF MICHIGAN

3                            SOUTHERN DIVISION

4    EUGENE HABICH,

5                            Plaintiff,

6        vs.                              Case No. 20-cv-12528

7                                         Hon. David M. Lawson

8    COUNTY OF WAYNE,

9    JOHN DOE #1, JOHN DOE #2,

10                           Defendants,

11   _____/

12   PAGE 1 TO 161

13

14        The Deposition of EUGENE HABICH,

15        Taken at 30445 Northwestern Hwy., Suite 250,

16        Farmington Hills, Michigan

17        Commencing at 10:10 a.m.,

18        Thursday, November 4, 2021,

19        Before Tamora L. Thompson, CSR-5378.

20

21

22

23

24

25



**Page 10**

1 Q. Are any of these four vehicles operable?
2 **A. Only the 2001 Jeep. I don't have plates on the rest.**
3 Q. So you have a 2004 Jeep. What is wrong with that car?
4 **A. Right now it needs a new motor in it.**
5 Q. You said you had a 1995 Range Rover?
6 **A. Yes.**
7 Q. What is wrong with that car?
8 **A. Air bag suspension.**
9 Q. You said the what?
10 **A. Air bag suspension.**
11 Q. Does it make it undrivable?
12 **A. You can drive it, but it bounces down the road. Very**
13 **uncomfortable.**
14 Q. Then the RV obviously, does that work?
15 **A. Yes.**
16 Q. Do you know anything about fixing cars yourself?
17 **A. Yes, I do.**
18 Q. Is there any reason why, for the vehicles that are not
19 operable, are those repairs you can do yourself?
20 **A. Yes.**
21 Q. And is there a reason why you haven't repaired those
22 vehicles?
23 **A. Time.**
24 Q. So with the 2001 Jeep, do you drive that today?
25 **A. No.**

**Page 11**

1 Q. Why don't you use it?
2 **A. It's my mother's.**
3 Q. But you keep it at your house?
4 **A. I bought it for her.**
5 Q. Okay. But is it at your house?
6 **A. Right now it's at my house, yes.**
7 Q. Does she have a car at her house?
8 **A. No.**
9 Q. Sorry to ask you so many questions about these cars.
10 Are these cars all registered to you?
11 **A. Yes. My mother's name is on a few of them.**
12 Q. As a co-owner or as the owner?
13 **A. I don't know. Two names on there.**
14 Q. Is her name is also on the registration?
15 **A. Yes.**
16 Q. Are all -- where are these four vehicles registered to
17 in terms of what address do these vehicles reflect on
18 the registrations?
19 **A. They are all at Firestone.**
20 Q. All of them?
21 **A. Yes.**
22 Q. Even the Dodge Charger?
23 **A. Yes.**
24 Q. Why do you have them registered in Dearborn?
25 **A. Because that's where I was living when I purchased all**

**Page 12**

1 of them.
2 Q. So when you have to get a new registration every year
3 from the Secretary of State, you don't update the
4 address to Romulus on any of them?
5 **A. You can't get into the Secretary of State, not since**
6 **COVID.**
7 Q. Well, I mean, so you have not registered any of these
8 vehicles this year?
9 **A. Just the Charger and the 2001 Jeep.**
10 Q. So the other vehicles don't have registrations?
11 **A. No.**
12 Q. That makes sense. During August 2020, what vehicles did
13 you own?
14 **A. The Dodge Charger, basically all of them. I haven't**
15 **bought a new vehicle or sold anything.**
16 Q. So in August of 2020, were any of these other vehicles
17 operable?
18 **A. No. Just the Dodge Charger.**
19 Q. And what was wrong with the 2001 Jeep, 2004 Jeep and
20 Range Rover and RV?
21 **A. The 2001 Jeep, I had the head off of it. Doing a head**
22 **gasket, water pump. I believe I replaced the alternator**
23 **at the same time.**
24 Q. When did you -- was the 2001 Jeep fixed?
25 **A. Took me about two weeks after they took the car.**

**Page 13**

1 Q. Did you also have the 2004 Jeep at the time?
2 **A. Yes.**
3 Q. Was that at Romulus in August of 2020?
4 **A. Yes.**
5 Q. Was that vehicle operable?
6 **A. No.**
7 Q. What was wrong with it?
8 **A. That's the engine. I still have not fixed the engine in**
9 **it.**
10 Q. How about the Range Rover, was that operable?
11 **A. No. That wasn't even there, neither was the motor home.**
12 Q. Those were things you acquired after 2020?
13 **A. No. They were in storage.**
14 Q. You said you were able to fix the 2001 Jeep in a couple
15 of weeks after August 1, 2020?
16 **A. Uh-huh. Yes.**
17 Q. After you were able to fix the Jeep, were you able to
18 operate that car on a daily basis?
19 **A. Yes.**
20 Q. Mr. Habich, where do you currently work?
21 **A. Steelcraft Tool, Livonia.**
22 Q. What are your job duties?
23 **A. I run a surface grinder.**
24 Q. What do surface grinders do?
25 **A. Grind the parts.**



**Eugene Habich**
**11/04/2021**                                    Pages 14..17

Page 14

1 Q.  So it's like a bench grinder or is it a larger?
2 A.  **It's a larger grinder.**
3 Q.  How long have you been working at Steelcraft Tool doing
4     this job?
5 A.  **Since 2000.**
6 Q.  Have you had, since 2000, have you had any other
7     positions at Steelcraft besides surface grinder?
8 A.  **Work the drills, water jets.**
9 Q.  Anything else?
10 A. **Mills.**
11 Q. Who is your current supervisor at Steelcraft?
12 A. **Good question.  They keep bouncing me around.  I can**
13    **give you the owner.**
14 Q. Like I said -- does Steelcraft Tool have more than one
15    location, right?
16 A. **No.**
17 Q. Just has one.  I seen them around town.  Who is the
18    owner?
19 A. **Nan Marr.**
20 Q. N-A-N?
21 A. **Yes.**
22 Q. M-A-R?
23 A. **R-R.**
24 Q. Okay.  Do you have somebody you report to on your shift?
25 A. **Paul.**

Page 15

1 Q.  Do you know his last name?
2 A.  **Narcovitz.  Don't ask.**
3 Q.  Has he been your supervisor, how long?
4 A.  **Fifteen years.  He is one of the foreman.**
5 Q.  Do you have any other employment besides Steelcraft?
6 A.  **Not at the moment.**
7 Q.  Let's say since 2010, I can't tell you where I worked
8     before 2010.  Have you had any other jobs besides
9     Steelcraft before 2010?
10 A. **Part-time stuff.**
11 Q. What kind of part-time jobs had you had since 2010?
12 A. **Doing security work.**
13 Q. Has this been -- are you self employed in this or work
14    for a company?
15 A. **Self.**
16 Q. Do you have a name of a company; does your self
17    employment have a company name?
18 A. **Osiris.**
19 Q. Is that an LLC?
20 A. **Yes.**
21 Q. How long has Osiris been around?
22 A. **'90s.**
23 Q. So did you found Osiris?
24 A. **Yes.**
25 Q. Does anybody else have any ownership interest in Osiris?

Page 16

1 A.  **No.**
2 Q.  Anybody else ever had any ownership interest?
3 A.  **No.**
4 Q.  Are you the sole employee?
5 A.  **Yes.**
6 Q.  You said you have been doing this since the 1990s?
7 A.  **Not this, no.**
8 Q.  Not Osiris?
9 A.  **Osiris has been done since the 90s.  I was a private**
10    **investigator before that.**
11 Q. Back in the 90s.  Let's -- I do want to ask you about
12    that.  Few more questions about Osiris.
13       In Osiris, you're the owner and sole employee?
14 A. **Yes.**
15 Q. Did you do Articles of Organization for the LLC?
16 A. **I haven't, no.**
17 Q. Did you have an attorney draft them for you?
18 A. **Papers, that would be Sharon did all that stuff for me.**
19    **I don't know what she did.**
20 Q. Do you know if you file annual reports with the State of
21    Michigan with Osiris?
22 A. **I don't think so, no.**
23 Q. If your reports were filed, do you know who would have
24    filed them?
25 A. **It would have been Sharon.**

Page 17

1 Q.  Who is Sharon to you?
2 A.  **Girlfriend.**
3 Q.  How long have you known her?
4 A.  **Eight, nine years.**
5 Q.  How long have you guys been together?
6 A.  **Maybe three.**
7 Q.  Do you live together?
8 A.  **No.**
9 Q.  Do you know what city she lives in?
10 A. **Whitmore Lake.**
11 Q. Is it Thalacker?
12 A. **Yes.**
13 Q. Ms. Thalacker, did she assist you with Osiris in the
14    past?
15 A. **No.**
16 Q. You said she may have helped you with the articles or
17    getting the company together?
18 A. **Yes.  She did all of that.**
19 Q. Did you pay her to do that?
20 A. **No.**
21 Q. You don't know if Osiris is current on filing its
22    reports with the State of Michigan?
23 A. **I don't.  I don't know of any reports.  I don't know if**
24    **she did that or not.**
25 Q. Do you file tax returns for Osiris?



**Eugene Habich**
11/04/2021
Pages 30..33

Page 30

1 A. No.
2 Q. How much did she offer to purchase from the City of
3     Dearborn for?
4 **A. 400.**
5 Q. $400?
6 **A. Uh-huh.  Yes.**
7 Q. I want to ask you about the Dearborn address on
8     Firestone.  Are there security cameras at that address?
9 **A. Yes, there are.**
10 Q. Do you know when they were installed?
11 **A. 2001.**
12 Q. Had they been the same cameras since 2001?
13 **A. No.**
14 Q. Were they updated at some point?
15 **A. Yes.**
16 Q. What year?
17 **A. The camera stopped working.  I replaced it.**
18 Q. Was it the last couple of years or long time ago?
19 **A. No.  That one has probably been in there ten years.**
20 Q. Around 2010, you would say?
21 **A. Yes.**
22 Q. How many cameras does that house have?
23 **A. One in the front.**
24 Q. You said on the front door or --
25 **A. Right next to the front door, yes.**

Page 31

1 Q. Any other cameras?
2 **A. Not now, no.  The other ones went bad.  I just took them**
3     **down.**
4 Q. Do you know when they went bad?
5 **A. No.**
6 Q. How are those -- the current one in the front, is that
7     like a Nest or something or is that --
8 **A. It's a Guardian.  Wireless Guardian.**
9 Q. Does that -- where does any feed from that camera go to?
10 **A. There is a small tablet sized monitor in the house.**
11 Q. Is it a live feed or does it record?
12 **A. It records.**
13 Q. Does it record movement or just continuously?
14 **A. Yes, motion.**
15 Q. At a certain point, does the tablet storage run out?
16 **A. It just overrides it.**
17 Q. What do you mean it overrides it; does it erase it?
18 **A. When the card fills up, it writes over the old stuff.**
19 Q. Do you know how long it usually takes before?
20 **A. About two weeks.**
21 Q. So has that system always been a Guardian system?
22 **A. No.  I had a different system before.**
23 Q. Do you know when you got Guardian?
24 **A. Ten years when I put that one in.**
25 Q. Are you aware that two Wayne County Sheriff deputies

Page 32

1     visited the Firestone address on August 1, 2020?
2 **A. They stated they were there.**
3 Q. Did you have access to the video footage from that
4     house?
5 **A. I didn't look at it, no.**
6 Q. So you never looked to check the video footage to
7     confirm if they were there or not?
8 **A. No.**
9 Q. Would the video still exist?
10 **A. Probably not.**
11 Q. I mean, do you think probably not or definitely not?
12 **A. I never took the card out, so it's obviously**
13     **overwritten.**
14 Q. Do you know any of your neighbors of the Dearborn
15     address?
16 **A. I don't really talk to them, but we wave.**
17 Q. Do you not know any of them by name?
18 **A. No.**
19 Q. Would they -- any of them know you by name?
20 **A. I don't know.  Probably not.**
21 Q. Let me start this way.  What address does your driver's
22     license have on it today?
23 **A. Firestone.**
24 Q. Why have you not updated the address to Romulus?
25 **A. Because of the federal lawsuit.**

Page 33

1 Q. Well, tell me about that.  Tell me the connection
2     between the federal lawsuit and the address issue.
3 **A. City of Dearborn, as soon as they know something happens**
4     **to my mother, they are going to lock the house up again.**
5 Q. So you think the City of Dearborn is going to retaliate
6     against your mother if you don't reflect you live there?
7 **A. Yes.**
8 Q. Have you had any contact with the City of Dearborn since
9     this lawsuit?
10 **A. They have been staying away at the moment.**
11 Q. How long have they stayed away?
12 **A. Since 2005, 2006.**
13 Q. So you haven't -- about 15 years?
14 **A. Yes.**
15 Q. If I may ask, how old is your mother?
16 **A. 82.**
17 Q. So you're saying you haven't updated your license
18     because of a possible retaliation by the City of
19     Dearborn against your mother?
20 **A. Yes.**
21 Q. How does keeping your address at Dearborn help with
22     that?
23 **A. They can't stop me from going into the house.**
24 Q. I mean, do you keep the Dearborn address as other
25     official addresses, for example, like your tax returns?



