# EXHIBIT 3

Brian Glatfelter
11/29/2021

1        IN THE DISTRICT COURT OF THE UNITED STATES
2           FOR THE EASTERN DISTRICT OF MICHIGAN
3                     SOUTHERN DIVISION
4
5    EUGENE HABICH,
6              Plaintiff,
7      vs.                        Civil Action
8                                 No. 2:20-cv-12528
9                                 Hon. David M. Lawson
10   WAYNE COUNTY, CORPORAL JOHN
11   WOJCIECHOWSKI, and DEPUTY
12   CHRISTOPHER MITTLESTAT,
13             Defendants,
14   _____/
15   PAGE 1 TO 76
16
17        The Deposition of BRIAN GLATFELTER,
18        Taken at 500 Griswold,
19        Detroit, Michigan,
20        Commencing at 10:07 a.m.,
21        Monday, November 29, 2021,
22        Before Jill Sickels, CSR 0162.
23
24
25



Page 10

```
1   Q.  And I take it that after the academy, you became a
2       deputy.
3   A.  I was a deputy in the jail first and then I worked
4       midnights and part of my degree was to get to the
5       police academy, so then in order to finish my degree, I
6       went to the police academy during the day and then I
7       worked midnights at the jail.
8   Q.  No sleep?
9   A.  4 hours.  4 hours.
10  Q.  We were younger then, weren't we?
11  A.  We were -- I was just going to say that.  We were
12      younger then.
13  Q.  Exactly.
14  A.  I could do it but it would be tough now.
15  Q.  Okay.  You know, what, if anything, did you do to
16      prepare to talk about this case today to refresh your
17      recollection?
18  A.  Kind of -- it was minimal but I did have a chance to go
19      over the defendant's testimony, I guess I'll call it.
20      I was curious on what he had to say since I've never
21      spoken to him or anything like that, so I did go over
22      that.  I briefly went over the case but I'm familiar
23      with it so I really didn't need to do much of that, so.
24  Q.  When you say the defendant's testimony, did you mean
25      Corporal Wojciechowski or Deputy Mittlestat or did you
```

Page 11

```
1       mean --
2   A.  No, I mean.
3   Q.  -- the plaintiff Eugene Habich?
4   A.  The plaintiff's.  The plaintiff's testimony.
5   Q.  Got it.
6   A.  I didn't know exactly how you wanted it addressed in
7       this hearing so I just call them defendants whether
8       they're charged or not charged or guilty or not guilty.
9       You know, they're defendants, so.  Defendants,
10      suspects, you know.
11  Q.  Okay.  That's what I wanted to find out --
12  A.  Right.
13  Q.  -- from you because I need to know what you think.
14  A.  Right.  It's just a term that I use for anybody that's
15      either being investigated, charged in court, you know,
16      somebody that's under investigation at the very least,
17      you know, versus victim versus complainant versus
18      witness.  It's just a term.
19  Q.  So in your mind, you read the statement of the suspect?
20  A.  Yes.
21  Q.  Since your memory, I hope, was refreshed, when did you
22      first hear about the incident on I-275?
23          MR. STELLA:  I would object for just
24      foundation just jumping right into it, but go ahead and
25      answer it, sergeant.
```

Page 12

```
1   A.  Okay.  I was waiting on him.
2   BY MS. DOWNEY:
3   Q.  That's right.  That's the right thing to do.
4   A.  All right.  I heard about it, I want to say, either the
5       day of or the day after.  I'm not exactly sure, but I
6       would say it was right around -- if I didn't hear about
7       it the day of, we could have been off for a -- on our
8       off days and maybe heard about it when they come back,
9       but it was something that I would hear about if I was
10      working that day.
11  Q.  Does Corporal Spaulding report to you?
12  A.  No, he was on day shift, but since they -- the way I
13      would get it would be because it would be a complaint
14      on a criminal matter, something that happened -- even
15      though he was on his way to work, he still took -- in
16      my mind, took police action, you know, on his way to
17      work, made a complaint, observed an illegal activity
18      and it needs to be investigated, so that's how it would
19      end up on my desk.
20  Q.  When it ended up on your desk, what did you know about
21      it?
22  A.  Basically, I read Corporal Spaulding's report and I
23      knew that, according to his report, he was on his way
24      to work and an incident occurred and he had tried to
25      locate a specific vehicle and he was unable to.
```

Page 13

```
1   Q.  When it ended up on your desk, what action, if any, did
2       you take?
3   A.  I tasked Corporal Wojciechowski, because that's one of
4       his specialties is to track stuff down, so I asked him
5       if he could see if he could locate the vehicle.
6   Q.  Now, is that his specialty or your group's specialty?
7       I wasn't clear on that.
8   A.  Well, I consider it his specialty because the other
9       members of my staff at the time were not as seasoned
10      and, if anything, they were along to assist him and to
11      learn off of him and stuff like that, which is what I
12      usually do is, All right, this guy's doing this, you
13      shadow him, help him out.  You know, like, on-the-job
14      training pretty much, you know.  You can study in the
15      book all you want but until you actually get out there
16      and start doing it for real for yourself and to be
17      actually involved in the, you know, police work and
18      stuff like that, then -- I mean, it's a hands-on job.
19      There's only so much you can learn at the academy and
20      there's only so much you can learn from an instructor
21      and so you have to get out there and do it, so.
22  Q.  Sounds right.  Who was shadowing Corporal
23      Wojciechowski?
24  A.  For the sake of this deposition, we know that we're
25      talking about Corporal Wojciechowski, which is an
```