**Eugene Habich**
**11/04/2021**                                   Pages 34..37

Page 34

1   When you sign a federal or state tax return every year
2   in 2020, 20201, what address do you use?
3 **A.  I use Firestone.**
4 Q.  Is there a reason, is that the same reason with the
5   Dearborn thing?
6 **A.  Yes.**
7 Q.  Do you claim a homestead tax exemption on your property?
8 **A.  No.**
9 Q.  So when you file your taxes, that means you have to list
10  like your principal residence.  I think you get some
11  kind of property tax setoff or maybe used to be able to
12  get it before the tax revision.  Do you put down
13  Dearborn on your taxes or your principal residence?
14 **A.  I do only because the address that's on my driver's**
15  **license.**
16 Q.  Okay.  Do you pay property tax bill on the Dearborn
17  address?
18 **A.  No.**
19 Q.  Who pays that?
20 **A.  My mother.**
21 Q.  Do you pay the property tax on the Romulus address?
22 **A.  Yes.**
23 Q.  Do you claim that Romulus, that's your principal
24  residence?
25 **A.  To Romulus, yes.**

Page 35

1 Q.  On the Romulus address, now that we are on the topic of
2   security cameras, are there security cameras on the
3   Romulus address?
4 **A.  Yes.**
5 Q.  How many cameras are there?
6 **A.  Four.**
7 Q.  Where are they positioned?
8 **A.  Out the front, one covering the driveway, one in the**
9   **back yard and one covers the front of the garage.**
10 Q.  How long have you had those cameras in place?
11 **A.  Since I purchased, 2014.**
12 Q.  Where do those record; are those live or do they record?
13 **A.  They record.**
14 Q.  Is this a movement recording or continuous?
15 **A.  Yes.**
16 Q.  Only movement?
17 **A.  Yes.**
18 Q.  Is that also a Guardian system?
19 **A.  Yes.**
20 Q.  Is that also saved to a card?
21 **A.  Yes.**
22 Q.  On a tablet?  And is it the same amount of time that
23  feed gets preserved?
24 **A.  Yes.  About two weeks.**
25 Q.  Is that a service that you have to pay for?

Page 36

1 **A.  No.**
2 Q.  So it's a stand alone, it's not a subscription service
3   or anything?
4 **A.  Correct.**
5 Q.  So you had a -- in 2014, I think.  Are the cameras
6   conspicuous; if somebody is on your driveway, can they
7   see them?
8 **A.  Yes.**
9 Q.  Which cameras could they see?
10 **A.  From the front?**
11 Q.  Yes.  If you're standing on the driveway.
12 **A.  They will be able to see three of them.  One is pointing**
13  **out in the back yard.**
14 Q.  Are they -- in the front, are they positioned just in
15  thirds along the front or one at the door?
16 **A.  One on the house, one on the garage -- two are on the**
17  **garage.**
18 Q.  Okay.
19 **A.  One is in the front of the garage, one in the back of**
20  **the garage.**
21 Q.  Okay.  And why did you feel the need to install a
22  security system at your Romulus address?
23 **A.  Have you seen the news?**
24 Q.  I have seen the news in the past.
25 **A.  There is break-ins.  A lot of stuff going on.**

Page 37

1 Q.  Personal security?
2 **A.  Yes.**
3 Q.  Is that the same reason for the Dearborn address?
4 **A.  No.**
5 Q.  Why do you have cameras at the Dearborn address?
6 **A.  Because of the City of Dearborn.**
7 Q.  In Dearborn, it's not so much a fear of random crime.
8   More the Dearborn retaliation?
9 **A.  Correct.**
10 Q.  Does your mother know how to use the security system in
11  Dearborn?
12 **A.  I believe so, yes.  It's been there a long time.**
13 Q.  She lives by herself?
14 **A.  No.**
15 Q.  No assistance?
16 **A.  Not at the moment.**
17 Q.  Do you assist her with anything?
18 **A.  Yes, I do.**
19 Q.  How often, in the past two years, do you go over to see
20  your mother?
21 **A.  Minimum of once a week.**
22 Q.  She is able to maintain the house by herself?
23 **A.  Yes.**
24 Q.  There was testimony in this case and you weren't there.
25  This is going to be somewhat of a hypothetical.  But if



Page 50

1  A.  That's why I purchased it.
2  Q.  I'm just saying that somebody might remove it because
3     they don't like how it looks or something like that.
4     You have no problem with the push bar being on it?
5  A.  No, I have no problem with the push bar.
6  Q.  Does the push bar add any structural protection into the
7     car in an accident?
8  A.  I'm guessing it would.
9  Q.  But you don't know?
10  A.  It's bolted into the front part of the frame.
11  Q.  So like I said, you may not know.
12       Do you expect that a push bar provides
13     additional protection in the case of a front-end
14     accident?
15  A.  I would be guessing, but I would say yes.
16  Q.  You said that the car had a police package when you
17     purchased it.  So the interior configuration of a police
18     package is going to be a little bit different.  The
19     radio is not going to be in the same place and shifter
20     is not going to be in the same place, do you know?
21  A.  I mentioned the radio is in the same place in the dash.
22  Q.  So I'm just trying to get a sense of what your
23     understanding of the difference between what a regular
24     Dodge Charger that a person off the line one compared to
25     a police package.  So if I were unfamiliar with police

Page 51

1     package when I got to the driver's seat, what, besides
2     the column shifter and the switches, what would look
3     different, to me, than a normal Dodge Charger?
4  A.  The metal center console.  It's a Jotto desk.
5  Q.  Are the sites different?
6  A.  I don't believe they are, no.
7  Q.  So the seat adjustments and all that would be the same?
8  A.  I'm guessing, yes.
9  Q.  Do you think, in your opinion, if the Dodge Charger had
10     not had the police package, would you have purchased it?
11  A.  Probably not.
12  Q.  So if it had just been off the line regular run of the
13     mill boring Dodge Charger, you wouldn't have necessarily
14     purchased it for $4,000?
15  A.  Probably not.
16  Q.  When you purchased the vehicle, was there anything else
17     installed on the vehicle besides what you told me
18     already?
19  A.  I'm not sure what you mean.
20  Q.  In terms of additional things beyond what normal Dodge
21     Charger has beyond the police package?
22  A.  It had visor lights, set of lights in the push bar.
23  Q.  Lights in the push bar, you said?
24  A.  Yes.
25  Q.  Any other lights?

Page 52

1  A.  Lights in the rear window.
2  Q.  Anything else?
3  A.  Light control was in the center console.
4  Q.  Okay.  Is there anything with regard to those four
5     lights, anything else?
6  A.  There is a spotlight in the driver's side.  Ticket light
7     mounted on the ceiling.
8  Q.  Ticket light, okay.  Anything else?
9  A.  I don't think so.
10  Q.  Was there a laptop in there?
11  A.  No.
12  Q.  Was there a camera recording system in it?
13  A.  No.
14  Q.  Your position is that all the lights, the spotlights and
15     various lights, were they functional when you purchased
16     the car?
17  A.  Yes.
18  Q.  Did Mr. Cooper attempt to up sell you the car by showing
19     you the lights worked?
20  A.  No.
21  Q.  Did you check to see if the lights worked before you
22     purchased it?
23  A.  The other girl that was there said everything worked,
24     turned them on.
25  Q.  Okay.  So you saw them in operation before you purchased

Page 53

1     the car, all the lights?
2  A.  Yes.
3  Q.  If we asked Mr. Cooper if he sold you a car in this
4     condition, he would confirm this is the way it was sold?
5  A.  Yes.
6  Q.  When you took the car home, did you make any -- add any
7     additional equipment to the vehicle to the condition in
8     which you purchased it?  Anything external that was not
9     bolted onto the car?
10  A.  External, no.
11  Q.  Or did you add anything to the car -- let me back up.
12       Did you install a camera recorder system in
13     the car?
14  A.  Yes, I did.
15  Q.  Where did you purchase the camera recorder?
16  A.  Ebay.
17  Q.  Would you know what year you purchased it in?
18  A.  No.
19  Q.  Few months after you bought the car, it would have been
20     in 2017 or '18?
21  A.  Yes.
22  Q.  What did that set come with when you purchased it?
23  A.  The control unit, the main forward camera.
24  Q.  How about hard drive?
25  A.  That's in the control unit, interior camera.



**Eugene Habich**
**11/04/2021**                                    Pages 54..57

Page 54

1  Q.  Good.  I'm sorry.  I caught you off.  Interior camera,
2      you said?
3  A.  Interior camera, yes.  Then there is four small cameras.
4  Q.  Where are those four small cameras located?
5  A.  I didn't put them in.
6  Q.  Where would they have gone?
7  A.  All four corners of the car.  So records front, the
8      sides and the back.
9  Q.  Did you install this yourself?
10 A.  The main camera in the front?
11 Q.  Yes.
12 A.  And the rear facing camera, yes.
13 Q.  How about the control unit?
14 A.  Yes.
15 Q.  What is the power source for this unit?
16 A.  Twelve volt.
17 Q.  Does it feed from the car battery?
18 A.  Yes.
19 Q.  Do you find that the camera system drains the battery
20     faster than not having a camera?
21 A.  No.
22 Q.  It doesn't?
23 A.  No.  It's only when you turn it on.
24 Q.  That was my next question.  It's a system where you have
25     to manually turn it on?

Page 55

1  A.  Yes.
2  Q.  Anything that camera records, it's because someone wants
3      to record?
4  A.  Correct.
5  Q.  Did you ever use -- do you use the camera to record
6      things while you're driving the car?
7  A.  Sometimes.
8  Q.  What kind of things do you like to record?  First thing,
9      what kind of things do you like to record when you use
10     it?
11 A.  I don't know.  Driving.
12 Q.  Just driving?
13 A.  Yes.
14 Q.  What things have you recorded, since 2000, since you
15     installed it?
16 A.  Idiot drivers.
17 Q.  So you have used it to record other people's bad
18     driving?
19 A.  Yes.
20 Q.  Have you used it for anything else, for any other
21     purpose?
22 A.  The reason I got it was for the security stuff to video
23     when I'm driving.
24 Q.  So how does taking video of your driving help you in the
25     security stuff?

Page 56

1  A.  I don't know.  It's nice to be able to look back and see
2      stuff.
3  Q.  Have you ever used the video camera, done a
4      demonstration for somebody in your car about how it
5      works?
6  A.  I have.
7  Q.  While you're driving?
8  A.  Yes.  You just push one button.
9  Q.  Who have you demonstrated the capability of the camera
10     system to?
11 A.  Not sure.
12 Q.  Have you demonstrated to Ms. Thalacker?
13 A.  Yes.
14 Q.  How about your mother?
15 A.  Yes.
16 Q.  Have you showed it to any friends?
17 A.  Probably.  I don't know who I showed it to.
18 Q.  Have you showed it to more people than just
19     Ms. Thalacker and your mother?
20 A.  Probably.
21 Q.  Do you know, can you give me a rough estimate about how
22     many people you have shown it to?
23 A.  I can't.
24 Q.  Is it more than five or less than five?
25 A.  I really don't know.