Page 14

1  entire -- it's hard to say, even harder to spell. I
2  had to memorize it in order to do that. So we just
3  call him Wojo, W-O-J-O. Wojo. Corporal Wojo, badge
4  number 1287. So if it helps just in this -- I know
5  it's legal and everything like that. We just call him
6  Wojo, Corporal Wojo. So if it helps, I'll know what
7  you're talking about if you say Corporal Wojo.
8  Q. Thank you. I think I'll do that and --
9  A. Okay.
10 Q. -- I will not be meaning any disrespect to the corporal
11    by doing that.
12 A. Believe me, if he was here, he would not feel any
13    disrespect. Trust me.
14 Q. Okay. Very good. So who was shadowing Corporal Wojo?
15 A. It was Deputy Mittlestat.
16 Q. What did you ask or rather what did you tell Corporal
17    Wojo?
18 A. Well, I let him read Corporal Spaulding's report and I
19    asked him if he could locate the vehicle in question.
20 Q. What was the next thing that you heard about the case?
21 A. The next thing I heard about the case was that he had
22    went to a house in Dearborn and that the vehicle wasn't
23    there but he had a lead on where it might be or where
24    the subject, defendant, I mean, how do you want me to
25    address --

Page 15

1  Q. Any way --
2        MR. STELLA: Mr. Habich might be --
3  A. Mr. Habich.
4        MR. STELLA: For clarity.
5  A. Mr. Habich. Is that how you say his name?
6        MR. STELLA: Yeah.
7  A. Mr. Habich on where he would be or his whereabouts or,
8     you know, and so I said okay.
9  BY MS. DOWNEY:
10 Q. Did you say anything other than okay?
11 A. Yeah, that's it. I mean, I released him to do his
12    thing so he was letting me know that he made this
13    location, the car wasn't there, the person wasn't
14    there, talked to a few neighbors, might have a lead of
15    where he's at. I said, Okay, let me know.
16 Q. Okay. What's the next thing you heard?
17 A. I believe the next thing I heard was that I've located
18    the vehicle. I said, Okay. Well, see if you can talk
19    to somebody, if he's there or -- you know, do your
20    thing, basically.
21 Q. Did the corporal describe where the car was?
22 A. No.
23 Q. Did he tell you whether it was a residence or not?
24 A. He did say it was at an address in Romulus.
25 Q. Did he tell you anything about the address in Romulus?

Page 16

1  A. No.
2  Q. What's the next thing that you heard?
3  A. A little time had passed and then he told me that he
4     had the vehicle on the tow truck and that he was taking
5     it in for evidence and that he had spoken briefly with
6     Mr. Habich and that he'd -- I told him to make sure
7     that he puts the -- had the tow truck driver put it in
8     what we call the secured storage so that we could --
9     because I knew I was going to get a search warrant for
10    it. And that's so nobody touches it, goes in it, tries
11    to start it or basically messes with it. We do that
12    for, like, if somebody ditched a stolen car that fled
13    from us or a crash or something, like, whenever a car
14    needs to be investigated, fingerprinted, photographed,
15    stuff like that, then we ask the tow company to put it
16    in a secured storage, which is basically just their
17    barn that's secured.
18 Q. I think you said you told him to tell the tow truck
19    driver to put it in the secured lot because you knew
20    you would be getting a warrant. Did I --
21 A. Yes.
22 Q. -- understand you right?
23 A. Yes.
24 Q. Why would you be getting a warrant?
25 A. Because according to the complaint, there were -- was

Page 17

1  police equipment utilized, and I know that if -- just
2  by my training and experience, what you would have to
3  do to a vehicle in order to make it -- those lights
4  work mechanic-wise, it's not anything that -- I mean,
5  you could maybe see the lights but you'd have to be
6  able to make sure that they worked, that it lit up and
7  stuff like that maybe, and maybe there was other things
8  involved inside the car, so just for procedural
9  purposes, I didn't want to dive into a car. I wanted
10 to be able to go into the trunk, the glove box, look
11 underneath it, pop the hood, so it's better to get a
12 warrant to do anything like that.
13 Q. What is your training about when you do or don't need a
14    warrant to seize a car?
15 A. It's all specific to -- it's really incident specific
16    because it changes. The law might change but really
17    what changes more than anything else is the case law.
18    You know, we get -- I get regular bulletins from the
19    state police and, you know, this law says this but this
20    has been adjudicated, the appellate court, the Supreme
21    Court ruled this so now you can't do this anymore and
22    you have to do this. So everything is -- it depends on
23    the situation. It really does.
24 Q. How often do you get these updates from the state
25    police?



Page 22

1   where there's, like, a -- LEIN, you have to recertify
2   in LEIN, so you have to take the test again and you
3   have to recertify on anything that's new in regards to
4   LEIN, and then there's other modules, like, you know,
5   the jails have to do suicide prevention and recognizing
6   contraband.  There's a whole online training course
7   slash university, I'll just call it.  I don't know if
8   they declared themselves a university but it's training
9   programs.  They have to sit down in front of a computer
10  and watch a video and take a test.  And then you have
11  your firearms.  You can't do that on video but, you
12  know, stuff like that.
13 Q. The kids think you can but you can't.
14 A. Yeah.  It's not the same, trust me.  It's not the same.
15 Q. No.  Are any of the modules concerned with warrant
16  procedure or seizure of autos?
17 A. No.
18 Q. Let's go back.  We kind of diverted there.
19 A. Okay.
20 Q. You'd gone back to you had heard the car was on the tow
21  truck and you gave instructions about where the car was
22  to be secured.  What's the next involvement that you
23  had with the car?
24 A. Well, once it was in the secured storage, I wanted to
25  take a look at it so I went to the tow company,