Page 57

1  Q.  Does the camera record anything other than just video;
2      does it record audio?
3  A.  It does.
4  Q.  Does it have any additional capability like how fast
5      you're going or something like that, any other data
6      besides video and audio?
7  A.  Yes.  GPS location.
8  Q.  Anything else beside GPS location?
9  A.  Shows the speed.
10 Q.  Shows your current speed of your vehicle?
11 A.  Yes.
12 Q.  Is that tied into your car's speedometer or just GPS?
13 A.  I'm guessing it's from the GPS.
14 Q.  You don't see any connection that would be able to read
15     it from the actual car?
16 A.  I didn't connect it to anything to the speedometer on
17     the car, no.
18 Q.  Did the video equipment, anything about the camera
19     equipment, did it indicate that it was from a police
20     department somewhere?
21 A.  It did.
22 Q.  What police department was it from?  Was that indicated
23     where it was from?
24 A.  I don't know.  There is a sticker on it.  I don't know.
25 Q.  Do you know if it was a state police or local police?


HANSON RENAISSANCE   COURT REPORTERS & VIDEO   hansonreporting.com
313.567.8100

Eugene Habich
11/04/2021
Pages 58..61

Page 58

1  A.  I believe it was state police.
2  Q.  Are these camera systems easy to find on Ebay typically?
3  A.  Not anymore, no.  It's an old system.
4  Q.  Older system?
5  A.  Yes.
6  Q.  How much did you pay for it?
7  A.  I can't give you an exact amount.  I don't know.
8  Q.  Was it --
9  A.  Tried to look that purchase up on Ebay and it's too old.
10  Q.  Was it $1,000 or less?
11  A.  No.  Like maybe 250.
12  Q.  You don't have to give me an exact number.  I just want
13      to know the ball park you said for it.  Is the video and
14      audio captured somewhere?
15  A.  Inside the control unit.
16  Q.  Does it have a hard drive?
17  A.  It's got memory cards.
18  Q.  What kind of memory cards does it come with; are they
19      compact flash or are something you normally put a
20      digital camera or special cards that only work in that
21      unit?
22  A.  I imagine they go into a digital camera.
23  Q.  But you don't know.  Have you ever tried to put them in
24      some other thing, ever tried to hook them up to your
25      computer, those cards?

Page 59

1  A.  No.
2  Q.  Have you ever tried to download on something that
3      wasn't -- let me ask you this.
4          On the video system, can you actually replay
5      the video in the car?
6  A.  With the laptop.
7  Q.  That was my next question.  Did you -- the laptop didn't
8      come with the car, right?
9  A.  No.
10  Q.  You purchased that?
11  A.  Yes.
12  Q.  You purchased it for use in the car only or a personal
13      laptop?
14  A.  Both.
15  Q.  What was the model of the laptop?
16  A.  CF-30, Panasonic.
17  Q.  Do you know what year that was from?
18  A.  I do not.
19  Q.  Do you know if it -- is it a Windows computer?
20  A.  Yes, Windows 95 or 98.
21  Q.  That is a very old laptop.  Where did you purchase the
22      laptop from?
23  A.  Ebay.
24  Q.  Do you know what year did you purchase it after the
25      camera?

Page 60

1  A.  Yes.
2  Q.  Did you purchase a laptop that could -- was one of the
3      reasons you purchased the laptop was to use it in
4      conjunction with the camera system?
5  A.  Yes.  They were both Panasonic systems.
6  Q.  Do you know if the camera recorder requires an older
7      version of Windows or can it use any version?
8  A.  I don't know.
9          MS. DOWNEY:  Excuse me.  Are you going to need
10      a break at any time soon?
11          MR. STELLA:  Go ahead and take a break.
12          (A short recess was taken)
13  BY MR. STELLA:
14  Q.  Back on the record.  We were asking you about the laptop
15      that was -- that you purchased for -- in partially in
16      connection with using the camera system?
17  A.  I don't recall.
18  Q.  Do you know what year you bought the laptop or was it
19      shortly --
20  A.  Shortly after I bought the car.
21  Q.  Do you need a laptop to be able to operate the camera
22      system?
23  A.  It makes it easier.
24  Q.  How does it make it easier?
25  A.  It stops and starts it from the control unit, but that's

Page 61

1      in the trunk.
2  Q.  Without the laptop, let me circle back.
3          Does the laptop allow you to get real time
4      footage from the camera while you're driving?
5  A.  No.
6  Q.  Does the laptop allow you to play back video that has
7      already been stored?
8  A.  Yes.
9  Q.  When you -- have you ever used the laptop that's been in
10      the Dodge Charger with the camera?
11  A.  Yes.
12  Q.  Why do you have the laptop in the car?
13  A.  Because it helps you run the camera system.
14  Q.  I just want to be clear because I don't know the
15      technical things about it.  You can't use the laptop to
16      look at the cameras in real time, right?
17  A.  No.
18  Q.  You can use the laptop to activate the camera?
19  A.  Yes.
20  Q.  And turn it off?
21  A.  Yes.
22  Q.  But you don't need the laptop to turn it on or off?
23  A.  You can turn it on from the camera itself.  There is a
24      red button on it, but can't turn it off.
25  Q.  So the idea you would have to turn it on, go to the



**Eugene Habich**
**11/04/2021**                                     Pages 62..65

Page 62

1   trunk, press the red button, shut the trunk, drive.  And
2   when it stops, you would have to go back to the trunk.
3  **A.  Yes.**
4  Q.  Do you use the laptop for anything else in connection
5   with driving besides the camera?
6  **A.  Not with driving, no.**
7  Q.  I mean, do you -- when you're parked in the car, do you
8   use the laptop?
9  **A.  Yes.**
10  Q.  What do you use it for?
11  **A.  Notes.**
12  Q.  Does the laptop have an internet connection?
13  **A.  No.  But my phone has a hot spot.**
14  Q.  Did you ever tether your laptop to your phone?
15  **A.  Yes.**
16  Q.  Do you have any -- let me ask you this.  Does the camera
17   system require that the laptop have any proprietary
18   software for it to operate?
19  **A.  It's got its own software, yes.**
20  Q.  The camera system has its own software?
21  **A.  Yes.**
22  Q.  When you bought the laptop, was the software already
23   installed?
24  **A.  No.**
25  Q.  How did you get the software to install it?

Page 63

1  **A.  Purchased it.**
2  Q.  Where did you purchase it from?
3  **A.  On-line.**
4  Q.  Was it a download or did they send you a CD?
5  **A.  Yes, download.**
6  Q.  Do you know what the name of the company you bought it
7   from is?
8  **A.  I do not.**
9  Q.  Do you know what the name of the software it?
10  **A.  Front End.**
11  Q.  Is it, to your knowledge, is Front End a software still
12   being made or older platform?
13  **A.  It's probably not being made because I had a really hard**
14  **time finding it.**
15  Q.  Do you know how much you paid for it?
16  **A.  Maybe thirty bucks.**
17  Q.  You had to go to a website and download it?
18  **A.  Yes.**
19  Q.  Do you have any other software installed other than
20   Solitaire?
21  **A.  No.**
22  Q.  It only has the Front end, no Microsoft Word?
23  **A.  There is stuff for the radio.**
24  Q.  Let's talk about that.  Does the laptop interact with
25   the radio?

Page 64

1  **A.  Just a program.**
2  Q.  Were you talking about the radio for FM or AM or
3   different type?
4  **A.  Ham radio.**
5  Q.  Is a ham radio installed in the car?
6  **A.  Yes.**
7  Q.  Like physically in the car?
8  **A.  Yes.**
9  Q.  Can it be controlled from the dash, not the dash, but
10   the center console?
11  **A.  Yes.**
12  Q.  Is it like an analog needle or something or digital
13   thing?
14  **A.  It's digital.**
15  Q.  Does the car have a regular AM/FM radio?
16  **A.  Yes.**
17  Q.  Is the ham separate unit?
18  **A.  Separate.  Separate unit.**
19  Q.  What, to your knowledge, what are ham radios used for?
20  **A.  People use them to talk.**
21  Q.  Are they like what long-haul truckers use the same
22   system?
23  **A.  No.  It's a CB.**
24  Q.  How is ham different than a CB?
25  **A.  Just runs on different frequencies.**

Page 65

1  Q.  Without the laptop, does the ham radio have the ability
2   to talk into it and to hear back from other people?
3  **A.  Has the ability, yes.**
4  Q.  Do you ever use it like that?
5  **A.  I don't talk on it, no.  Just listen.**
6  Q.  What kind of things have you listened to on the ham
7   radio?
8  **A.  Just other people talking.**
9  Q.  Can you give me an example about what something somebody
10   might talk on that radio?
11  **A.  Usually other ham radio guys talking about other ham**
12  **radios.**
13  Q.  Is there any sort of -- does any emergency service or
14   law enforcement still use ham radios?
15  **A.  No.  They are all on a P-25 system that's digital, not**
16  **analog.**
17  Q.  Okay.  Did 2008 Dodge Charger have a P-25 system in it?
18  **A.  No.**
19  Q.  Does it have any law enforcement communication system in
20   it?
21  **A.  No.**
22  Q.  So there is no scanner in the vehicle?
23  **A.  No.**
24  Q.  Does the vehicle, as configured in 2020, have the
25   ability to read police scanners in any way?



Page 74

1  Q.  I mean in the past, was there anything in the car that
2     you used for work?  The only thing, we talked about the
3     lights.  We have a ham radio, camera, laptop, spotlight,
4     anything like that.  Is there anything else?
5          MS. DOWNEY:  Objection to the form.  It sounds
6     like you're saying he put the spotlight on.
7          MR. STELLA:  I'm just trying to follow up what
8     he is saying.
9  BY MR. STELLA:
10 Q.  Besides things we talked about, is there anything else
11    that's wired or attached to the car that you use for
12    work, other than what we have talked about already?
13 **A.  Don't know.  I told you everything I used for work was**
14 **    in the car when they took it.**
15 Q.  Let's talk about the lights for a second.  You said
16    there is basically four sets of lights on the car?
17 **A.  Visor lights.**
18 Q.  There was visor, push bar, one on the rear?
19 **A.  Yes.**
20 Q.  Only three sets of lights on the side now?
21 **A.  No.  There is no lights on the side.**
22 Q.  Just the visor, push bar and the rear?
23 **A.  Yes.**
24 Q.  The visor lights are installed underneath the
25    windshield?