Page 23

1   Martin's Towing, it's in Brownstown, went there and
2   took a look at it and it was plain to see that there
3   was police lights or police style lights visible.  I
4   saw them in the windshield, top of the windshield, the
5   front push bar, even though it had a spotlight and
6   that's not illegal but it looked like -- except for the
7   license plate, which the license plate had lights on
8   it, too, it looked like a plainclothes detective car or
9   something like that.
10 Q. Was this the same day that it was taken to the yard?
11 A. No, it's not the same day.
12 Q. How much longer?
13 A. I'm not exactly sure.
14 Q. Was it a matter of a few days or a few weeks or a few
15  months?
16 A. It wouldn't have been any more than a week.  Yeah.
17 Q. Who did the inventory search of the car?
18 A. I did.
19 Q. When did you do that?
20 A. After I got the search warrant.
21      MS. DOWNEY:  Let's mark this, please.
22      DEPOSITION EXHIBIT 1
23      WAS MARKED BY THE REPORTER
24      FOR IDENTIFICATION
25

Page 24

1 BY MS. DOWNEY:
2 Q. We've marked as Exhibit 1 a copy of what was given to
3  us as being a search warrant pertaining to this matter.
4  Do you recognize this document, sir?
5 A. Yes, I do.
6 Q. Is that the search warrant that you got before you took
7  the inventory search of the car?
8 A. Well, actually, this is the search warrant I got to
9  inventory the car.  It wasn't under an inventory
10  search.  This was actually -- like I said before, I got
11  a search warrant so I could dive in and see what all
12  these lights were and everything else, because standing
13  around it, you could see that it was set up like a
14  police car, and I don't know how deep you want me to go
15  into this since it's an active case but the inventory
16  search would have been done by -- I know the officers
17  maybe took a look inside it or whatever, make sure
18  there was no weapons or whatever, but I don't know if
19  they did a -- I don't think they did a full on search.
20  This is a search warrant for a full on search, like,
21  under the hood, wires, I mean, trunk, under the seats,
22  glove box, stuff like that, so that's different than
23  a -- that's a different -- it's different than an
24  inventory search.  This was I did a search and I
25  executed a search warrant on the car.

Page 25

1 Q. Okay.  Well, then let me go back.  Is there a different
2  search warrant that you got before you did an inventory
3  search of the car?
4      MR. STELLA:  Okay.  I object.  He plainly
5  said he didn't do an inventory search.  He got a search
6  warrant.  So there's no 2 searches.  He testified
7  there's just one.  But you can answer the question.
8 BY MS. DOWNEY:
9 Q. Oh, let me get this straightened out.
10 A. Okay.
11 Q. Okay.  Did you do one search or 2 searches of this car?
12 A. I did one search.
13 Q. Did you fill out an inventory search form?
14 A. I did what's called a PJ 400, which is a -- documents
15  any evidence taken into custody.
16 Q. Okay.
17 A. Okay.
18 Q. That's what I wanted --
19 A. Maybe that's why we were -- we were just saying --
20  we're probably thinking the same thing but saying
21  different things.  I just didn't want to get confused.
22  The only time I went into the car was after I got the
23  search warrant and then I documented that on what's
24  called a PJ 400 I believe you have.
25 Q. Okay.  That's --



Page 26

1  A.  Okay.
2  Q.  -- one of the reasons that we're here today, to make
3      sure --
4  A.  Right.
5  Q.  -- that all the facts are correct.
6  A.  Hundred percent.  Hundred percent.
7  Q.  Okay.  I'm showing you what was previously marked in a
8      different deposition as Exhibit 1 to Corporal Wojo's
9      deposition.  Can you tell me what that piece of paper
10     is?
11 A.  This is the Wayne County Sheriff Impounded Vehicle
12     Report, otherwise known to us as a tow tag.
13         MR. STELLA:  Wait.  One second.  I don't mean
14     to cut you off but are we marking this in this
15     deposition?
16         MS. DOWNEY:  No.  We're just using it to --
17     it's already been marked and I've referred to it as the
18     Deposition Exhibit 1 from Corporal Wojo's deposition.
19         MR. STELLA:  Okay.  Well, I mean, I'm just
20     saying I want all deps (sic) to go -- that are used to
21     go with the transcript so I'd like them to be included.
22         MS. DOWNEY:  Do you want it marked a second
23     time?
24         MR. STELLA:  Yeah.
25         MS. DOWNEY:  I have no objection to --

Page 27

1          MR. STELLA:  I would just appreciate it.
2          MS. DOWNEY:  -- marking it a second time.
3      That's fine.  We can do that.
4          (Discussion off the record)
5          DEPOSITION EXHIBIT 2
6          WAS MARKED BY THE REPORTER
7          FOR IDENTIFICATION
8  BY MS. DOWNEY:
9  Q.  We were talking about what's now been marked as Exhibit
10     2 to your deposition and you've told me that it's
11     commonly known as a tow tag, correct?
12 A.  Correct.
13 Q.  And that's the one that Corporal Wojo filled out?
14 A.  Yes.  I can tell by his writing.
15 Q.  Work with a guy long enough, you know the writing,
16     right?
17 A.  He's a left-handed hook guy.  I think ticket printers
18     were made for guys like him.
19 Q.  There's a case number in the upper right-hand corner --
20 A.  Yes.
21 Q.  -- that I'm seeing.
22 A.  It says 9032 dash 20.
23 Q.  Is that a previous case number or is it a new case
24     number?
25 A.  These 2 cases had to be linked because, unbeknownst to

Page 28

1      me, he took a separate case number for this impound and
2      his report when he should have wrote a supplemental to
3      the original.  But once you draw a case number in the
4      system, you have to use it, so we just linked the cases
5      together.  So it is one and the same to Corporal
6      Spaulding's case.
7  Q.  Got it.  They mean the same case.
8  A.  They mean the same case.  Unfortunately -- I hate when
9      this happens because all it does is invite confusion
10     and scrutiny, but I didn't catch it in time so once I
11     got this paperwork, I'm, like, -- we couldn't change
12     it.
13 Q.  That's fine.
14 A.  Yeah.
15 Q.  We don't want anybody changing paperwork.
16 A.  No, we don't, so.  And that's why you're looking at it
17     the way it is.
18 Q.  That's fine.  On the third line down toward the right,
19     it says:  Reason towed.
20 A.  Hold on.  Okay.
21 Q.  How do you train your people to fill in that box?  What
22     is that supposed to represent?
23 A.  That's supposed to represent somebody who was arrested.
24 Q.  Are you aware of Mr. Habich being arrested that day?
25 A.  I am not aware of him being arrested that day.