Page 75

1  **A.  Yes.**
2  Q.  Push bar lights are actually on the push bar?
3  **A.  Yes.**
4  Q.  Then the rear ones, are they under the rear windshield
5     or on the rear dash?
6  **A.  They are on the rear deck.**
7  Q.  Rear deck.  Where are the controls on the car for those
8     lights?
9  **A.  Where ever they put them.  I don't know.**
10 Q.  I'm just saying --
11 **A.  Right now there isn't any.**
12 Q.  When they were all there, where was the controls or --
13 **A.  Center console.**
14 Q.  Were there switches for each or one set for all of them?
15 **A.  Different switches.**
16 Q.  It's possible to turn on some lights, but not others?
17 **A.  Yes.**
18 Q.  Is there a way to modify how fast they blink?
19 **A.  I imagine in the programming for the lights themselves.**
20 Q.  But from the console, can you do that?
21 **A.  No.**
22 Q.  Is there any way to vary the speed of the blinking?
23 **A.  In the programming.  Not from the control unit, no.**
24 Q.  Can those lights be programmed then?
25 **A.  I believe they can, yes.**

Page 76

1  Q.  Are they programmed to a computer something?
2  **A.  No.**
3  Q.  How would you program them?
4  **A.  I'm not sure, but you look them up.  I think there is 25**
5  **    different patterns or something for the lights.**
6  Q.  Did you ever activate the lights in any situation?
7          MS. DOWNEY:  Going to object.  Instruct him
8     not to answer that.  That's discovery in the criminal
9     case.
10         MR. STELLA:  Fifth Amendment?
11         MS. DOWNEY:  Fifth Amendment and, of course,
12    the relevant stuff is preserved.
13         MR. STELLA:  That's fine.
14 BY MR. STELLA:
15 Q.  Do you know -- can I ask, do you know what colors those
16    lights would flash if they were turned on?
17 **A.  They were red and white in the front, red and yellow in**
18 **    the back.**
19 Q.  Is it your testimony those lights were all installed
20    when you purchased the vehicle?
21 **A.  Yes.**
22 Q.  Did Mr. Cooper use that to try to -- the lights as a
23    selling point to you in buying the car?
24 **A.  No.**
25 Q.  Did Mr. Cooper explain, to you, anything about the

Page 77

1     process of how police cars are decommissioned?
2  **A.  No.**
3  Q.  Have you ever seen civilian vehicles around town in the
4     last five years with the same sort of lights?
5  **A.  Yes.**
6  Q.  Where have you seen those?
7  **A.  Past five years?**
8  Q.  Yes.
9  **A.  They are all over the place.**
10 Q.  Are there civilians driving them who don't work for
11    security companies?
12 **A.  Yes.  They look like civilian vehicles, yes.**
13 Q.  Do they look like -- but you're not sure if they work
14    for a security company or not?
15 **A.  There was nothing on the cars, no.**
16 Q.  You see this just driving on the street?
17 **A.  Yes.**
18 Q.  Can you give me an example of when the last time you saw
19    a car like this?
20 **A.  I saw a pick-up truck that had yellow flashing lights.**
21    **Was a lawn service.**
22 Q.  You're just -- I guess my question was bad.
23         My question is, have you ever seen people with
24    red and white flashing lights like civilians in
25    non-security company cars have those lights on the car?



Eugene Habich
11/04/2021
Pages 86..89

Page 86

1 Q.  You make a decision what to do on the day of?

**2 A.  Sometimes it backs up at 275 and 96.**

3 Q.  At that point you would just bypass that --

**4 A.  Yes.**

5        MS. DOWNEY:  You need to let him finish the

6   question.  You guys are talking over each other.

7 BY MR. STELLA:

8 Q.  On July 30, 2020, at 6 a.m., is the sun up or is it

9   still dark?

**10 A.  Usually still dark.**

11 Q.  Do you know when it gets to be light?

**12 A.  I couldn't tell you.**

13 Q.  Do you remember an encounter with a pick-up truck on

14   July 30 on I-275?

15        MS. DOWNEY:  You can answer yes or no.

**16 A.  Explain encounter.**

17 BY MR. STELLA:

18 Q.  I mean, at some point did you notice a red pick-up

19   truck?

**20 A.  Yes.**

21 Q.  Did the red pick-up truck, where was it in relation to

22   you?

23        MS. DOWNEY:  At this point, I'm going to make

24   a statement on the record.  The county has been

25   threatening prosecution over this episode for more than

Page 87

1   a year.  We have put the facts of that encounter in the

2   Complaint and in Mr. Habich's Affidavit.  I'm going to

3   instruct him to not answer anything other than what has

4   already been put in the Affidavit and the Complaint,

5   because this cannot be used as a free means of discovery

6   in the criminal case for anything else.  I will instruct

7   him to take the Fifth.

8        MR. STELLA:  Previous answer to that, I think

9   since he has filed an Affidavit describing the

10   encounter, the Fifth is waived as to the details of that

11   encounter.  That's my position.  If your position is

12   something else, I'll --

13        MS. DOWNEY:  Our position is that we stick

14   only to what is in the Affidavit or in the Complaint.

15   That's the only statement I will allow him to make.

16        MR. STELLA:  Okay.  Like I said, we can go

17   into this today.  My position is going to be that

18   whatever has been disclosed a little bit on the story on

19   the record, they disclose the whole story.  We'll do it

20   with that objection in mind.  I don't agree.  We'll look

21   at the Affidavit.

22        DEPOSITION EXHIBIT 2

23        WAS MARKED BY THE REPORTER

24        FOR IDENTIFICATION.

25 BY MR. STELLA:

Page 88

1 Q.  I want to give you a copy of what is marked as Exhibit

2   2.  Mr. Habich, when you get a chance, can you look

3   through this and take as much time as you need, if you

4   need a minute or two.  Don't feel like you need to rush

5   through it.

**6 A.  All right.**

7 Q.  Have you had a chance to review Exhibit 2, what I just

8   gave you?

**9 A.  Yes.**

10 Q.  This is -- for the record, this is your statement from

11   September 26, 2020.  Since you had a chance to look over

12   it, is there anything about what you have -- that you

13   remember today that makes you want to think that

14   anything you said, you want to change anything you said

15   in here?

**16 A.  Not that I can see, no.**

17 Q.  Today, like as you think more about it, there is nothing

18   in the Affidavit that you think is, wait a minute,

19   should be there or I want to clarify as that.

**20 A.  No.**

21 Q.  Let's look at paragraph four of the Affidavit where it

22   says on July 30.  I don't want to grind through it too

23   hard.  So on the morning of July 30, do you know around

24   what time of day was it when you were merging from I-94

25   to I-275?

Page 89

**1 A.  Somewhere between 6 a.m., 6:30.**

2 Q.  6:30 a.m.  So I probably didn't ask it right before.

3   From Romulus, you would take 94 to I-275 or Ann Arbor 94

4   would be the first thing you would be on?

**5 A.  Yes.**

6 Q.  When you merged from I-94 to I-275, would you know what

7   city that is?

**8 A.  I would guess Romulus.**

9 Q.  Could it possibly be Canton?

**10 A.  Could be.  I really don't know.  There is no sign.**

11 Q.  I don't think I know either.  Romulus or Canton.  When

12   you say you saw a red pick-up truck cross -- cut across

13   several lanes and pass you, what lane were you in when

14   you say you saw it?

**15 A.  I was in the ramp from 94 to 275.**

16 Q.  So does that enter into the left of I-275 or the right

17   -- the left lane or right lane?

**18 A.  You're coming in on 275 on the right.**

19 Q.  So I-94 to get onto 275, you would enter into the right

20   lane of I-275?

**21 A.  Yes.**

22 Q.  You saw a red pick-up truck cut across several lanes and

23   pass you.  Was the car behind you as you were entering

24   or in front of you as you were entering?

**25 A.  Behind me.**



Eugene Habich
11/04/2021

Pages 90..93

Page 90

1 Q.  So you're saying the pick-up truck got into your lane,
2     into the right lane?
3 A.  No.  It was in the lane I was in.  It was on the ramp.
4 Q.  On the ramp, a red pick-up truck cut across several
5     lanes and passed you from 94?
6 A.  Correct.
7 Q.  So on the 94, 275 ramp, somebody went around you quickly
8     and cut you off, you say?
9 A.  They didn't cut me off.
10 Q.  Which side of you did they pass you on?
11 A.  On my left side.
12 Q.  So this person, would you assume the person was also
13     traveling on I-94?
14 A.  Correct.
15 Q.  When you say later the truck is stuck in traffic.  So
16     what lane was it in when it was stuck in traffic?
17 A.  Middle lane.
18 Q.  Then you say passed them on the left, does that mean you
19     were in the left lane?
20 A.  I was in the passing lane, yes.
21 Q.  How many lanes on I-275 are there?
22 A.  Three.
23 Q.  The middle lane was stuck, was backed up with traffic,
24     right?  And then was the right lane backed up too, and
25     you were in the passing lane?

Page 91

1 A.  Yes.
2 Q.  And the passing lane was still moving?
3 A.  It was moving faster than the other two.  They were
4     large construction trucks.
5 Q.  So when you say that you rolled past in the left lane,
6     rolled past the red truck, how fast were you,
7     approximately, going?
8 A.  I don't know.
9 Q.  Was it high speed or something slower?
10 A.  It was a lot of traffic, so I thought I was doing 70.
11 Q.  But you don't know exactly how fast you were going?
12 A.  No.
13 Q.  Then you say the pick-up truck changed into my lane, the
14     pick-up truck, you say, got out of the middle lane and
15     into the passing lane?
16 A.  Correct.
17 Q.  Okay.  So you say after about a mile, I turned the rear
18     lights on and off once to get him to back off.  So after
19     a mile of traveling with the pick-up truck behind you
20     somewhat, you're saying --
21 A.  Yes.
22 Q.  We are still south of what road here; are we south of
23     Michigan at this point?
24 A.  We are probably between Michigan and Ford Road.
25 Q.  That is Canton, right?

Page 92

1 A.  I don't know.  There is no signs.
2 Q.  I don't think there are, between Ford and Michigan.  So
3     you're in the left lane of the highway.  You are -- the
4     red truck behind you five feet, and you flicked on, you
5     said you turned on the rear lights, right?  Are those
6     the lights, what you call them, not dash, deck lights?
7 A.  Yes.
8 Q.  What color do those flash?
9 A.  Red and amber.
10 Q.  Why did you think that flashing those lights would make
11     him -- get him to back off?
12 A.  I don't know.  It was dangerous.
13 Q.  If someone had lights and flashed them back at you if
14     you were too close for them, would you back off?
15 A.  I would.
16 Q.  Why would you back off?
17 A.  Because it would probably be dangerous --
18 Q.  I mean --
19 A.  -- to be that close.
20 Q.  If you're following somebody closely or somebody flashes
21     their lights, how does that make you stop or back off as
22     the person following them?
23 A.  I would just back off.  I don't know.
24 Q.  Has anybody ever done that to you before; flashed rear
25     lights at you to make you back off?

Page 93

1 A.  They tapped their brake lights, yes, and I backed off.
2 Q.  Like a brake check, what you're saying?
3 A.  Yes.
4 Q.  Strange thing to do.  So you said you flashed the
5     lights, but instead of backing off, the truck actually
6     got closer?
7 A.  Correct.
8 Q.  Then you say you hit the brakes and moved into the
9     middle lane.  You hit the brakes.  Did you slam on the
10     brakes or just tap?
11 A.  I tapped them.
12 Q.  Then you moved into the middle lane.
13 A.  Yes.  He moved into the middle lane behind me.
14 Q.  Okay.  So you moved in the middle lane, right?  Then the
15     truck in the left lane is still in the left lane, but
16     intends to flash a badge.  This is the idea that whoever
17     tried to flash a badge was reaching over to the
18     passenger side to show you the badge?
19 A.  No.  The driver's side.  He had got into the right lane.
20     There was traffic in the passing lane.
21 Q.  I'm not trying to confuse you.  I'm just trying to get a
22     sense of things.  You're both in the left lane.  You get
23     over to the middle lane, right?
24 A.  Yes.
25 Q.  Then he crosses over two lanes back to the right lane?