Page 29

1  Q.  Okay.  Let's go back to the paper that was marked as
2      Exhibit 1 to your deposition.
3  A.  Okay.
4  Q.  Way at the top of the pages, you've got some dates that
5      say 10 dash -- or 10 forward slash 06 forward slash
6      2020.
7  A.  Uh-huh.
8  Q.  When did you apply for this search warrant?
9  A.  I believe it could have been that day or the day
10     before.  I'm not exactly sure.  It was right around
11     that day so it wouldn't be -- it would be within a day
12     or so.  Yeah.  So that would be a good time frame.
13 Q.  I noticed the last page it says:  Subscribed and sworn
14     to before me and issued under my hand this 7 day of
15     October 2020.  Did I read that right?
16 A.  You read it right.
17 Q.  Was that the day that you signed this or the day that
18     the judge signed this or both?
19 A.  I believe this is the day the judge signed it.  I'm not
20     sure if I had to -- I can't remember if I had to fax it
21     in and wait since it wasn't -- you know, it's not
22     nothing that I needed right away and I had to fax it in
23     and wait, and then once it was ready to be heard, I had
24     to go on the record, the 35th District Court, and then
25     that's when it was signed and sent over.  This could



Page 30

1    just be -- I'm not exactly sure why the 10-6 of '20 is
2    up there because it says it was 8:30 at night, so.
3  Q.  Well, let's talk about the procedure, then. Maybe that
4    will help me get that straight in my mind. How do you
5    go about getting a search warrant?
6  A.  All right. Well, I have a blank form, other than maybe
7    the top of there. There are certain forms for, like,
8    search warrant for blood in an accident and/or a search
9    warrant for blood for OWI and then there's, like, blank
10   search warrant forms for property, is probably what I
11   pulled up here, and then basically just type out the --
12   what I have, what I want to search, why I want to
13   search it, and then supporting -- an affidavit
14   supporting the warrant on the circumstances of the case
15   and present it to the judge and either he's going to
16   have questions or he's not or he's going to sign it or
17   he's not.
18 Q.  In this case, did you communicate with the judge in
19   person or --
20 A.  I want to say --
21 Q.  -- by phone or by fax?
22 A.  -- in person.
23      MR. STELLA: Let's make sure we don't talk
24   other each other.
25 A.  I'm sorry. I'm sorry.

Page 31

1  BY MS. DOWNEY:
2  Q.  So you went out to 35th District?
3  A.  Yes.
4  Q.  You notice that the top of the fax form here said
5    20:32, seeming to indicate that something was faxed at
6    8:30 at night, correct?
7  A.  Correct.
8  Q.  Is there a magistrate or a judge on duty at 35th
9    District Court after normal business hours or
10   something?
11 A.  There can be, but if I remember correctly, I'm not a
12   hundred percent sure, I had to fax it and then wait.
13   Like, their clerk would get it off the fax machine,
14   because the 721-2836, that's our fax number. That's
15   the Sheriff's office fax number. So I had to fax it
16   and then wait for it to be heard, called and heard, so.
17   And it's just lucky that it was the next day. It could
18   have been 2, 3 days. Depends on who's there, the
19   nature of the search warrant, you know, expediency and
20   stuff like that. I've waited a week to get a search
21   warrant before -- you know, it just depends on what
22   you're asking for, what you're asking to search, where
23   is it at. If they feel like you need it right this
24   second, then that's something that I would have called
25   in the morning, you know. Hey, I need the search

Page 32

1    warrant, I need -- you know, here are the
2    circumstances. But that wasn't the case here. Nothing
3    was going anywhere, you know, any time soon so it
4    wasn't, it wasn't needed. It wasn't time sensitive so
5    they got me in when they could.
6  Q.  Did the judge ask you any other questions?
7  A.  I believe I read the search warrant or he had it read
8    into the record, and only thing I really remember from
9    the conversation is him flipping through and reading
10   afterwards and then he's, like, Okay, I'll sign it and
11   I hope you get this SOB.
12 Q.  Okay.
13 A.  Yes.
14 Q.  Did you tell the judge anything that's not written down
15   here in these pages?
16 A.  Absolutely not.
17 Q.  Did you tell him that the car had been taken without a
18   warrant in the first place?
19 A.  He didn't ask but I don't think I said that. I believe
20   I just let him know that it was in the impound yard and
21   in storage.
22 Q.  In your opinion as a supervisor, did Corporal Wojo and
23   Deputy Mittlestat act correctly in seizing the car
24   without a warrant?
25 A.  Well, I wasn't there so I can't testify on what they