Eugene Habich
11/04/2021

Page 94

1  A.  Correct.  He was on my passenger side.
2  Q.  On your passenger side, but his driver's side?
3  A.  Yes.
4  Q.  You can see him try to flash a badge?
5  A.  Yes.
6  Q.  Did you recognize what that badge was?
7  A.  Looked like a sheriff's department badge.
8  Q.  Then what did you do next?
9  A.  I don't know.  Drive.  Didn't have that far to go, and I
10    got off at Ann Arbor Road.  He got off behind me.
11  Q.  You're saying that you got off at Ann Arbor Road, which
12    is -- that's the one north of Ford Road, right?
13  A.  Yes.
14  Q.  The pick-up truck follows you?
15  A.  Correct.
16  Q.  How long did you say the pick-up truck followed you
17    before the pick-up truck stopped following you?
18  A.  He got into the turn lane and went north on Newburgh.  I
19    continued straight.
20  Q.  On Ann Arbor Road?
21  A.  Yes.
22  Q.  So at no point did you ever follow the red pick-up
23    truck?
24  A.  I was never behind the red pick-up truck, no.
25  Q.  So when the driver of the red pick-up truck flashed a

Page 95

1    badge, the sheriff -- what you think might have been a
2    sheriff's badge, did you believe he was a police
3    officer?
4  A.  Have no way of knowing.
5  Q.  Did you have a reason to doubt he was a police officer?
6  A.  No.
7  Q.  Did you see the person in the red truck try to mouth
8    some words to you?
9  A.  No.  I was trying to pay attention to the driving.
10  Q.  Did you, at any time, blow a horn or make any sound with
11    the car?
12        MS. DOWNEY:  I'm going to instruct him not to
13    answer.
14  BY MR. STELLA:
15  Q.  Did you attempt to maybe communicate with, at all, with
16    the person in the red pick-up truck?
17  A.  We were driving freeway speeds and the windows were up.
18    There was no way to communicate back and forth.
19  Q.  At any point when -- let's talk about, we are between
20    Ford Road and Ann Arbor Road, north of Ford and south of
21    Ann Arbor where you get off.  Between those two roads
22    with the red pick-up truck, is there -- where was he, on
23    the right of you or behind you?
24  A.  After he flashed the badge, we kept going.  He slowed
25    back down and got behind me again.

Page 96

1  Q.  How much time elapsed between the flashing the badge and
2    you exiting the expressway?
3  A.  I have no idea.  Few minutes.
4  Q.  Do you know how fast you were going?
5  A.  No.
6  Q.  Was it the speed limit or something less or was it
7    something more?
8  A.  There was a lot of traffic.  It was probably the speed
9    limit.
10  Q.  Did you attempt to call anybody or follow up about this
11    encounter?
12  A.  Who was I going to call?
13  Q.  You call the police about it?
14  A.  No.
15  Q.  Why did you not call the police about it?
16  A.  I don't know.
17  Q.  If someone is following you and if you think there is
18    danger while you are driving, why did you not report
19    that?
20  A.  I don't know.
21  Q.  Did you, at any time, activate the camera in the car
22    during this encounter?
23  A.  I believe I did after he got behind me again.
24  Q.  Have you watched that video?
25  A.  I did.

Page 97

1  Q.  Do you still have a copy of that video?
2  A.  I do not.
3  Q.  Was the copy erased?
4  A.  They took it.  I don't know.  I don't have the memory
5    cards.
6  Q.  Did you have the camera on, at any point, where the
7    camera could have seen the red pick-up truck?
8  A.  Yes.
9  Q.  If the memory cards have not been altered since that
10    moment, that would be on those memory cards?
11  A.  Correct.
12  Q.  Are you confident what that camera would show would be
13    the same description that you provided for us today and
14    in the Affidavit?
15  A.  Yes.
16  Q.  You went to work that day?
17  A.  Yes.
18  Q.  How long did you work, till seven or earlier?
19  A.  I don't know if this was a ten-hour day or twelve-hour
20    day.
21  Q.  So you worked until that night?
22  A.  Yes.
23  Q.  Did you work on the next day?
24  A.  If it was a Thursday.  Next day would have been a
25    Friday, yes.



Eugene Habich
11/04/2021
Pages 98..101

Page 98

1  Q.  Your schedule is normally Monday through Friday?
2  A.  Some Saturdays, yes.
3  Q.  I think I'm going to circle back on something that I
4      forgot to ask about, about whether the car is equipped
5      with anything other than a standard car horn that makes
6      sound.  Does it have anything like that, other than a
7      regular car horn?
8  A.  It had a PA.
9  Q.  Was the PA system, was it installed in the car when you
10     purchased it or something you put in?
11 A.  It was installed.
12 Q.  Was it working when you bought it?
13 A.  Yes.
14 Q.  Tell me where the PA system is located in the vehicle
15     itself?
16 A.  It was in the grill in the front.
17 Q.  More or less, I'm not an expert on this.  Does it
18     operate more like a loud speaker through the front
19     grill?
20 A.  Yes.
21 Q.  How is that powered?
22 A.  Through the control unit, I'm guessing.  I don't know.
23 Q.  Is there like a microphone?  How do you speak through
24     the loud speaker, the PA system?
25 A.  There is a microphone that goes with it.

Page 99

1  Q.  Is it like a clip microphone, is it a big microphone,
2      what does the microphone look like?
3  A.  Just a microphone with a curly cord on it.  I don't
4      know.
5  Q.  Going from memory of watching television of cop cars, is
6      it up above you, the driver's side where you would grab
7      it if you were trying to get to it?
8  A.  It's on the column itself.
9  Q.  It has a little telephone or thing?
10 A.  Yes.
11 Q.  The PA has to be switched onto work or is it always on?
12 A.  It's always on.
13 Q.  Draw power from the battery?
14 A.  I would imagine, yes.
15 Q.  Did you ever use the PA while you were on the road?
16     MS. DOWNEY:  I'm going to object to, again,
17     you're seeking information and discovery in a criminal
18     case.  I'll instruct him not to answer.
19     MR. STELLA:  I'm going to disagree.  I'm doing
20     a civil case, and I'm not a prosecutor, not doing
21     criminal discovery in this case.
22     MS. DOWNEY:  If you'll give us a protective
23     order that will not shared beyond this case and these
24     lawyers, I'll allow him to answer.  Without the
25     protective order, I'm instructing him not to answer.

Page 100

1      MR. STELLA:  That's the Fifth Amendment you're
2      instructing him not to answer?
3      MS. DOWNEY:  Yes, of course.  The objection to
4      relevance are all reserved.  We'll argue about that
5      later.
6      MR. STELLA:  Okay.
7  BY MR. STELLA:
8  Q.  But you knew the PA system worked, right?
9  A.  Yes.
10 Q.  Is there any other system on the car that creates noise,
11     external noise, other than the horn?  Is there, for
12     example, is there a siren?
13 A.  There was.
14 Q.  Was the siren -- is it your testimony the siren was
15     installed when you purchased the vehicle?
16 A.  Yes.
17 Q.  Did the siren work when you purchased the vehicle?
18 A.  It did.
19 Q.  Have you ever used the siren while driving?
20     MS. DOWNEY:  Same objection.  Unless you will
21     give us a protective order limiting the use of the
22     information to this case and these attorneys, otherwise
23     I'll instruct him to take the Fifth.
24 BY MR. STELLA:
25 Q.  Besides the PA system and the siren, is there anything

Page 101

1      else that makes noise externally to the car?
2  A.  No.
3  Q.  So is the horn involved -- does the horn installed on
4      the police package, is that the same horn as a regular
5      car horn?
6  A.  I don't know.  I have never compared the two.
7  Q.  But in your experience, just as a person who drives
8      cars, does the horn sound any different than a regular
9      car or does it sound different?
10 A.  I don't know.  A car horn kind of sounds a little
11     different.
12 Q.  I agree they do sound different.  Anything struck you as
13     wow, that sounds like a different type of horn than a
14     regular car?
15 A.  No.
16 Q.  In your understanding, would a police package, the
17     police package doesn't include a different type of horn?
18 A.  I don't know.
19 Q.  So it's possible it could include a different type of
20     horn?
21 A.  It's possible.
22     (A short recess was taken)
23 Q.  Back on the record.
24     Mr. Habich, you said that you drove the Dodge
25     Charger to the deposition today?



1 Q.  Couple years, you said?

2 **A.  Yes.**

3 Q.  So when is the last time you saw him?

4 **A.  Been a couple of years.  I haven't seen him.**

5 Q.  Are you still getting his mail at your house?

6 **A.  I am.  Stimulus checks I returned, driver's license.**

7 Q.  Is it the person you bought the house from?

8 **A.  His son.  I didn't buy it from them.  It was a sheriff's**
9 **sale.**

10 Q.  Oh.  So their house was foreclosed upon?

11 **A.  Yes.**

12 Q.  So any other incident where you had to review some
13    recorded footage from that system?

14 **A.  Yes.**

15 Q.  What are the other incidents?

16 **A.  Somebody pulled into the driveway and stole my garden**
17    **hose.  I got it on tape.**

18 Q.  Did you report this incident to the police?

19 **A.  I did.**

20 Q.  Would that be the Romulus Police Department?

21 **A.  Yes.**

22 Q.  Did they do anything about it?

23 **A.  No.**

24 Q.  Besides the former owners and then somebody stealing
25    your garden hose, anything else?

1 **A.  I haven't seen anything else, no.**

2 Q.  When you come home from being out, right, does the
3    monitor tell you whether or not while you were gone it
4    recorded something?

5 **A.  It records every vehicle that drives past the house, any**
6    **motion it picks up.**

7 Q.  Does that mean it had recorded most of the day?

8 **A.  All day long, yes.**

9 Q.  Is there anything you can do to make it stop doing that?

10 **A.  Probably not, no.**

11 Q.  This is a stand alone system; you don't pay a
12    subscription for this, right?

13 **A.  No.**

14 Q.  You bought it from Guardian Alarm Company?

15 **A.  No.  It's a Guardian manufactured package.**

16 Q.  Is that the same company as Guardian Alarm?

17 **A.  I don't believe it is, no.  They just use the Guardian**
18    **name.**

19 Q.  That's confusing.

20 **A.  It is.**

21 Q.  You said that your plan was to work on your car, on the
22    Jeep that day.  Did you start working on the Jeep that
23    day?

24 **A.  It was raining first thing in the morning, but I was**
25    **working on it when they pulled up.**

1 Q.  I want to get to that.  What time of day did they pull
2    up, did people pull up to your house?

3 **A.  7:00.**

4 Q.  What are you doing between 7 a.m. and 7 p.m.?

5 **A.  Don't know.  It was raining.  I was in the house working**
6    **on something in there.**

7 Q.  At some point you left the house to go work on the Jeep?

8 **A.  Yes.**

9 Q.  Where was the Jeep parked?

10 **A.  In the driveway.**

11 Q.  What color is the Jeep?

12 **A.  Blue.**

13 Q.  Do you know what time of day you started working on it,
14    around what time?

15 **A.  I don't.**

16 Q.  When the deputies pulled up, you don't know if it had
17    been half hour, 45 minutes, 2 hours, how long you had
18    been tinkering with the Jeep?

19 **A.  I don't know.  Maybe a half hour.**

20 Q.  Was Ms. Thalacker outside with you as well?

21 **A.  Yes.**

22 Q.  What was she doing while you were working on the Jeep?

23 **A.  Don't know.**

24 Q.  Does Ms. Thalacker help you fix cars?

25 **A.  She has, yes.**

1 Q.  Was she helping you with the Jeep?

2 **A.  She probably was, yes.**

3 Q.  So what point on your work on the Jeep did somebody
4    approach -- Wayne County Sheriff Deputy approach the
5    house?  Was anything apart on the Jeep?

6 **A.  Yes.**

7 Q.  What was apart?

8 **A.  The head.**

9 Q.  Is the head light enough to lift just by yourself?

10 **A.  It weighs about 80 pounds.**

11 Q.  When did you first notice a Wayne County before the
12    deputy walked up, did you notice any sheriff's cars?

13 **A.  Before they started walking up the driveway?**

14 Q.  Yes.

15 **A.  Not at that time, no.**

16 Q.  There were two deputies?

17 **A.  Yes.**

18 Q.  What did they look like?

19 **A.  One was older maybe late 50s, blond, gray hair.  Kind of**
20    **heavy set, maybe 240 or so, 250.  Maybe 5'10".**

21 Q.  Okay.  The other guy was 5'10"?

22 **A.  No.  That would be the first one --**

23 Q.  Who was the second one --

24 **A.  -- with the attitude problem.  The other one was in a**
25    **black outfit.  Had a dog.  Was probably in his 30s.**



1    Maybe 6 foot, thin, dark hair.
2 Q.  You said he had a dog with him?
3 A.  Canine in the car, yes.
4 Q.  There was no dog accompanying him?
5 A.  No.
6 Q.  When the deputies walked up, did they have their hands
7    anywhere?
8 A.  They grabbed the guns, yes.
9 Q.  So you said they both, one or both them unholster their
10    weapon?
11 A.  They didn't draw it, but they grabbed it.
12 Q.  Was it actually removed from the holster?
13 A.  No.
14 Q.  You said both of them had their hands on their holster,
15    on the guns in the holsters?
16 A.  Yes.
17 Q.  Are you sure this was a gun and not like a taser or
18    something?
19 A.  I don't know.  They were grabbing for something.
20 Q.  So you don't know if it might be something else on their
21    belts, not necessarily the gun?
22 A.  I guess not.
23 Q.  Are you just assuming it was a gun?
24 A.  The first one only had a gun.  The second one had a
25    taser.