Page 33

1    saw or anything like that. I didn't get the case until
2    after they were done doing their investigation from the
3    road, so I'm assuming that they had proper -- that they
4    had acted properly.
5  Q.  Did they ask for your opinion on whether they needed a
6    warrant or not?
7  A.  They did not.
8  Q.  If a patrol officer calls in and asks you for an
9    opinion, what factors do you ask the patrolman?
10 A.  Well, let's just take this case for an example,
11   because -- since we're talking about this case. If
12   they had called me and say, Look, should we take this
13   car, or, This is what I got, what do you think, I would
14   not be able to answer that over the phone. I would
15   have to make the location and see for myself, What are
16   you looking at? Especially if, you know, you're not
17   dealing with somebody running through the field, you
18   know? All right. Let me come to where you're at and
19   then we can talk about it so I can see what you're
20   seeing. Had they asked the question, that's what I
21   know I would have done.
22 Q.  What factors would you be looking for at the scene?
23 A.  Well, if it's the car in question, first of all, you
24   know. I mean, very first, Is this the car we're
25   looking for? If the answer is no, then we're done



Brian Glatfelter
11/29/2021
Pages 38..41

Page 38

1 police, they ended up helping, I don't want to ruin
2 anything for them. They might have -- I don't know
3 what they need and I don't want to be the one going
4 through and fingering everything when they would have
5 wanted me to leave it alone. So I had to just leave it
6 alone until we decided who was going to take this,
7 who's going to dive into this because it needed some
8 specialized forensic investigation. And it turns out I
9 was right. I mean, it really was a long, long process
10 to get this digital evidence and the laptop that was in
11 plain view and get all that stuff taken care of, it
12 really was, and then, you know, COVID and everything
13 like that. So everything's been way delayed. So
14 that's what I was doing between the time the vehicle
15 was impounded and the time of the search warrant was
16 seeing who was going to take the case and if I could
17 expediate (sic) it a little bit with another
18 specialized unit.
19      DEPOSITION EXHIBIT 3
20      WAS MARKED BY THE REPORTER
21      FOR IDENTIFICATION
22 BY MS. DOWNEY:
23 Q. This one, I take it, is marked number 3 here, was
24    previously marked as Corporal Wojo's Deposition Exhibit
25    Number 2.

Page 39

1 A. Okay.
2 Q. Is this also a paper that the corporal filled out?
3 A. Yes.
4 Q. And you saw that one as well, correct?
5 A. Me, right?
6 Q. Yeah.
7 A. No. I seen -- yes, I seen this. Yeah, it's just a PJ
8    400, which is a report on property, and it lists Mr.
9    Habich as the owner.
10      MS. DOWNEY: And then this is number 4.
11      DEPOSITION EXHIBIT 4
12      WAS MARKED BY THE REPORTER
13      FOR IDENTIFICATION
14 A. How many pages is that? 3. I got 3.
15 BY MS. DOWNEY:
16 Q. I've got 3.
17 A. Okay.
18 Q. Okay. So far, so good.
19 A. All right.
20 Q. I'm showing you what we marked as Exhibit Number 4,
21    which consists of 3 pages, and at the bottom there's a
22    Bates stamp WC 000011 through 13. Can you identify for
23    us what this is a copy of?
24 A. This is a copy of a PJ 400 report on property.
25 Q. And that's the one we were talking about earlier?

Page 40

1 A. Which one?
2 Q. You said that when you searched after getting a search
3    warrant, you filled out a PJ 400?
4 A. Yes. Let me look it over.
5 Q. Okay. Please do.
6 A. I believe the first page, yes. The second page is the
7    equipment received from Priority 1 after the vehicle
8    was -- police equipment was decommissioned from the
9    vehicle. And number 3, I want to say, is a receipt --
10    was a form that I actually -- of items given back to
11    the defendant.
12 Q. Okay. That's what I wanted to get straight, which was
13    which and what was what. Thank you.
14 A. Okay.
15 Q. That's very helpful. So the first one --
16 A. Hold on.
17 Q. Okay.
18 A. One second. Let me --
19 Q. Sure.
20 A. I think that might -- the third one, I believe, is
21    going to be the items received from the MSP lab because
22    it has scan disc, video, 64 gigabyte from the MSP
23    computer lab, and then the style (sic) notebook after I
24    got it back from them, and then there's laptop data
25    files. Yeah, that's not what I gave back. That's in

Page 41

1 addition to the first page. Yeah, that's in addition
2 to the first page. So the first page is the original,
3 the second page is from the police equipment company
4 that you and Wayne County worked out, and the third one
5 is received back from the Michigan State Police lab
6 that has their extraction and stuff on it along with
7 the notebook.
8 Q. And then the second page here that has 12 on the bottom
9    for the page number.
10 A. Okay.
11 Q. There are 2 complaint numbers in the upper right box,
12    correct?
13 A. Yes.
14 Q. And I think we've seen the 9032 dash 20 before --
15 A. Yes.
16 Q. -- on the tow tag, correct?
17 A. Yes. Yes.
18 Q. Can you tell me what the number above is?
19 A. It's 8940 dash 20. That's the original number that we
20    talked about earlier that this -- Corporal
21    Wojciechowski's report should have supplemented and
22    that's the original report from Corporal Spaulding.
23 Q. Are you aware of any written policies of Wayne County
24    as to how and when deputies can seize vehicles?
25 A. Well, it depends on the circumstance. I know we have a