1 Q.  What happened next?
2 A.  They were yelling.  Sharon had her dog there.  The dog
3    was barking.  It was on a leash.
4 Q.  They were yelling?
5 A.  Yes.
6 Q.  Which one of them was yelling or were both of them
7    yelling?
8 A.  Both.
9 Q.  What were they yelling?
10 A.  To get the dog.
11 Q.  To restrain the dog?
12 A.  Yes.
13 Q.  Was the dog taken -- restrained or taken somewhere?
14 A.  We had put him in the house.
15 Q.  What kind of dog is it?
16 A.  Black lab mix.
17 Q.  Is it a big dog or small dog?
18 A.  About 120 pounds.
19 Q.  Would you say that is a big dog?
20 A.  I would, yes.
21 Q.  Were any other animals outside?
22 A.  No.
23 Q.  What happens next?
24 A.  They told me they were taking the car.  That it was
25    illegal.

1 Q.  Is it the first thing they said to you?
2 A.  Yes, after "get the dog."
3 Q.  After they told you they are taking the car, what
4    happens next?
5 A.  They told me that I could give them the keys or they
6    were dragging it out of the driveway.
7 Q.  Then what did you do?
8 A.  I asked them what it was all about.  They wouldn't
9    answer.
10 Q.  After that, what happened?
11 A.  I asked them what their names were.  They wouldn't
12    answer.  I asked them if they had business cards.  They
13    said no.
14 Q.  Were these deputies in uniform?
15 A.  Yes.
16 Q.  Do their uniforms have their name tags on them?
17 A.  No.
18 Q.  Did their uniforms have badges on them?
19 A.  Yes.
20 Q.  You asked for their badge numbers?
21 A.  I asked them for a business card.
22 Q.  In your experience, do all police officers normally
23    carry business cards?
24 A.  Most of them.
25 Q.  Do you know if Wayne County Sheriff deputies are issued

1    business cards?
2 A.  I do not.
3 Q.  So what happens next?
4 A.  They said they were taking it.  I gave them the keys out
5    of protest, because I didn't want the car damaged.  I
6    asked them if I could get some stuff out of it.  I had a
7    bag in there, stuff, and they said yes.  He unlocked it.
8    As soon as I opened the door, he started yelling at me
9    and said they had to search it first.
10 Q.  What items were you -- did you want to retrieve out of
11    the car?
12 A.  I had a bag for work.
13 Q.  What was the -- what is in the bag?
14 A.  Stuff I use at work; radio, head phones.
15 Q.  Were there any tools you were trying to get out of the
16    car?
17 A.  No, I don't remember any tools.
18 Q.  So you said that before you could enter the car, they
19    had to do a sweep, right?
20 A.  They said they had to search the car first.
21 Q.  Did they -- somebody search the car?
22 A.  Yes, they did.
23 Q.  Who did that?
24 A.  The second one.
25 Q.  Younger guy?



Eugene Habich
11/04/2021
Pages 118..121

Page 118

1  A.  Yes.
2  Q.  Did they find anything in their sweep that they took?
3  A.  Not at that time, no.
4  Q.  After the search was done, did the deputy permit you to
5      take anything out of the car?
6  A.  Yes.
7  Q.  What did you take out of the car?
8  A.  I grabbed the bag out of the back seat.  I went to grab
9      the laptop, and they told me I had to put it back.  It
10     was evidence.
11 Q.  So was there anything that you -- what did you want to
12     take that they would not let you take besides the
13     laptop?
14 A.  I wanted to keep my car.
15 Q.  Just the interior contents of it?
16 A.  I don't know.  They wouldn't let me keep the laptop.  I
17     went into the trunk.
18 Q.  Wait.  Before we get to that.  I want to stay on the
19     interior of the car.  We'll get there.  You got -- they
20     told you no about the laptop.  Did you grab the gift
21     cards?
22 A.  No.
23 Q.  Why didn't you grab the gift cards?
24 A.  Because I forgot they were in the door.
25 Q.  If you remembered about the gift card, would you have

Page 119

1      grabbed them?
2  A.  Yes.
3  Q.  Is there anything else you forgot was in the car that
4      you wished you had taken out?
5  A.  I don't know.  Handicap sticker.
6  Q.  Is it reasonable why you didn't take that because you
7      just didn't think to?
8  A.  It was in the glove box, yes.
9  Q.  Anything else besides the handicap placard and gift
10     cards that you didn't think to take?
11 A.  No.
12 Q.  Were there other things still in the car that you
13     decided that wasn't worth taking that you see the thing
14     and said no, not taking it?
15 A.  Not worth taking.  Everything in there was mine.
16 Q.  Did they tell you you couldn't take anything that you
17     want to?  Did they restrict you from taking anything you
18     asked besides the laptop?
19 A.  The memory card from the trunk.
20 Q.  Other than the trunk, I'm just talking about the
21     passenger compartment of the car.
22 A.  No.
23 Q.  So what happens next?
24 A.  They were talking, to me, about what happened on 275.
25 Q.  Did you talk to them about that?

Page 120

1  A.  I did.
2  Q.  What did you tell them?
3  A.  I told them what happened on 275.
4  Q.  What did they say?
5  A.  Nothing.
6  Q.  Do you have any other conversations at this point?
7  A.  When they told me they were collecting evidence, I
8      stopped answering their questions.
9  Q.  Did they ever say you were under arrest?
10 A.  No.
11 Q.  Did they ever tell you you were free to leave?
12 A.  No.
13 Q.  Did you ever ask to leave the situation?
14 A.  I was on my own property.
15 Q.  Well, I mean --
16 A.  Where was I going to go?
17 Q.  I understand.  I'm just asking the question.  Did you
18     ask them if you could leave?
19 A.  No.
20 Q.  Did you ask them to leave?
21 A.  Well, I'm pretty sure they knew I wanted them off the
22     property.  That was kind of futile.
23 Q.  Did you verbally tell them to leave?
24 A.  No.
25 Q.  Did you verbally tell them you did not want to talk to

Page 121

1      them?
2  A.  Yes.
3  Q.  What point did you say that to them?
4  A.  When I told them I wasn't answering anymore of their
5      questions.
6  Q.  That was after the I-275 conversation?
7  A.  Yes.
8  Q.  Did either of the deputies ever ask you for your ID?
9  A.  No.
10 Q.  Did either of the deputies give you a name and phone
11     number which you could contact the Wayne County
12     Sheriff's department?
13 A.  Yes.  They wrote it on the back of a towing card.  Not
14     their card.
15 Q.  Did you receive any other information from the deputies?
16 A.  No.
17 Q.  Besides the towing card and the telephone number?
18 A.  No.
19 Q.  How long from the last time you spoke to either of the
20     deputies did the tow truck arrive?
21 A.  I don't know.  Maybe 30 minutes or so, 20.
22 Q.  Did all of you sit in silence for 30 minutes to wait for
23     that to happen?
24 A.  I went back to working on the Jeep.
25 Q.  Where were the deputies at this time?



**Eugene Habich**
**11/04/2021**                              Pages 122..125

Page 122

1  A.  Standing there.
2  Q.  On the driveway?
3  A.  The older one went back to his car.  The other one stood
4      there and watched me.
5  Q.  Did Ms. Thalacker witness any of this?
6  A.  All of it.
7  Q.  Did she say anything to anybody?
8  A.  I don't know.  I was having my own discussion with them.
9  Q.  Did you hear her saying anything to anybody?
10  A.  I did not.
11  Q.  Did she tell you later whether she said anything to
12      anybody?
13  A.  I don't recall.
14  Q.  What happened when the tow truck arrived?
15  A.  The tow truck driver came over, got in it, drove it off
16      the driveway, loaded it up.
17  Q.  Was the tow truck driver marked with a company it was
18      from?
19  A.  The tow truck, yes.
20  Q.  Did you see what that business was called?
21  A.  Martin's Towing.
22  Q.  Had you ever heard of Martin's Towing?
23  A.  No.
24  Q.  Have you ever had any of your cars towed in the past?
25  A.  Yes.  I had the Jeep towed back when it stopped running.

Page 123

1  Q.  Is it the '04 or '01 Jeep?
2  A.  The '01.
3  Q.  How long ago was that towed?
4  A.  I don't know.
5  Q.  Was that five years ago, ten years ago?
6  A.  No.  Last year.
7  Q.  2020?
8  A.  Uh-huh.  Yes.
9  Q.  You said it was towed because it had broken down or
10      something?
11  A.  The head gasket and everything, yes.
12  Q.  That is on the side of the street somewhere, or was that
13      somewhere else or was at your house?
14  A.  It was middle of the road.
15  Q.  Do you know who towed that car?
16  A.  I do not remember, no.
17  Q.  Did you call to get it towed?
18  A.  Yes.
19  Q.  You called.  Did the police come out to the vehicle in
20      the middle of the street?
21  A.  No.
22  Q.  What street was this on?
23  A.  Southfield.
24  Q.  Which city?
25  A.  Allen Park there, I think.

Page 124

1  Q.  Is that a boulevard there?
2  A.  Yes.
3  Q.  So in the middle of one of the sides of the boulevard?
4  A.  Yes.
5  Q.  You had that towed to -- where did you get that towed
6      to?
7  A.  Back to Olive.
8  Q.  Have you ever had cars towed before then?
9  A.  Yes.  My entire life I had cars towed.  I don't know
10      what that has to do with this.
11  Q.  I'm just asking you about your experience with cars
12      being towed because your car was towed at this time.
13      Ever had your car towed involuntarily; somebody tow your
14      car when you didn't want to?
15  A.  Yes.
16  Q.  Can you tell me when is the last time that happened?
17  A.  About the same time we had the federal lawsuit in
18      Dearborn Building and Safety kept towing my car out of
19      the driveway.
20  Q.  Out of your mom's driveway?
21  A.  Yes.
22  Q.  Did you have to pay to get your car out?
23  A.  Yes.
24  Q.  You had to go down to the tow truck place to get it out?
25  A.  Yes.

Page 125

1  Q.  That was the last time you had that car involuntarily
2      towed?
3  A.  Yes.
4  Q.  Have you ever had a police involuntarily tow your car?
5  A.  It has to be the police that comes out.
6  Q.  So the police were always involved, Dearborn Police, for
7      example, were involved in the towing around the lawsuit?
8  A.  Yes.
9  Q.  Was that the Dearborn cops?
10  A.  Yes.
11  Q.  Did they give you a business card for the towing
12      company?
13  A.  No.
14  Q.  Did they give you a name and address of somebody to
15      call?
16  A.  No.
17  Q.  After, at some point the deputies left, both of them?
18  A.  Yes.
19  Q.  What did you do for the rest of the day?
20  A.  Worked on the Jeep.
21  Q.  Did you work on it at night afterwards?
22  A.  Not when it was dark, no.
23  Q.  How many cars were on your property on August 1, 2020
24      before the tow?
25  A.  Three.