Brian Glatfelter
11/29/2021
Pages 42..45

Page 42

1 traffic impound policy, but seize vehicles as a result
2 of criminal investigations, I don't think we have a
3 written policy on that.
4     MR. STELLA: Mind if I use the bathroom real
5 quick?
6     MS. DOWNEY: Oh, okay. This is a good time
7 to take a break. I should have said that before.
8     (A recess was taken from 11:04 a.m. to 11:07
9 a.m.)
10     DEPOSITION EXHIBIT 5
11     WAS MARKED BY THE REPORTER
12     FOR IDENTIFICATION
13 BY MS. DOWNEY:
14 Q. Sergeant, I've shown you a document that's 10 pages
15    starting with Bates number on the bottom WC 000001
16    through 10.
17 A. Okay.
18 Q. Have you ever seen this paper before?
19 A. Yes.
20 Q. What is it as far as you're concerned?
21 A. It plainly states Abandoned and Impounded Vehicles.
22 Q. Is that the written policy you were talking about a
23    minute ago?
24 A. This is the written policy for general traffic
25    impounded and abandoned vehicles left on properties,

Page 43

1 crashed vehicles in the road, people who don't have a
2 driver's license, stuff like that.
3 Q. Does it apply to vehicles seized for criminal
4    investigation?
5 A. It does not.
6 Q. In your training, does this piece of paper have
7    anything to do with the kind of car seizure we're
8    talking about in this case?
9 A. I would say other than the tow tag and the -- other
10    than the tow tag and, like, the tow truck involvement
11    is probably it.
12 Q. Are you aware of any written policy in Wayne County
13    that tells you whether you do or don't have to get a
14    warrant to seize a car from somebody's driveway?
15 A. There is no written policy in the county that I was
16    able to locate or that I've been trained on.
17 Q. When you say that you were able to locate, have you
18    tried to locate such a written policy?
19 A. I believe the FOIA in this case directed us to search
20    to see, and I couldn't find anything in any policy. I
21    even looked in the old policy manual just to be sure
22    and nothing. Even -- nothing. There's nothing. This
23    is the only impound and it really just deals with
24    regular patrol.
25     MS. DOWNEY: Okay. Off the record.

Page 44

1     (Discussion off the record).
2 BY MS. DOWNEY:
3 Q. We were talking a little bit about this Castle -- I
4    don't know whether to call it a theory, policy,
5    whatever. A man's home is his castle.
6 A. Yeah. Guideline?
7 Q. Guideline. That's a good way. In your experience,
8    does that relate only to what's inside a house or does
9    it include the area immediately surrounding a house?
10 A. Depending on the area surrounding the house, it would
11    include partially. It would include parts of that,
12    yes, but less -- I would say less protection than
13    anything inside a garage or a house.
14     MS. DOWNEY: Let's just mark this again as
15 number 6, please.
16     DEPOSITION EXHIBIT 6
17     WAS MARKED BY THE REPORTER
18     FOR IDENTIFICATION
19 BY MS. DOWNEY:
20 Q. I'm showing you a very blurry image that --
21 A. That's not too bad.
22 Q. -- was taken from a video, so it's not as sharp as a
23    regular photograph, but it's marked as Exhibit 6, I
24    believe.
25 A. Yes, ma'am.

Page 45

1 Q. And hypothetically, if you rolled up on a scene and saw
2    cars parked where they are depicted here, do you see
3    the white car in the front?
4 A. I do.
5 Q. Would you consider that within the area where you'd
6    have to think about a man's home is his castle?
7 A. It's hard to tell from this picture. I'd have to be
8    out front where you could see the grainy photo of what
9    I recognize as a patrol vehicle from the Sheriff's
10    office. I'd have to be sitting there in order to give
11    you a yes or no.
12 Q. What would it depend on?
13 A. What you could see from the street.
14 Q. What would you be looking for from the street?
15 A. Where was the main entrance to the house, first of all.
16    If there was any vehicles parked in front of there,
17    which there's not. And just what you see. What are we
18    looking for? Are we looking for -- I mean, in this
19    case we're looking for a car with obvious police
20    equipment. Can you see that from the street?
21    That's -- those are very basic definitions.
22 Q. Okay. Would the castle doctrine or guideline depend on
23    whether the car had police equipment? I'm a little
24    confused.
25 A. Well, if -- it's illegal in the State of Michigan to



Page 54

1  call the Martin's Towing.  He could call Martin's
2  Towing, and Martin's Towing, they're going to find out
3  that information.  Maybe they would say, Hey, you're
4  going to have to call the Sheriff's Department down at
5  headquarters.  If you're not getting anything at the
6  road patrol, then you can call headquarters.  They even
7  know.  Don't bother with any -- if you have any kind of
8  complaint, send it to us.  We'll take care of it.
9  Because we don't want them hassled either because, you
10 know, a lot of times they can't do anything about it.
11 They're just the custodian of the vehicle.
12 Q.  That's right.  What if nobody gets back to the owner of
13     the car after they call this number and leave a
14     message?
15 A.  Not sure.  Not sure.  But I know -- and believe me, I
16     know people who file complaints, no matter how
17     ridiculous they are, get answered.  It gets filtered
18     down to where it needs to go.  Say, Hey, did this
19     really happen or, you know, what's going on with this,
20     can you answer that?  So those, the complaints always
21     get adjudicated, I guess, for a better word.
22 Q.  If they know where to find it, right?
23 A.  Well, if they know where to find it.
24 Q.  That's right.
25 A.  I mean, we live in an Internet world.