Page 126

1 Q. That was the 2001 Jeep, the Charger and then
2 Ms. Thalacker's car?
**3 A. No. Four.**
4 Q. Was it the Range Rover?
**5 A. No. The 2004 Jeep.**
6 Q. You had -- those four vehicles were on the property at
7 the time?
**8 A. Yes.**
9 Q. Then which cars were parked in the driveway; was the
10 Charger and Ms. Thalacker's car?
**11 A. Hers was in front of the driveway. The garage.**
12 Q. Okay.
**13 A. All the other three were in the driveway.**
14 Q. So the order of the cars from the street to the back,
15 what was the order; the Charger, then what?
**16 A. The Charger, the 2001 Jeep, 2004 Jeep.**
17 Q. After the tow, did you ever try to contact the towing
18 company about the tow?
**19 A. No.**
20 Q. Have you ever tried to contact the sheriff's department?
**21 A. I did.**
22 Q. When is the first time you tried to contact them?
**23 A. They told me to call the next day at four.**
24 Q. That would have been a Sunday?
**25 A. Yes.**

Page 127

1 Q. Did you call them the next day at four?
**2 A. Yes.**
3 Q. What happened?
**4 A. I left a message. Never got a response.**
5 Q. What number did you call?
**6 A. The one they wrote on the back of the card.**
7 Q. What telephone did you use to call?
**8 A. Cell phone.**
9 Q. Is the cell phone you used, let's say, August 2, 2020
10 the same cell phone you have today?
**11 A. Yes.**
12 Q. Is it the same number?
**13 A. Yes.**
14 Q. Can I have that number?
**15 A. (313) 247-4632.**
16 Q. How long have you had this number?
**17 A. 17 years, 18.**
18 Q. Did you try to contact the sheriff's department after
19 August 2?
**20 A. No. I called an attorney instead.**
21 Q. Did you ever attempt to go down to the road patrol and
22 talk to somebody in person?
**23 A. I had no idea who they were. They wouldn't give me a**
**24 card.**
25 Q. So you didn't know where their station was?

Page 128

**1 A. No.**
2 Q. But you're familiar with the Wayne County Sheriff's
3 department as generally?
**4 A. Yes.**
5 Q. To your knowledge, did they have telephone numbers on
6 the internet to contact them?
**7 A. Yes. That doesn't tell me where to call though.**
8 Q. Did you try calling any other number from the sheriff's
9 department other than the one they gave you?
**10 A. No.**
11 Q. I want to ask you about when you received the car back.
12 At some point did you receive the Charger back?
**13 A. Yes.**
14 Q. Do you remember when that was?
**15 A. I do not.**
16 Q. Was it earlier this year?
**17 A. Yes.**
18 Q. I don't remember the date of this. February, March?
**19 A. February something.**
20 Q. We should know this. Did you go to pick up the car?
**21 A. Yes.**
22 Q. Where did you pick it up from?
**23 A. Martin's Towing.**
24 Q. Did you have a chance to inspect the car before you left
25 the area?

Page 129

**1 A. I looked it over, yes.**
2 Q. Did you see anything of note on the car when you looked
3 it over?
**4 A. Yes.**
5 Q. Can you tell me what you saw on that day?
**6 A. Lights were gone. The trim on the driver's side had**
**7 been removed. The door panel had been removed, missing**
**8 pieces.**
9 Q. You mean the panel over -- like the metal panel actually
10 over the actual door?
**11 A. The inside panel.**
12 Q. Inside door panel?
**13 A. Uh-huh. Yes.**
14 Q. So I want to make sure I get this list right. Lights
15 were gone. Trim pieces removed. So what trim pieces?
**16 A. There is little covers for the screws in the door panel.**
**17 They are gone.**
18 Q. On the inside of the door?
**19 A. On the inside.**
20 Q. Okay. Then you said the interior door panel had been
21 removed. It was still there, right?
**22 A. Yes.**
23 Q. But it was just missing the screw covers?
**24 A. Yes.**
25 Q. Are screw covers standard parts that can be purchased at



Page 130

1 Autozone or something?
2 A. I don't think you can get them at Autozone, no.
3 Q. Do you know where you would get the screw cover?
4 A. Probably have to find the right color. Junkyard or
5 something.
6 Q. Do you know how much they cost?
7 A. I do not.
8 Q. So in addition to the stuff, anything else when you
9 actually inspected the vehicle?
10 A. The center console has a locking compartment, that was
11 busted.
12 Q. To your knowledge, when the car was towed, was the
13 center console locked?
14 A. It was.
15 Q. Was there anything in there?
16 A. Gas receipts.
17 Q. Does it lock automatically or do you have to actually
18 lock it?
19 A. You have to lock it.
20 Q. Why do you keep the gas receipts in the console?
21 A. I don't know. I have just got a lock on it. I locked
22 it.
23 Q. In terms of, what would you save gas receipts for?
24 A. I don't know. Just to see how much I'm spending.
25 Q. For business or taxes or something?

Page 131

1 A. I use a card when I pay. I don't pay cash.
2 Q. So they are credit card receipts?
3 A. Yes.
4 Q. Just wondering if it was a business reimbursement thing.
5 Anything else?
6 A. The laptop was gone. When I started it up, the engine
7 was knocking. All of the lights were on in the dash.
8 Traction control, check engine light, ABS light was on.
9 Q. Anything else?
10 A. The cover for the battery was just thrown in the trunk.
11 Stuff from the glove box was thrown on the seat on the
12 floor on the passenger side.
13 Q. Okay. Anything else?
14 A. Not that I noticed then.
15 Q. If your car had been at Martin's Towing -- well, let me
16 ask this way.
17 Assuming that your car was in only this tow
18 place, tow yard and Priority One which, as we discussed,
19 removed some of the police equipment, right? Did you
20 make any complaint to Martin's Towing that you thought
21 that any of the things you saw was their fault or
22 something they had to fix?
23 A. No. I never talked to anyone at Martin's Towing.
24 Q. Like I said, do you believe that any of these -- which
25 of any of the problems that you listed so far do you

Page 132

1 think are attributable to a car sitting on a tow lot?
2 A. Probably the engine knocking.
3 Q. Okay.
4 A. It sat with nobody starting it.
5 Q. What about, is there anything else that you think the
6 car sitting, of those problems, would be caused by
7 sitting on a lot?
8 A. Nothing else. Everything else is damage not from
9 sitting.
10 Q. Was there any exterior damage to the car?
11 A. No other than the exterior lights missing.
12 Q. Did you figure out what was causing engine knocking?
13 A. It appears to be the springs have collapsed.
14 Q. Where are the springs; in the motor?
15 A. Valve springs.
16 Q. Didn't have anything to do with old oil or old gas or
17 something like that?
18 A. No.
19 Q. Did you fix the valve springs?
20 A. I have not.
21 Q. So the engine is still knocking?
22 A. Yes.
23 Q. Have you had a mechanic look at it?
24 A. I tried to take it in, but told me they need it for
25 three weeks.

Page 133

1 Q. Besides the springs, what else do engine knocking come
2 from?
3 A. I have no idea.
4 Q. In terms of the interior stuff that you have listed,
5 would any of these things, in your experience, be caused
6 by a car sitting in a parking lot for months? Like
7 would the door panel screws disappear, would the check
8 engine light be on?
9 A. Probably not, no.
10 Q. Okay. So is it your contention that somebody who
11 actually -- somebody went into your car and then --
12 interior car and then messed a bunch of things up?
13 A. It appears, yes.
14 Q. Did you ever contact Priority One about any of this
15 damage?
16 A. No.
17 Q. You said that might have found -- think you found more
18 things after you took the car home. Is there another
19 list of things?
20 A. Yes.
21 Q. Can you provide that for me?
22 A. That list?
23 MS. DOWNEY: We sent you that by email the
24 next day. If you want me to take a break and pull it
25 up, I suppose --



Page 142

1 Q.  Have you performed any private investigative services
2    since the late 90s for anybody?
3 A.  No.
4 Q.  Did Osiris ever have a website?
5 A.  No.
6 Q.  Did you ever have business cards for it?
7 A.  Yes.
8 Q.  Do you still have any of those business cards?
9 A.  They were with the ID.
10 Q.  You mean, they were with -- what do you mean with them?
11    They were next to them or they were --
12 A.  They were tucked in with the ID.
13 Q.  When is the last time you handed out an Osiris business
14    card to somebody?
15 A.  Late 90s.
16 Q.  I thought you said you did stuff past the 90s with
17    Osiris?
18 A.  With the security stuff, yes.  We filed the LLC same
19    name.
20 Q.  Wait a minute.  Osiris became -- was a business and
21    became an LLC.  They did different things.  What are you
22    saying?
23 A.  I had Osiris back in the 90s.  Didn't renew it after I
24    stopped being a private investigator and renewed it for
25    the security stuff.

Page 143

1 Q.  The company?
2 A.  Yes.
3 Q.  When is the last time you had business cards made for
4    Osiris?
5 A.  Back in the 90s.
6 Q.  Even though Osiris still performed services in the past
7    20 years, you didn't have any business cards for the
8    business?
9 A.  What business?
10 Q.  Osiris.
11 A.  What business did I perform in the past 20 years?
12 Q.  I thought you said you did locks and doors and things
13    like that.
14 A.  After I started it back up again, yes.
15 Q.  Just, when did you start it back up again?
16 A.  I don't know.  Couple of years ago, I sent the
17    paperwork.  I don't have that.
18 Q.  So since 2017, did you give out any business cards for
19    Osiris?
20 A.  No.
21 Q.  So the business cards you say that are with the ID were
22    business cards that were 25, 30 years old?
23 A.  Yes.
24 Q.  Mr. Habich, let's go back to what we marked as Exhibit 2
25    again, which is the Affidavit of Eugene Habich.  Couple

Page 144

1    more things.
2        We had talked about the July 30 stuff.  I want
3    to look at a couple more things on this.  Can you take a
4    look at number nine which is on page three.  I just want
5    to be clear about your timeline of events that you said
6    earlier that the first thing that the cops said to you
7    was about -- we are just taking the car, right?  Is this
8    -- that was --
9 A.  They said it was illegal and they were taking it.
10 Q.  But number nine in the third -- fourth sentence you
11    said, it reads I pointed out to them there were no blue
12    lights on the car.  Did that occur?
13 A.  Yes.
14 Q.  So you did have a conversation.  You tried -- did you
15    try a protest the lights were not a problem with the
16    lights?
17 A.  Yes.  I was protesting.
18 Q.  Okay.  So number nine, it says that the other deputy
19    then said it had a camera system, but I said that many
20    people now have dash cams and they were not illegal.  So
21    do you remember that -- did that occur in --
22 A.  Yes.
23 Q.  Okay.  So in number nine, there was -- I had some back
24    and forth with the deputies about whether the equipment
25    installed in the car was legal or illegal.  Is that fair

Page 145

1    to say?
2 A.  Yes.
3 Q.  Then is it also fair to say the deputies did not accept
4    these explanations?
5 A.  Yes.
6 Q.  Number 12, right after the search, it says after the
7    search when they saw me remove video equipment, they
8    took the memory card from my camera saying it was
9    evidence in an investigation.  I want to get the -- this
10    has gone on for a long time.  I might have missed asking
11    about this thing.  We are talking about the trunk?
12 A.  Yes.
13 Q.  Is there a point where the trunk was open, of the car,
14    on August 1, 2020?
15 A.  They opened the trunk.
16 Q.  How is the trunk open on that Dodge Charger?
17 A.  Key fob.
18 Q.  Was that what was used, key fob to open the trunk?
19 A.  That's the only way.  Unless you have the key in the
20    ignition, the trunk release does not work.
21 Q.  So the key would have to be in the ignition or the key
22    fob?
23 A.  Yes.
24 Q.  So when the trunk was opened, did you try to take access
25    of the memory cards in the control box back there?



1 A.  My car fixed.

2 Q.  That includes the list of things that you had

3      previously --

4 A.  And whatever else they find when they are fixing it.

5      There was nothing wrong with the car.

6 Q.  So would a resolution that would satisfy you in this

7      matter is if someone fixed your car, all the problems on

8      it, would that be enough?