Page 55

1  Q.  I take it that you're familiar somewhat with vehicles
2      with the internal combustion engines, being on road
3      patrol, correct?
4  A.  Yes, and I worked at a dealership prior to becoming a
5      Sheriff's Deputy.
6  Q.  Then you know about cars.
7  A.  Generally speaking, yes.  You'll have to be a little
8      bit more specific and I'll let you know if I know or
9      not.
10 Q.  That's fair enough.
11 A.  Yeah.
12 Q.  What happens to a car if you don't start it up for
13     several months?
14 A.  Well, it depends on the vehicle.  Normally, nothing.
15     As long as you don't have any parasitic draws on the
16     battery and as long as the battery is good, then
17     nothing.  You should be able to go right out there,
18     turn the key, and on these fuel injected cars, wait a
19     second, let the fuel pump pressurize the system and
20     then turn the key over and have the starter engage and
21     the car should start.
22 Q.  If it has a draw on the battery, what happens?
23 A.  Oh, that battery's dead, and these batteries in cars
24     are not deep cycle batteries.  They have to stay 80
25     percent or better charged in order to last.  If not,

Page 56

1  then they're garbage and they have to be replaced.
2  Q.  Who was in charge of maintaining this car while it was
3      in custody?
4  A.  You'd have to talk to the custodian of the vehicle
5      because basically they just hold it, noncharge.  To my
6      knowledge, they're not responsible for starting the
7      car, driving it around the lot, making sure that the
8      wheel bearings' greased or anything like that.  It's
9      just they're responsible to make sure no damage, you
10     know, comes to it.  No tree falls on it, nobody jumps
11     the fence and knocks the windows out, nobody scrapes it
12     up, stuff like that.
13 Q.  When you say they, who are you referring to?
14 A.  Anybody.
15 Q.  Let me ask you a better question.
16 A.  Okay.
17 Q.  When you said they make sure that there's no tree
18     falling on it or anything, who is that they?
19 A.  Sorry.  The Martin's Tow Yard is responsible for the
20     custody of the vehicle.
21 Q.  Did you have anything to do with making sure that the
22     car was in the same condition as when it was seized
23     except for police equipment?
24 A.  No, I didn't have anything to do with that.
25 Q.  Okay.  We were talking a little while earlier about the

Page 57

1      first page of Exhibit 4.  It's the one that has WC
2      000011 at the bottom.
3  A.  You're talking about the first page of --
4  Q.  First page.
5  A.  -- the property forms?
6  Q.  Yes, sir.  I think that's the PJ 400.  Is that correct?
7  A.  Yeah.  My property forms, not Wojo's.
8  Q.  Yes, yours.
9  A.  All right.  Go ahead.
10 Q.  After you filled out this form, did you send a copy to
11     the owner of the car?
12 A.  No.
13 Q.  Why not?
14 A.  Because the car was underneath investigation for
15     criminal activity.  Had he asked, I probably would have
16     gave it to him, but I never had any contact with Mr.
17     Habich at all.
18 Q.  Did you send a copy of the warrant to the owner of the
19     car?
20 A.  No.
21 Q.  Okay.  I believe that's all the questions I have this
22     morning, sergeant, except for if there's a follow-up.
23     Thank you for your time.
24 A.  No problem.
25         MR. STELLA:  Do you want to take a break



Page 58

1    or -- because I've got a lot of questions.
2             (A recess was taken from 11:30 a.m. to 11:38
3    a.m.)
4    EXAMINATION BY MR. STELLA:
5    Q.  Hi, sergeant. This is Davidde Stella and I have a few
6        follow-ups from the questions you were asked earlier.
7        You were asked a lot about the complaint process by
8        civilians. Were you ever made aware of a complaint
9        that Mr. Habich made against the Sheriff's Office aside
10       from this lawsuit?
11   A.  Aside from the lawsuit, no.
12   Q.  Were you ever informed of any phone calls that he had
13       made to the Sheriff's Office?
14   A.  No.
15   Q.  Were you ever informed of a written complaint ever
16       being filed?
17   A.  No.
18   Q.  In your practice, if people call and reach a desk
19       sergeant or leave a message at the 734721 (sic) number
20       on Exhibit 7, you know, are messages often relayed to
21       you?
22   A.  Yes, I get a lot of them written on those little pink
23       missed-you-while-you-were-gone notes.
24   Q.  So if Mr. Habich had called twice or 3 or 4 times,
25       would you expect that somebody would have given you

Page 59

1    that message?
2    A.  At least once, yes.
3    Q.  Just to be clear, I think you made this clear already,
4        sergeant, but you've never met -- have you met Mr.
5        Habich?
6    A.  Never.
7    Q.  Have you ever been to this Romulus address?
8    A.  No.
9    Q.  Are you able -- since you've never been to the address,
10       can you make a guess about what can be seen from where?
11   A.  No. I don't like making guesses. Not when it comes to
12       that, no.
13   Q.  Do you know -- so what is Martin's Towing? Does
14       Martin's Towing have a contract with Wayne County?
15   A.  As far as I know, yes.
16   Q.  How many years have you dealt with Martin's Towing?
17   A.  Pretty much my whole career.
18   Q.  And how far is Martin's Towing away from the Henry Ruff
19       station?
20   A.  Actually, they have more than one yard, but the main
21       yard is in Brownstown, which is on Allen and
22       Pennsylvania area right there. It's, like, 3 different
23       cities but it's in Brownstown side.
24   Q.  And the 2008 Dodge Charger that's at issue in this
25       case, was this ever on a Wayne County lot during this

Page 60

1    entire period?
2    A.  Not to my knowledge.
3    Q.  Was the vehicle always located at Martin's Towing until
4        it was returned?
5    A.  No.
6    Q.  Where else was it?
7    A.  Priority 1 Police Equipment.
8    Q.  Okay. Yeah, maybe I should just clarify. So other
9        than Priority 1, was it always on Martin Towing's --
10   A.  Not to my knowledge.
11   Q.  Yes, to your knowledge? What --
12   A.  Not to my knowledge. The only place it went from its
13       parking spot basically assigned at the tow yard was to
14       Priority 1.
15   Q.  I have a question about the Dodge Charger. Did you
16       have a chance to open the hood?
17   A.  Yes. When I was jumping it.
18   Q.  Okay. Did the Dodge Charger have a stock Dodge Charger
19       motor or was it what people call a cop motor?
20   A.  I don't know. I'd have to run the vehicle
21       identification number to be sure.
22   Q.  Okay. Is there such thing -- I'm sorry I'm using a bad
23       term, a cop motor. Do you know what that means?
24   A.  Yes.
25   Q.  What does it mean?