9 A.  No.

10 Q.  What else are you looking for?

11 A.  I would like you to fire all four cops.

12 Q.  Okay.  Termination of those four deputies.  Anything

13      else?

14          THE WITNESS:  Whatever you got coming.

15 BY MR. STELLA:

16 Q.  Just from you personally.  Ms. Downey's fees

17      notwithstanding, is there anything you are looking for?

18 A.  Get rid of all four cops.  Fix my car.  Not really, no.

19 Q.  So after you got the car back from the Martin's Towing

20      in February or March, whatever, did you take any

21      photographs of its condition?

22 A.  Took a video of all the stuff not working.

23 Q.  I don't know if I have the video.  Did you turn it over

24      to your attorney?

25 A.  I did not.

1 Q.  Okay.

2          MS. DOWNEY:  We can get that for you.

3          MR. STELLA:  That's fine.

4 BY MR. STELLA:

5 Q.  Is there any other photos or videos regarding alleged

6      damage to the car?

7 A.  I haven't done anything else, but the video the day I

8      picked it up.

9 Q.  So in lieu of getting your car fixed, what if somebody

10      gave you money to buy a new car of equivalent value?

11 A.  I don't know.  I hadn't thought about it.

12          MR. STELLA:  I have no further questions.

13          MS. DOWNEY:  I have a few follow up.

14          (A short recess was taken)

15              EXAMINATION

16 BY MS. DOWNEY:

17 Q.  Back on the record hear.  Again, before we started the

18      break, I wanted to do couple follow ups.

19          We had been talking a lot about the 2001 Jeep.

20      Who customarily drove that Jeep prior to the time they

21      took the Charger away?

22 A.  I bought it from Cooper's for my mother.

23 Q.  Okay.  Did your mom have any other means of

24      transportation?

25 A.  She had a very old Dodge Durango.  We junked that, so

1      that replaced the Durango, yes.

2 Q.  Once the Charger was seized, and after the two weeks it

3      took to get the 2001 Jeep up and running again, after

4      that, my understanding, from your testimony, seems to be

5      that was primarily what you have been driving; is that

6      correct?

7 A.  The Jeep, yes.

8 Q.  What was your mom doing during this time?

9 A.  Nothing.

10 Q.  How did having your mom's Jeep change your routine or

11      schedule or free time?

12 A.  Driving over there all the time.

13 Q.  How come?

14 A.  Because she had nowhere to go, nowhere to get anywhere.

15 Q.  How was she getting to doctor's appointments or

16      groceries or stuff like that?

17 A.  I had to drive her.

18 Q.  Was that during your work hours or after your work

19      hours?

20 A.  I would have to take days off.

21 Q.  Did you lose any money from taking those days off?

22 A.  Yes.  I don't get paid when I'm not there.

23 Q.  About how many days did you have to take off?

24 A.  Don't know.

25 Q.  Is there a way to figure that out?

1 A.  Yes.  She got a U of M portal of all of her doctor's

2      appointments.

3 Q.  Nobody else drove her those days.  You drove those?

4 A.  Yes, me.

5 Q.  So we could get ahold of those portal records and get

6      that figured out --

7 A.  Yes.

8 Q.  -- and multiply times what hours you missed?

9 A.  Yes.

10 Q.  During this whole time, did you have the same hourly

11      rate at work?

12 A.  Yes.

13 Q.  I take it, you're paid by the hour?

14 A.  Yes.

15 Q.  Do you think that as part of this case, it would be fair

16      for the defendants to compensate you for that?

17 A.  Yes.

18 Q.  You said that prior to the car being taken, you were

19      getting a couple hundred, a hundred a piece from two

20      clients for driving past their closed businesses and

21      checking them out.  Do I remember that correctly?

22 A.  Yes.

23 Q.  Is there a way we can find out the names of those

24      customers?

25 A.  I can get them when I get home.



Eugene Habich
11/04/2021                                        Pages 154..157

Page 154

1 Q.  Were those on a contract or was a just a casual kind of
2     agreement?
3 A.  Casual.  No contract.
4 Q.  Was the intent to do that only during the shutdown, or
5     was this supposed to continue after everybody was back
6     from the COVID shutdown?
7 A.  I really can't answer that.  I don't know what -- once
8     they opened back up, I don't know if they still wanted
9     -- that the businesses were closed for COVID.
10 Q.  Okay.  Do you think it would be fair for the county to
11     pay you back for the lost couple hundred or did you
12     still get paid?
13 A.  No, I didn't get paid.
14 Q.  You think it would be fair for the defendant to
15     compensate you for that?
16 A.  I don't know.  How do you judge how long that was going
17     to go?  It's hard to say.
18 Q.  Okay.  That's fair.  You were asked also about what you
19     wanted out of this case.  You mentioned some items that
20     would make you feel better about this.  Why are you so
21     strongly concerned about the deputies being fired?
22 A.  Because I live and work in Wayne County.
23 Q.  What do you mean by that?
24 A.  I don't want to be harassed.
25 Q.  A fear of retaliation?

Page 155

1 A.  Yes.
2 Q.  Okay.  If dismissing the deputies is not on the table
3     and not an option, and tell you what, no lawsuit can
4     force them to do that.  Is there any alternative?
5 A.  I guess enough money for me to move and get another job.
6 Q.  Okay.  You think you deserve anything for the time you
7     have had to waste for the stress that it's put on you --
8 A.  Probably, yes.  I spent a lot of time working on the
9     house trying to get it the way I want it.
10 Q.  When Mr. Stella was asking you what you wanted out of
11     this case, was it your intent to waive any of the damage
12     claims that you have made in consultation with your
13     lawyer?
14 A.  No.  Didn't waive anything.
15 Q.  Okay.
16 A.  Still don't understand how all this is going yet.
17 Q.  Sure.  That's okay.  There has been a question about
18     when you handed over the keys or handed over memory
19     cards, when you were asked to hand over memory cards.
20     Why didn't you just put it in your pocket and turn away?
21 A.  Because they were standing on both sides of me.
22 Q.  Why didn't you physically interfere with them trying to
23     take the car?
24 A.  Because they have guns.
25 Q.  Why didn't you call the police on them?

Page 156

1 A.  I don't see what that would have done.
2 Q.  They are the police, aren't they?
3 A.  Yes.
4 Q.  You were asked some questions about the red truck and
5     whether you called the police on the tailgate.  Have you
6     ever been tailgated before this incident?
7 A.  Yes.
8 Q.  Did you ever call the police on any of them?
9 A.  Doesn't do any good.
10 Q.  Did you have a license number for the red truck?
11 A.  It was behind me.
12 Q.  So if you were calling to report it, could you have
13     reported the license plate of the truck that tailgated
14     you?
15 A.  I could not, no.
16 Q.  Do you remember everything that was in that glove
17     compartment that particular day?
18 A.  No, I don't.  Pretty sure there was no gloves in the
19     glove compartment.
20 Q.  Okay.  I had a question about the setup of the house.
21     I'm just going to show you a very blurry photograph.
22         MS. DOWNEY:  Do you want me to mark it as an
23     exhibit?
24         MR. STELLA:  Yes, might as well.
25             DEPOSITION EXHIBIT 3

Page 157

1             WAS MARKED BY THE REPORTER
2             FOR IDENTIFICATION.
3 BY MS. DOWNEY:
4 Q.  We have marked a fairly blurry photograph as Exhibit 3.
5     Can you tell me what that is a photo of?
6         MR. STELLA:  By question, photograph video or
7     still?
8         MS. DOWNEY:  Well, we're going to find out.
9 A.  It's a still from the video.
10 BY MS. DOWNEY:
11 Q.  Okay.  When you say it's the still from the video, from
12     what location?
13 A.  The rear camera on the garage.
14 Q.  At the Olive Street address?
15 A.  Yes.
16 Q.  I wanted to get straight.  There is a picture that's
17     toward the middle on the upper face.  Is that a door or
18     window there?
19 A.  That's a door.
20 Q.  Is there a door you go in and out of or door you don't,
21     can you tell us?
22 A.  I don't go in and out that door.
23 Q.  Is there another door that's father down?
24 A.  Yes.
25 Q.  I'm sorry.  You've got to wait until I finish.



Eugene Habich
11/04/2021                                          Pages 158..161

Page 158

1        MR. STELLA:  I'm lost here.  We are talking
2    about this door?
3        MS. DOWNEY:  Yes.
4        MR. STELLA:  He said there is another door?
5        MS. DOWNEY:  No.  Further down.
6        MR. STELLA:  Down this way?
7        **THE WITNESS:  Right.**
8        MR. STELLA:  Out of the frame.
9        MS. DOWNEY:  Out of frame.
10   BY MS. DOWNEY:
11   Q.  So there's actually two doors on the side of the house;
12       is that correct?
13   **A.  Yes.**
14   Q.  But you only really use one of them customarily?
15   **A.  Yes.**
16   Q.  Okay.  Then there is a front door around the other side
17       out of frame as well?
18   **A.  No.**
19   Q.  So there is no front door to this house?
20   **A.  No.  They enclosed the porch, so there's a window in the**
21       **front.**
22   Q.  Is there a doorbell on the front facade of the house?
23   **A.  Yes.**
24   Q.  Is there something --
25   **A.  There is no doorbell inside.  I took that down.  Didn't**

Page 159

1       **work.**
2    Q.  When you roll up to the front of the house, and the side
3        that faces the street, is there something there that
4        looks like a door?
5    **A.  The side that faces the street, no.**
6    Q.  Okay.
7        MS. DOWNEY:  That's the only questions I had
8    on this.  I had to get the dimensions correct.
9        MR. STELLA:  I had just a follow up, just
10   exactly what that photograph shows.
11       RE-EXAMINATION
12   BY MR. STELLA:
13   Q.  I didn't realize there was no front door.
14       Mr. Habich, when people bring deliveries to
15   you house, where do they leave them?
16   **A.  In front.**
17   Q.  Where there is no door?
18   **A.  Yes.  They usually leave them right on the side there.**
19   Q.  So not where the front door would have been, but where
20       in relation to the Charger in this photograph are
21       packages left?
22   **A.  Next to it.**
23   Q.  Okay.  Like toward the house from the Charger?
24   **A.  Yes.**
25   Q.  One last question about your mom, about her

Page 160

1    transportation needs.  I just want to clarify on August
2    1, 2020, the 2001 Jeep wasn't working, right?
3    **A.  Yes.**
4    Q.  So her car wasn't working at that time?
5    **A.  Yes.**
6    Q.  Okay.  You were still in the process of fixing it?
7    **A.  Yes.  It's the blue one right there in the middle.**
8    Q.  Right.  So as of August 1, 2020, your mom didn't have a
9        car at this point either?
10   **A.  No.**
11       MR. STELLA:  All right.  I have no further
12   questions.  That's it.
13       COURT REPORTER:  If you would like to order
14   the transcript, please state that now.
15       MR. STELLA:  Yes, for sure.
16       MS. DOWNEY:  We'll take both.  E-trans, both.
17   (The deposition was concluded at 2:25 p.m.)
18
19
20
21
22
23
24
25

Page 161

1              CERTIFICATE OF NOTARY
2
3    STATE OF MICHIGAN        )
4                             ) SS
5    COUNTY OF OAKLAND        )
6        I, Tamora L. Thompson, Certified Shorthand
7    Reporter, a Notary Public in and for the above county
8    and state, do hereby certify that the above deposition
9    was taken before me at the time and place hereinbefore
10   set forth; that the witness was by me first duly sworn
11   to testify to the truth, and nothing but the truth, that
12   the foregoing questions asked and answers made by the
13   witness were duly recorded by me stenographically and
14   reduced to computer transcription; that this is a true,
15   full and correct transcript of my stenographic notes so
16   taken; and that I am not related to, nor of counsel to
17   either party nor interested in the event of this cause.
18
19
20       _Tamora L. Thompson_
21       Tamora L. Thompson CSR 5378
22       Notary Public,
23       Oakland County, Michigan
24       My Commission expires:  12-24-2026
25