Page 61

1    A.  I believe what you're saying is does -- if you don't
2        mind me --
3    Q.  Yeah.
4    A.  An '08 Dodge Charger came equipped with a civilian
5        package for the general public and for -- a police
6        package for police, fire, you know, special service. I
7        don't know the designation that they give it, but extra
8        suspension, brakes, the motor's more powerful. Even if
9        it's the same -- even if it's the V-6, it still shifts
10       better. You know, stuff like that. There's no
11       governor on it, so.
12   Q.  Do you know if this Dodge Charger had this upgraded cop
13       package?
14   A.  I can only assume that if at any time it was ordered as
15       a special service, law enforcement vehicle, then yes,
16       it would.
17   Q.  Sergeant, did you get a chance to look inside the
18       vehicle after a search warrant was obtained?
19   A.  Yeah, I did.
20   Q.  Did you have a chance to look at how the lights that
21       you mentioned were installed on the car? Like, the
22       manner they were installed?
23   A.  Yeah. Some of the lights were -- like, the push bumper
24       lights and the lights in the back window, you could see
25       the wires coming up or whatever, so if that's what



Brian Glatfelter
11/29/2021                                   Pages 66..69

Page 66

```
 1     personally, how would you get there from this picture?
 2  A. Well, if there's no front door and I was directed what
 3     the -- in this picture what the front door is, I'd have
 4     to go to that door that's next to the open trunk there
 5     in this picture.
 6  Q. So on Exhibit 2 on this tag --
 7  A. All right.  You're talking about the tow tag from
 8     Corporal Wojciechowski?
 9  Q. Is this type of document something that you would
10     normally see after it was filled out or did you see
11     this document at some point later?
12  A. This is basically for -- this document would be for the
13     tow company and for recordkeeping, so it's really --
14     would get filed with records.  It's not part of any
15     kind of criminal matter, unless it gets FOIA'd, of
16     course.
17  Q. So the idea is that in normal course, when a vehicle is
18     impounded, does Corporal Wojo have to drop this
19     document off on your desk to look at?
20  A. No.
21  Q. So when you were asked about reason towed, it was
22     A-C-C, A-B-A-N, and so it's on the third column down on
23     the right, reason towed?
24  A. Yes.
25  Q. What does A-C-C stand for?
```

Page 67

```
 1  A. Accident.
 2  Q. And then what is A-B-A-N?
 3  A. ABAN.
 4  Q. Okay.  And ARREST, is that --
 5  A. Is an arrest.
 6  Q. And what is REC?
 7  A. It's actually recovered stolen.
 8  Q. Okay.  So is there any --
 9  A. And then there's --
10  Q. Oh, go ahead.
11  A. Yeah, go ahead.
12  Q. So is there any check box for seizing evidence in a
13     criminal investigation?
14  A. No.
15  Q. Do you know why Corporal Wojo would have marked arrest
16     on this as opposed to an accident, abandoned --
17  A. Well, just guessing --
18  Q. -- or stolen?
19  A. Just guessing, it would probably be out of habit.
20  Q. Okay.  But there's no box for criminal investigation?
21  A. No.  He could have wrote it in.
22  Q. So when you executed the search warrant, the signed
23     search warrant from 35th District Court, was this at
24     Martin's Towing?
25  A. It was.
```

Page 68

```
 1  Q. And does the Sheriff let Martin's Towing ever access
 2     these cars?  Can they get inside of them?
 3  A. Not while they're in the secured storage, no.
 4  Q. And then let's look at Exhibit 5 real quick.
 5  A. Exhibit 5 is?
 6  Q. Is the impound.
 7  A. Impound, yeah.  All right.
 8  Q. Okay.  You were asked a couple questions about whether
 9     this applied to a general criminal investigation.  Do
10     you remember that?
11  A. Yes.
12  Q. Did you have a chance to actually read through all this
13     before?
14  A. Before I got here?
15  Q. Yeah.
16  A. No.
17  Q. But it's your impression, without studying it, that
18     this is not applicable?
19  A. Well, it's just my impression of this policy always has
20     been that it is a general patrol policy based on
21     traffic stops and abandoned vehicles from, yeah, on the
22     roadway and stuff like that.
23  Q. Okay.  And you said that maybe some of the towing
24     procedures and all that stuff would be used in a
25     regular criminal investigation?
```

Page 69

```
 1  A. It all depends on the circumstances.  It really does.
 2  Q. Sergeant, are you in charge of the training of the
 3     deputies below you?  The formal training?
 4  A. I'm not.
 5  Q. Do you know who is in charge of training?
 6  A. There's a lieutenant assigned to the training unit.  I
 7     do not know -- I want to say it's O'Rourke.  Can't just
 8     be a simple name, I know.
 9  Q. So my question would be do you decide what formal
10     training are provided for deputies who report to you?
11  A. I do not, but generally speaking, if I do get e-mail
12     notification from an outside agency that training is
13     available that's applicable, I'll have them apply to
14     take the training.  But they have to apply to the
15     training unit, which has to approve, and that's -- in
16     the last couple years, that's been nothing, so.
17  Q. When you had a chance to execute the search warrant,
18     did you attempt to see if all the -- if the lights
19     installed in the vehicle worked?
20  A. Yes.
21  Q. Okay.  And did they work?
22  A. Yes.
23  Q. So you saw them in operation and what they would look
24     like is what I'm asking.
25  A. I did.
```

