# EXHIBIT 4

**John Wojciechowski**
**11/03/2021**

1      IN THE DISTRICT COURT OF THE UNITED STATES
2         FOR THE EASTERN DISTRICT OF MICHIGAN
3                    SOUTHERN DIVISION
4
5   EUGENE HABICH,
6              Plaintiff,
7      vs.              Civil Action
8                       No. 2:20-cv-12528
9                       Hon. David M. Lawson
10                      Magistrate Judge Anthony Patti
11  WAYNE COUNTY, CORPORAL JOHN WOJCIECHOWSKI,
12  and DEPUTY CHRISTOPHER MITTLESTAT, in
13  their individual and official capacities,
14             Defendants,
15  _____/
16  PAGE 1 TO 101
17
18      The Deposition of JOHN WOJCIECHOWSKI,
19      Taken at 500 Griswold,
20      Detroit, Michigan,
21      Commencing at 10:17 a.m.,
22      Wednesday, November 3, 2021,
23      Before Jill Sickels, CSR 0162.
24
25



Page 18

1  and then we'll go on from there.
2  A. Well, let's put it this way. If I think there's
3     contraband in a vehicle or something like that, I'll use
4     a vehicle because it's much smaller, but I'm not going
5     to let somebody go in it until I see that we either go
6     through it and make sure that it's safe -- you know,
7     we're not going to -- I'm not going to let somebody go
8     in there and, like, destroy evidence if I think there's
9     evidence in there, put it that way.
10 Q. How about if you had seen the same contraband that we
11    talked about in our hypothetical being behind a picture
12    window and you would call your supervisor, what if you
13    saw it in the flower bed right next to the siding on the
14    house?
15 A. Nobody's going to go by that flower bed.
16 Q. Okay. But would you seize the contraband?
17 A. Well, in a way that would be kind of like seizing it. I
18    might not physically touch it but I'm still going to
19    seize that area.
20 Q. Okay. Until when?
21 A. Until my supervisor is contacted and we go from there.
22 Q. So you kind of treat the area around the house the same
23    as you would the house itself?
24 A. Sure.
25 Q. Why is that?

Page 19

1  A. If there's evidence there, you're protecting that
2     evidence. You might be protecting yourself if it's a
3     weapon. Now, if I'm going to -- if I see a gun in a
4     flower pot and there's a guy standing there and he's
5     going to lunge for it, we're going to talk about a
6     different ball game.
7  Q. What will you do in that instance?
8  A. Whatever I have to do to walk away from there.
9  Q. Including drawing your weapon if necessary.
10 A. Yeah. If I've got to protect you, anybody else around
11    there, yes.
12 Q. For example, if a guy is coming toward you with what
13    looks to be a weapon in a holster and his hand on it and
14    he's approaching you, you're going to react, right?
15 A. I'm going to react, but you said it looks like a weapon.
16    You didn't say it was a weapon. There's a difference
17    between what looks like a weapon and what is a weapon.
18 Q. Exactly. What do you do in that instance? Do you know
19    the difference at sight whether it's a weapon or just
20    looks like a weapon?
21 A. At some point, you're going to find out if it's a weapon
22    or not.
23 Q. Right.
24 A. You've got to look at it that way.
25 Q. That's true. To walk away from that, what are you going

Page 20

1  to do?
2  A. What do you mean, to walk away from it?
3  Q. To walk away from it. Say a guy's coming with you and
4     he's got his hand on something in a holster.
5  A. He's given verbal commands, you know.
6  Q. And if he's walking toward you and he's still talking,
7     what happens next?
8  A. You still give him verbal commands.
9  Q. Is it a threat to the officer if he's doing that?
10 A. Yeah, it could be.
11 Q. It could be, okay.
12 A. Uh-huh.
13 Q. Now, let's talk about the incident that brought us here
14    today. When is the first time you heard about this
15    Charger?
16 A. I want to say it was on the 1st of August.
17 Q. Of 2020?
18 A. Yes.
19 Q. Who told you about it?
20 A. Sergeant Glatfelter.
21 Q. What did he tell you?
22 A. He told me -- he actually gave me the plate. He told me
23    -- I don't know if he told me find this car or find out
24    what I can on the car.
25 Q. And what did you interpret that to mean?

Page 21

1  A. Well, basically he told me there was an incident
2     involving Corporal Spaulding and that's -- you know, I
3     think he said something like, If you can find this car,
4     find it, or if you can find out anything about it, let
5     me know.
6  Q. And what did you do after that?
7  A. I started looking into it. I started -- I ran the
8     plate. It came back to the registered owner, Mr.
9     Habich.
10 Q. Habich.
11 A. Habich, okay. And it came back to an address in
12    Dearborn, and Mr. Habich came back to the same address
13    in Dearborn.
14 Q. And what did you do then?
15 A. Mittlestat was available so both myself and Deputy
16    Mittlestat went to the Dearborn address on Firestone.
17    As we walked up to the house, I noticed that the house
18    was -- it had a lot of surveillance cameras on it, okay,
19    so I actually notified my partner of that because that's
20    actually a safety issue. He went off, stood off to the
21    side of the house. I went to the door, stood to the
22    side of the door, knocked on the door. No answer.
23 Q. Can you clarify for me, why is it a safety issue when
24    there's surveillance cameras?
25 A. Because we don't know if that guy -- if there's somebody



John Wojciechowski
11/03/2021
Pages 22..25

Page 22

1    in that house that has a gun pointed at us.
2  Q. Understood. Okay.
3  A. Yes.
4  Q. What happened next?
5  A. I knocked on the door. There was no answer. Knocked on
6     the door again. There was no answer. And I was walking
7     off the porch and I don't know -- I seen a neighbor and
8     I asked the neighbor if the guy lived there, Mr. Habich,
9     and he told me that he lived there but he wasn't home
10    because there was no car in the driveway, okay.
11 Q. Did the neighbor give you a name, identify himself in
12    any way?
13 A. I want to say he lived directly across the street. I'm
14    not positive if I do have his direct -- if I still have
15    his name or not.
16 Q. Would that be written down somewhere?
17 A. It might be in my notes. Usually, when -- I kind of
18    like go back to, I guess you can say, the way we did
19    things, like, when I worked for the apprehension teams.
20    Like, when I went to the house, I had a picture of the
21    guy. You definitely want to know who you're looking for
22    and everything. So if I talk to somebody, I usually,
23    like, would flip it over and I write notes on the back
24    of it, or if it's folded up, I open it up and write
25    notes on it. Now, if I still have them, I'm not sure.

Page 23

1  Q. What's your habit in retaining your notes?
2  A. What do you mean?
3  Q. Do you customarily file your notes somewhere or --
4  A. Well, yeah. We used to call them jackets, but it's just
5     like that folder you have there. Because you're
6     building -- you know, I mean, you might go look for
7     somebody one day and you put notes in there, like, where
8     you've been and who you talked to or something like that
9     but you might not work on that file for, like, the next
10    week or 2 weeks, you know, so.
11 Q. Certainly.
12 A. But at least I can go back and tell, hey, you know, this
13    is what we did, so.
14 Q. Okay. Got it. All right. After that, what happened
15    next?
16 A. Actually, I talked to the gentleman. I remember his
17    wife. They were in -- he pulled up in an SUV and I
18    remember talking to him, not her, and he said that -- he
19    said that he talked to him and he said that he was going
20    to be gone for a couple days. He was going to go stay
21    with his girlfriend. And I asked him if he knew his
22    family and he said not really well. He didn't know
23    their names or anything like that. He didn't even know
24    the girlfriend's name.
25 Q. What did you do after that?

Page 24

1  A. I went and did some research and I pulled up some
2     previous addresses that I found on him and I actually
3     started driving around until I came to the Olive
4     address.
5  Q. When you said you pulled up previous addresses, what
6     system or database did you use?
7  A. We can use LEIN. I've actually used Google, too.
8  Q. Which one did you use here?
9  A. I think I used both of them.
10 Q. Okay. And go ahead. You came to the Olive Street
11    address in Romulus?
12 A. Right. And the car was parked right there in the
13    driveway.
14 Q. What did you see from the street?
15 A. The whole car. The whole driver's side of the car and
16    the whole front of the car.
17 Q. I'm going to ask what's going to be a very silly
18    question --
19 A. Okay.
20 Q. -- with an obvious answer. You could not see inside the
21    car from the street, could you?
22 A. I can see through the windshield.
23 Q. You could not see into the trunk, correct?
24 A. Not in the trunk, no.
25 Q. And you could not see below the dash, correct?

Page 25

1  A. No, not below the dash. Not from the outside.
2  Q. Not from the street.
3  A. No.
4  Q. After you saw the -- well, let's talk about seeing it
5     from the street. Was the car parked with the front of
6     the car toward the street or the back of the car toward
7     the street?
8  A. The car was backed in the driveway along the side of the
9     house and there was another -- I think it was an SUV
10    behind it. Facing inward, though.
11 Q. Was the car backed in in front of the front of the house
12    even with the front of the house or behind the front of
13    the house?
14 A. I want to say it was even with the front of the house.
15    There was no fence, no gate.
16 Q. How close was the car to the side of the house?
17 A. What's normal width of a driveway? I mean, you could
18    walk up -- you could walk between the house and the car
19    but I don't know --
20 Q. Could you have fit another car in between?
21 A. No, no, no, no.
22 Q. Within a car length?
23 A. Less than a car length.
24 Q. Less than a car length, okay.
25 A. Less than the width of a car.



Page 26

1 Q. That's a better way to put it. You're absolutely right.
2   Okay. Very good. What did you do -- let me stop again.
3   The car was parked with the front of the car toward the
4   street. What did you see on the car?
5 A. There's a push bar with what appeared to be an emergency
6   light on it, in the grille between the push bar, there
7   was emergency -- what appeared to be emergency lights,
8   and through the windshield it looked like it had a light
9   bar on it.
10 Q. Is it illegal, in your opinion, to have a push bar?
11 A. No. Not that I know of, it's not.
12 Q. And were the lights operating at the time you saw them?
13 A. No.
14 Q. What did you do after that?
15 A. Actually, I notified Sergeant Glatfelter that I found
16   the vehicle and I believe that's when he had Deputy
17   Mittlestat make my location. Being a one-man person,
18   I'm not going to go up to the house by myself. That's
19   our policy.
20 Q. And just to have a clear record, when you say make the
21   location, that means come to the location?
22 A. Correct.
23 Q. While you were waiting for -- is it Deputy Mittlestat?
24 A. Yes.
25 Q. Okay. While you were waiting for Deputy Mittlestat to

Page 27

1   get there, what did you do?
2 A. I actually sat back, I think, a couple houses and then
3   waited.
4 Q. How long did that take?
5 A. I wouldn't say more than 10, maybe 15 minutes.
6 Q. Once Deputy Mittlestat was in range or nearby, what
7   happened next?
8 A. He, Deputy Mittlestat, actually, like, pulled up in
9   front of the house on, I guess you'd say, the north side
10   of the driveway and I pulled up more on the south side
11   of the driveway.
12 Q. And then what did you do?
13 A. We both got out of our vehicles.
14 Q. Where did you go?
15 A. We both started walking up the driveway. I noticed that
16   there was a dog out so I asked about the dog, if the dog
17   bites or anything.
18 Q. Was the dog leashed at any time?
19 A. I don't believe it was. I don't think it was.
20 Q. Did the dog attack anybody?
21 A. No, no, uh-uh.
22 Q. Go ahead. After you asked about the dog, what else did
23   you do?
24 A. Then I inquired -- there's a gentleman there. Mr.
25   Harbich?

Page 28

1 Q. Habich.
2 A. Habich and a lady, and I asked Mr. Habich -- I either
3   asked him if he was the owner of the car or he knew who
4   the owner of the car was. That I'm not sure. I would
5   have to -- I don't know if I've got that in my report.
6   But I know I did ask him for ID.
7 Q. Did he ask why you were there?
8 A. At first, no.
9 Q. While you were asking Mr. Habich for ID, what was Deputy
10   Mittlestat doing?
11 A. I believe he started walking around the vehicle and he
12   checked the plate on the vehicle to make sure it was the
13   right vehicle that we were looking for.
14 Q. Which side of the vehicle did he walk on? The side by
15   the house or the side on the other side?
16 A. I think in between the house and the car. I think
17   that's where he was.
18 Q. And where were you and Mr. Habich at that time?
19 A. I think we were still in front of the car. Maybe a
20   little bit off to the driver's side, if that makes
21   sense.
22 Q. Did Mr. Habich give you ID?
23 A. Yes, he did.
24 Q. What did you say next?
25 A. I think I started inquiring about the car but I don't

Page 29

1   remember the exact questions I asked him. But I think,
2   I know I did ask him if he owned the car.
3 Q. What did he say?
4 A. He told me that -- I think at first he told me he owned
5   the car, and then I think he told me that it belonged to
6   a security company.
7 Q. All right.
8 A. And then --
9 Q. And what else did you say?
10 A. I asked him what security company, and I think he was
11   hesitant about even answering me on it. He didn't want
12   to give me no information, because I even -- when we got
13   down to impounding the car, I told him I needed the
14   security company's contact, his boss's contact, a phone
15   number and everything, and he said, No, I'll have him
16   call you.
17 Q. So he was reluctant to give you information?
18 A. Yep.
19 Q. Was he also reluctant to give you the car?
20 A. He was actually -- no, he was actually pretty good about
21   it when I explained what happened. He actually told me,
22   you know, when I told him what -- well, actually, I
23   asked him what happened and he told me what happened
24   with Corporal Spaulding in his words, okay.
25 Q. Yeah, I notice you looking at your --



Page 30

1  A. Well, because I don't remember it word for word, but I
2     know it's in here, so.
3  Q. Okay. When did you decide to impound the car?
4  A. Actually, we -- it was going to be impounded because
5     there's an investigation going on. A possible criminal
6     investigation.
7  Q. Did you know that when you first walked up to Mr.
8     Habich?
9  A. If that was the car, yes.
10 Q. That you were going to impound it right -- you knew that
11    when you walked up to him?
12 A. Well, after I started talking to him, yes.
13 Q. Before or after he told you his story?
14 A. I don't know if I realized -- I think once we got the
15    plate, we knew that that was the car that was involved.
16    I think at that point I knew that I was going to impound
17    the vehicle for investigation.
18 Q. When you impound for investigation, what is the
19    procedure?
20 A. Well, I told him -- I let him know that I was going to
21    impound the vehicle and he goes, Can I get my stuff out
22    of the vehicle? I said, What kind of stuff are you
23    talking about? He said, Some personal stuff. I said,
24    What do you have in there? And I think he told me, Some
25    tools and some other things, and I told him, Well, we're

Page 31

1     going to have to go through that vehicle first to make
2     sure there's no weapons in there. Because I'm not going
3     to say, Oh, yeah, go ahead, and the guy reached
4     underneath his car or his front seat and pulls out a gun
5     and shoots everybody, so.
6  Q. What is the procedure that Wayne County has you follow
7     to impound a vehicle?
8  A. When we impound a vehicle, it's either for investigative
9     purposes or, like, let's say driving on a suspended
10    license. We're going to impound that vehicle because
11    that person should not be driving that car, but we're
12    also going to search that vehicle for an inventory
13    search. Somebody might leave their computer in there.
14    Somebody might leave money in there. You know,
15    something like that. Sometimes you find weapons in
16    cars. Sometimes you find drugs in cars.
17 Q. When do you fill out an inventory? When do you fill out
18    that inventory, right --
19 A. I usually write it --
20 Q. -- then and there on the spot?
21 A. -- on the tow tags. I usually write it on the tow tags.
22    Or if it ends up being, like, evidence or something like
23    that, it ends up on a PJ 400, which is a --
24 Q. Let me back up. You said you write it on the tow tag.
25    When do you write the tow tag?

Page 32

1  A. Before the tow truck driver gets there because we
2     usually give them a copy.
3  Q. You give a copy to the tow truck driver?
4  A. Correct.
5  Q. Do you give a copy to the person who owns the car?
6  A. No.
7  Q. Why not?
8  A. Was never told to. Never -- that's not the way our
9     policy tells us.
10 Q. We've been talking little bits about a policy. Is that
11    a written policy or is that --
12 A. That's the way I was trained, the way I was FTO'd is you
13    fill out the tow tag. The only thing that I give the
14    driver, or, you know, the owner of the car or the person
15    -- because sometimes the cars we tow aren't the owner's
16    car, we give them a copy of the Martin's business card,
17    okay. But I think in this case, because of the
18    situation, he was told that the car was being held for
19    investigative purposes and I believe he was given a
20    number to Sergeant Glatfelter's office.
21 Q. Did he --
22 A. To contact him.
23 Q. Did he ask you whether you had a warrant?
24 A. No, he didn't.
25 Q. Did he ask you whether there was an incident number?

Page 33

1  A. No, he didn't.
2  Q. Did he ask you whether there was a case number?
3  A. No.
4  Q. At any time, did you say that you were going to be
5     taking the car whether he consented or didn't consent?
6  A. No. He never even -- that conversation -- he was
7     actually pretty calm through this whole thing.
8  Q. Well --
9  A. Yeah.
10 Q. You had the gun and he didn't, right?
11 A. That might have been the way he looked at it. That's
12    not the way we looked at it.
13 Q. Okay. Were you trained that when you impound a car as
14    part of an investigation, you need a search warrant?
15 A. No. We don't always need a search warrant.
16 Q. When do you or do you not need a warrant to seize a car?
17 A. When do I what?
18 Q. When do you need a search warrant to seize a car for
19    investigation, to impound a car for investigation?
20 A. I don't think I've ever used -- I can't remember. Let's
21    just say I'll put it this way. I can't recall ever
22    getting a warrant to seize a car unless it was, like, --
23    and I'm not saying that I did this, but I think it's
24    been done a couple times for, like, like, felonies or
25    something like that. Like, a murder case or something



**John Wojciechowski**
11/03/2021    Pages 38..41

Page 38

1  depends. It depends. Like, on the bottom, if it's
2  involved in an accident, I might put on there accident.
3  In this incident, I put down there that it was set up
4  like a police vehicle, had police lights, CAD, and just
5  some information that was in the vehicle.
6  Q.  How important is it to get details right in a tow tag?
7  A.  Details are pretty -- I mean, these are pretty, like,
8  general, so I don't know, you know.
9  Q.  Do you expect other law enforcement or prosecutors to
10    ever rely on the tow tag information?
11  A.  I don't know what other law enforcement agencies do. I
12    mean, I think -- to tell you the truth, I think we're
13    one of the last agencies that even hand prints a tow
14    tag. So I don't even know what they even put on their
15    tow tags.
16  Q.  Automation hasn't come to Wayne County, huh?
17  A.  No.
18  Q.  Okay.
19  A.  Tell my carpal tunnel that.
20  Q.  I understand. I've got a question here. You've got the
21    third line down toward the right, it says, Reason towed.
22    Do you see that box?
23  A.  Right, uh-huh.
24  Q.  Do you see a check on the box that says arrest?
25  A.  Correct.

Page 39

1  Q.  Why did you check that box?
2  A.  Because it was involved in an investigation and it could
3    be -- lead up to an arrest.
4  Q.  Okay. But --
5  A.  And I think he was informed of that, that he -- you
6    know.
7  Q.  But he hadn't --
8  A.  He could be, he could be charged.
9  Q.  But you weren't intending by that to say that he had
10    been arrested and this was --
11  A.  No, he was not --
12  Q.  -- seized incident to arrest?
13  A.  He was not arrested at that time.
14        MS. DOWNEY:  I'm going to mark this as Exhibit
15    2, please.
16        DEPOSITION EXHIBIT 2
17        WAS MARKED BY THE REPORTER
18        FOR IDENTIFICATION
19  BY MS. DOWNEY:
20  Q.  We are looking at what we've marked for identification
21    as Deposition Exhibit Number 2. Can you tell me what
22    that report's called?
23  A.  This is, this is what we call a PJ 400 and this is used
24    for, like, something if we take it out of the vehicle.
25    It could be a gun. Any type of contraband or anything

Page 40

1  that we actually remove from the vehicle would go on
2  this.
3  Q.  So that's not an inventory report, correct?
4  A.  Correct.
5        DEPOSITION EXHIBIT 3
6        WAS MARKED BY THE REPORTER
7        FOR IDENTIFICATION
8  BY MS. DOWNEY:
9  Q.  Corporal, I'm showing you what's marked for
10    identification purposes as Deposition Exhibit Number 3.
11    Is that kind of report what you meant by an inventory
12    report?
13  A.  This could be an inventory report, yes.
14  Q.  Did you fill out this report?
15  A.  This one that you just handed me?
16  Q.  The one that --
17  A.  The second one?
18  Q.  Yes, sir. Number 3.
19  A.  No, I believe that was Sergeant Glatfelter.
20  Q.  Did you file or fill out any inventory report on this
21    car at any time?
22  A.  I put on the notes on the tow tag and I filled out the
23    evidence that I took out of the car.
24  Q.  But you didn't have a long report like this about what
25    was in the car, correct?

Page 41

1  A.  No. It says when it was turned -- after the vehicle was
2    impounded, it was actually -- the whole case was turned
3    over to Sergeant Glatfelter.
4  Q.  Is it policy that the officer who impounds the car does
5    not fill out the inventory?
6  A.  Not necessarily. Yeah.
7  Q.  What's the policy?
8  A.  Good question. But I know that other people have filled
9    out tow -- I mean, inventory sheets on vehicles before.
10  Q.  To your knowledge, there's no hard and fast rule about
11    which of you does that?
12  A.  Uh-uh. No.
13  Q.  That would be no.
14  A.  Not that I know of.
15  Q.  When you were at the Habich home on Romulus, excuse me,
16    in Romulus on Olive --
17  A.  Wait, wait, wait. I've got a question. How come the
18    case number is different on here?
19  Q.  That was a very good question. Do you have any
20    understanding of why that would be?
21  A.  No.
22  Q.  Where did you get your case number?
23  A.  From my dispatch. Now, this could be the original case
24    number from Corporal Spaulding's case. That's why that
25    could be different. Okay. That makes sense.



Page 42

1  Q.  And did you read that report that Corporal Spaulding had
2      made with that other number on it?
3  A.  No. I've never even seen that report.
4  Q.  Did you do anything else with regard to this case
5      after --
6  A.  After I impounded the vehicle?
7  Q.  After you impounded the vehicle, you had no further --
8  A.  Other than being asked questions, no.
9  Q.  Did you have anything to do with taking care of the car
10     while it was at the towing company?
11 A.  No.
12 Q.  Did you ever go back and check on the condition of the
13     vehicle?
14 A.  No.
15 Q.  When you were at the site and impounding the car, did
16     you ever turn on that computer to find out what it was?
17 A.  No.
18 Q.  Did you ever check the radio to find out whether it was
19     a ham radio or some other kind of radio?
20 A.  No.
21 Q.  Give me just a couple of minutes, corporal. I'm just
22     going to check a couple of things and see if I have any
23     other questions or not.
24 A.  Okay.
25 Q.  Okay. Thank you.

Page 43

1          MR. STELLA: Do you want to go off the record
2      for a second?
3          (Discussion off the record).
4  BY MS. DOWNEY:
5  Q.  Corporal, this car was not seized pursuant to any
6      forfeiture law, was it?
7  A.  Not that I know of.
8  Q.  When you impounded the car, did you tell Mr. Habich that
9      there was any way that he could get the car back?
10 A.  I told him -- if I remember correctly, I gave him
11     Sergeant Glatfelter's number, contact number, and told
12     him that he needed to talk to him about how -- I think
13     what was being investigated and what he would have to do
14     to get the car back.
15 Q.  Did you give him any written form?
16 A.  As in what?
17 Q.  Any kind of a form from the county to tell him what to
18     do to appeal the seizure or to get the car back?
19 A.  No, uh-uh. I didn't.
20 Q.  Are you aware of any such form in existence?
21 A.  I think if they do a seizure, they do, but at that
22     point, I wasn't doing a forfeiture seizure, so.
23 Q.  As far as you know, when it's impounding a car for
24     investigation, is there any form that Wayne County has
25     to give to the owner of the car to tell them what to do

Page 44

1      to get the car back?
2  A.  Uh-uh. We verbally tell them. We give them the copy of
3      the -- like I said, a business card for a tow company,
4      and an investigation like this, I would give him my
5      immediate supervisor's information.
6  Q.  What happens if the phone call doesn't get returned?
7  A.  I've never had that problem so I don't know.
8  Q.  Is there any office in Wayne County, to your knowledge,
9      that a citizen can go to if they can't get ahold of the
10     sergeant?
11 A.  He can come straight to our road patrol.
12 Q.  Is there any way for the citizen to know where the
13     sergeant works? You gave Mr. Habich a business card --
14 A.  The tow company. And then I gave him a piece of paper,
15     the number to our road patrol. So that was letting him
16     know that that's my supervisor. This is my supervisor,
17     here's the contact number.
18 Q.  Okay. Let's just mark this here as Deposition Exhibit 4
19     so that we're all talking about the same thing.
20         DEPOSITION EXHIBIT 4
21         WAS MARKED BY THE REPORTER
22         FOR IDENTIFICATION
23 BY MS. DOWNEY:
24 Q.  I've marked for identification as Deposition Exhibit
25     Number 4 a blown-up copy of the back of that card. Do

Page 45

1      you recognize that as your handwriting, sir?
2  A.  Which card are you talking about?
3  Q.  Okay. What I've got here is a blown-up copy of the back
4      side of the Martin's towing card that you handed to Mr.
5      Habich. Is that --
6  A.  That looks --
7  Q.  -- your handwriting?
8  A.  That looks like my writing. It could be, yes.
9  Q.  So that's the information that you gave him. It's got
10     Wayne County Sheriff's Office. Is that Sergeant
11     Glatfelter?
12 A.  Correct.
13 Q.  And a phone number and a case number, correct?
14 A.  Correct.
15 Q.  It doesn't say anything about road patrol, does it?
16 A.  I work secondary roads. He was given all that
17     information when I was there.
18 Q.  Not in writing, just --
19 A.  Oh, no, not in writing, but I did give him Sergeant
20     Glatfelter's number, name and number and the case number
21     and reference. That's what we do for everybody if we
22     need to give them the supervisor's information.
23 Q.  Is that number the sergeant's personal number or a
24     number that rings at the desk or --
25 A.  That is a number at the office. That is an office



John Wojciechowski
11/03/2021
Pages 46..49

Page 46

1   number.
2   Q. Who is --
3   A. I don't want these, do I?
4   Q. No, sir, you don't. When the phone rings at this
5       number, what desk is that phone at?
6   A. I think that goes to every phone, but we do have a desk
7       officer.
8   Q. Do you have an answering machine also?
9   A. I believe they do have an answering machine. I'm not
10      positive on that, though. I've never had to call that
11      number that I remember.
12  Q. There was nothing else in writing that you gave Mr.
13      Habich that day, was there?
14  A. Uh-uh. Not that I remember, no.
15  Q. You know, I have a question about the Answer to the
16      Complaint and I ask to find out whether we have a
17      difference of opinion as to facts or as to law, so I'm
18      going to just have this marked as Exhibit 5 so we know
19      what we're talking about.
20          DEPOSITION EXHIBIT 5
21          WAS MARKED BY THE REPORTER
22          FOR IDENTIFICATION
23  BY MS. DOWNEY:
24  Q. By the way, corporal, is this the first time you've ever
25      been sued in a case arising from your duties?

Page 47

1   A. I think I was named in one other suit before. A long
2       time ago.
3   Q. What was the allegation in that one?
4   A. If I remember correctly, it was -- it happened in
5       registry where an inmate attacked an officer and the
6       inmate was taken to the floor and he was injured and he
7       filed a lawsuit, and to tell you the truth, I don't even
8       know what happened in that lawsuit.
9   Q. Okay. How long ago was that?
10  A. Early 2000s, I think.
11  Q. Did you have to give testimony in that case?
12  A. No, I just came to one of these, and that was it, so.
13  Q. Do you know whether that was pending in the federal
14      courts or in the state courts?
15  A. I don't even remember, tell you the truth.
16  Q. Okay. Fair enough. I'm showing you what we marked as
17      Exhibit 5, which I will just tell you for your
18      information is an Answer that was filed on your behalf
19      in this case. And I seem to have lost track of my copy.
20      Oh, here it is. Okay. Great. There is an allegation
21      on paragraph 39, if you go to that, on page 13, okay,
22      and it says that Plaintiff has suffered damages from the
23      seizure of his property, including loss of the property
24      itself, costs and efforts to obtain other
25      transportation, and mental anguish, humiliation,

Page 48

1   annoyance and frustration, and the answer is, Denied as
2   untrue. Do you see that?
3   A. Yeah, I see it. It's exactly what you read.
4   Q. Okay. Do you have any information that Mr. Habich did
5       not suffer any damages here?
6   A. I have no information that he suffered any damages or
7       did not.
8   Q. Okay. That's what I wanted to find out.
9   A. Yeah.
10  Q. Do you know whether Wayne County Sheriff's Department is
11      a department of Wayne County?
12  A. If Wayne County Sheriff's Department is a department of
13      Wayne County?
14  Q. Yeah.
15  A. Of the County of Wayne, it is.
16  Q. Okay. On page 14, paragraph 42, is there a reason that
17      it says that you don't know whether that's true or not?
18      Paragraph 42, it says the Wayne County Sheriff's
19      Department is a department of the government of
20      defendant Wayne County. Answer --
21  A. When did I say this?
22  Q. Well, there's an answer down there and that's why I'm
23      asking you --
24          MR. STELLA: Well, I'm going to interject
25      here, okay. I filed this Answer on his behalf and it

Page 49

1   supports -- to the extent that this is a legal
2   conclusion, the Wayne County Sheriff's Department isn't
3   a department of the county. It's, like, an independent
4   statutory creation within the government. So it's an
5   inaccurate legal description of what the Sheriff's
6   Department is.
7       MS. DOWNEY: You know, I appreciate your
8   clarification, Mr. Stella, but I would --
9       MR. STELLA: That's why he lacks knowledge,
10  because to the extent that that's a legal description of
11  the Sheriff's office, the corporal does not know that.
12  A. I don't remember even being asked the question you asked
13      me before, so.
14  BY MS. DOWNEY:
15  Q. Okay. Did you ever read through the Complaint that was
16      filed in this case?
17  A. No, I haven't. Never did, tell you the truth.
18  Q. So this is the first time you're ever seeing it,
19      correct?
20  A. I believe so.
21  Q. Okay. Fair enough.
22  A. I believe so.
23  Q. Do you remember giving a statement under oath in this
24      case that you signed last November?
25  A. I remember talking. I don't remember if it was -- a



Page 54

1  Mittlestat arrived, we walked up the driveway and
2  observed Mr. Habich appearing to be working on another
3  vehicle off to the side of the driveway. Right there on
4  paragraph 9. You see that?
5  A. Okay.
6  Q. Did you confer with Deputy Mittlestat before you signed
7     that?
8  A. Before I said that?
9  Q. Before you signed the paper giving this information?
10 A. I'm telling you what I saw when I walked up the
11    driveway.
12 Q. Right.
13 A. Okay?
14 Q. Right.
15 A. That's what I'm telling you. That's what I'm telling
16    you in this.
17 Q. Yes. And in terms of the way this is written down, I'm
18    asking you, did you confer with Deputy Mittlestat for
19    verification on any of this?
20 A. No, I don't think so.
21 Q. Okay.
22 A. Why would I?
23 Q. That's all I was --
24 A. I mean, it's right there in plain view.
25 Q. That's all I wanted to know.

Page 55

1  A. Okay.
2  Q. That's fine. Like I said, I'm not asking you anything
3     else about that. Okay. You know something, I think
4     that's all the questions that I have for you right now,
5     corporal, unless your lawyer has anything he wants to
6     follow up on.
7        MR. STELLA: I do, but can we take a 5-minute
8     break?
9        MS. DOWNEY: Sure.
10       (A recess was taken from 11:26 a.m. to 11:34
11       a.m.)
12 EXAMINATION BY MR. STELLA:
13 Q. Hi, corporal, this is Davidde Stella. I have a few
14    questions for you about the incident at issue in this
15    case. As an initial matter, corporal, were you the
16    officer in charge of this investigation?
17 A. I was the officer in charge up until we found the
18    vehicle and it was impounded.
19 Q. Then did someone take over from you for the remainder of
20    the investigation?
21 A. Sergeant Glatfelter.
22 Q. And did you have any participation in the investigation
23    of this case after Sergeant Glatfelter took over?
24 A. Negative.
25 Q. Corporal, can you walk us through some of the training

Page 56

1  you've received at Wayne County since the beginning of
2  your employment?
3  A. Sure. What do you --
4  Q. Do you have to go through the police academy at some
5     point?
6  A. Yes, we do.
7  Q. And do you know what year that was?
8  A. 2002, I believe.
9  Q. And what general topics are taught at the police
10    academy?
11 A. General?
12 Q. Yeah. What, in general, does a police academy
13    curriculum include?
14 A. Been a long time. Well, you've got physical fitness.
15    You've got firearms training, defensive tactics
16    training, a little bit of legal training. What am I
17    forgetting.
18 Q. So there are other things that you may not remember?
19 A. Yeah.
20 Q. And do you have periodic training with Wayne County on
21    various topics in the course of your career?
22 A. Yes. Some, yes.
23 Q. And can you kind of let us know, if you can remember,
24    what topics those were?
25 A. Well, actually, this goes back to the academy, too.

Page 57

1  Like, your CPR training and I think it's called advanced
2  first responder or first responder training. We still
3  do that. Taser training. We still qualify every year.
4  It's kind of weird because we actually do training for
5  jails even though we don't work in there. We do, like,
6  suicide prevention, HIPAA, all types of training like
7  that.
8  Q. Okay. Is it fair to say you can't recall all the
9     training you've received, all the names of the courses?
10 A. No, there's no way I would be able to remember all of
11    them.
12 Q. When did you start with the Wayne County Sheriff's
13    Department, corporal?
14 A. May of 1997.
15 Q. So, corporal, you'd stated earlier that you were made
16    aware of Corporal Paul Spaulding's encounter with Mr.
17    Habich; is that right?
18 A. I want to say it was on the 1st when I was given the
19    plate information. That's when I was made aware of it.
20 Q. And do you know Corporal Spaulding?
21 A. Yes.
22 Q. And how long have you worked with him?
23 A. I think he started a year after me. So I've known him
24    about my whole career, off and on. We worked in
25    different areas.



Page 58

1 Q. Okay. And you said that Sergeant Glatfelter asked you
2    to follow up on Corporal Spaulding's encounter with Mr.
3    Habich?
4 A. Correct.
5 Q. Do you remember what Sergeant Glatfelter told you about
6    that incident? I know it's been some time.
7 A. I think he just made reference that there was an
8    incident on the expressway where the guy -- it was
9    determined that he was in a fake police car and that he
10   activated his lights to actually get away.
11 Q. Okay. And after Sergeant Glatfelter told you to look
12    into it, what did you do next?
13 A. Like I said earlier, I ran the plate, came back to a
14    Dearborn address. I believe Mr. --
15 Q. Okay. Let me stop you there. So you said you saw a
16    Dearborn address. Did you look in the LEIN to find that
17    address?
18 A. Correct.
19 Q. And to your knowledge, does the LEIN system contain --
20    where does the LEIN system, if you know, get the address
21    in that database from?
22 A. State of Michigan.
23 Q. So as far as you knew, Mr. Habich's official address was
24    in Dearborn?
25 A. Correct.

Page 59

1 Q. And you said -- do you know what time of day you went
2    over to the Dearborn address?
3 A. Approximately? This report was done at 19:58. I'm
4    going to say probably an hour, hour and a half maybe
5    before that.
6 Q. And you said you noticed some security cameras on the
7    property?
8 A. Correct.
9 Q. Do you know, can you tell us where those security
10    cameras you saw were?
11 A. They were on the outside of the house and there was also
12    one on the door.
13 Q. When you went to the Dearborn address and knocked on the
14    front door, was there any indication that someone
15    actually lived there?
16 A. There was no indication that somebody didn't live there.
17    It didn't appear to be vacant, no, but it didn't appear
18    that anybody was there at the time.
19 Q. And did you say you talked to the neighbor across the
20    street?
21 A. I believe he lived directly across the street.
22 Q. And how did that conversation occur? Did you approach
23    the neighbor or did the neighbor approach you?
24 A. We were actually walking back to our vehicles and he was
25    in the middle of the road. I don't remember if it was,

Page 60

1    like, a parking issue or what but I was just, like, Hey,
2    do you know this guy?
3 Q. So you asked the neighbor?
4 A. Correct.
5 Q. What did the neighbor tell you?
6 A. He told me that the guy lived there and I asked him, I
7    think, when the last time he saw him and I think he said
8    a couple days or something like that and he said that he
9    left and he said he was going to go stay with his
10    girlfriend for a little while. Either a little while or
11    couple days.
12 Q. Did the neighbor say where his girlfriend lived?
13 A. He did not have any information on her that I remember.
14    He didn't even remember her name.
15 Q. And do you think you might have the name of that
16    neighbor somewhere?
17 A. I'm not positive. I'd have to go back and look. But I
18    believe that she might have been -- there was a lady
19    present when we took the vehicle. I never had any
20    conversation with her but that could have been who he
21    was referring to.
22 Q. Okay. And back up a little bit. So when you ran --
23    when you looked up in the LEIN, did you look up the --
24    what did you look up first, the plate or the name?
25 A. I looked up the plate, and when you run the plate, they

Page 61

1    come up with the owner of the vehicle if there's a
2    registered owner of the vehicle.
3 Q. And so in LEIN, is the owner is the add -- do you know
4    if the address that's associated, is that associated
5    with the registration of the plate or the licensing of
6    the driver?
7 A. The plate -- the plate and the owner both came back to
8    the Firestone address. I don't remember if it was --
9    usually, when you run a plate, it'll come back and it'll
10    have the owner's information on the bottom and it'll
11    have his address and everything. And also when you run
12    the person's driver's -- his operator's license number,
13    it will come back to the same address.
14 Q. And so to your knowledge, that is the official State of
15    Michigan record of someone's address and licensing
16    address?
17 A. Correct.
18 Q. And the address to which the plate is registered?
19 A. In this incidence, yes.
20 Q. Okay. So how did you locate the Romulus address?
21 A. Sometimes when you run LEIN, it will give previous
22    addresses, okay. Because I remember -- I don't remember
23    off the top of my head. There might have been one or 2
24    addresses that I went to previously to the -- or I went
25    by previously to the Olive address. Or I use Google



Page 62

1  because Google still gives out information.
2  Q.  And did Sergeant Glatfelter give you a description of
3     what the car looked like that they were looking for?
4  A.  I don't actually remember that.  I think he just said
5     something about a fake police car.
6  Q.  Did he say what the model was?  Do you recall?
7  A.  I do not recall.
8  Q.  But you don't recall whether he said it or not, not that
9     he didn't say it.
10 A.  Right, right.
11 Q.  So you said you might have went to one or 2 addresses
12    before you arrived in Romulus?
13 A.  Uh-huh.
14 Q.  Is that a yes?
15 A.  I'm sorry.  Yes.
16 Q.  And do you remember if you saw anything at those
17    previous addresses that piqued your interest?
18 A.  No, I did not see anything at any other address.
19 Q.  Were you in a marked car that day?
20 A.  Yes, I was.
21 Q.  Okay.  Were you in uniform?
22 A.  Yes, I was.
23 Q.  So just to be clear, so is it your position that you
24    could see from the street or the sidewalk the lights on
25    Mr. Habich's vehicle?

Page 63

1          MS. DOWNEY:  Object to form.  You can answer.
2  BY MR. STELLA:
3  Q.  You can answer.
4  A.  Yeah, I could see them.  They were visible.
5  Q.  Is it your understanding that the possession of these
6     type of police lights are illegal under Michigan law?
7  A.  Yes, they are.
8          MS. DOWNEY:  Object to form.
9  A.  They are illegal.
10 BY MR. STELLA:
11 Q.  So I think you were asked about this but I don't think
12    you got your answer out.  So did Mr. Habich at any point
13    talk to you about the incident with Corporal Spaulding?
14 A.  Yes, he did.
15 Q.  And what did he tell you about that incident?
16 A.  He told me -- I'd have to look at my report, but he made
17    the statement that he was getting on northbound I-275
18    from 94 and a red pickup truck was heading the same way
19    and the pickup truck crossed over 2 sets of white lines
20    and almost caused an accident.  He then told me that the
21    pickup got caught up in a bottleneck of traffic and he
22    caught up to the pickup.  At this time, the owner told
23    me that the pickup truck -- the pickup was, like, 5 feet
24    behind him and that he activated his lights to get him
25    to back off.  After that, the owner said that he

Page 64

1     followed the red pickup truck to Newburgh Road in
2     Livonia.
3  Q.  And then did Mr. Habich indicate that the vehicle he was
4     talking about was the vehicle that was in his driveway?
5          MS. DOWNEY:  Objection to form.
6  A.  I'm sorry, repeat the question.
7  BY MR. STELLA:
8  Q.  Did Mr. Habich indicate that the vehicle involved in the
9     incident with Corporal Spaulding was the same vehicle
10    that was on his driveway?
11         MS. DOWNEY:  Same objection.
12 A.  It was -- we were talking about the same vehicle, yes.
13 BY MR. STELLA:
14 Q.  Did Mr. Habich tell you at any point, like, where he got
15    the lights from?
16         MS. DOWNEY:  Objection to form.
17 A.  No.  We never even had that conversation.
18 BY MR. STELLA:
19 Q.  At any time, did you tell Mr. Habich that he was under
20    arrest?
21 A.  No, I didn't.
22 Q.  At any time, did Mr. Habich tell you to get off of his
23    property?
24 A.  No, he didn't.
25 Q.  At any time, did he tell you to leave?

Page 65

1  A.  No.
2  Q.  At any time, did he refuse to answer anything you asked
3     him?
4  A.  No, he was pretty compliant.
5  Q.  And you said that there was another individual there at
6     the time?
7  A.  Yes, there was a female, but I never even had
8     conversation with her.
9  Q.  Was she near your conversations or was she physically
10    somewhere else?
11 A.  She walked around but she probably -- I mean, we're
12    having, like, conversation just like we are now so I'm
13    pretty sure she probably heard some of the
14    conversations.
15 Q.  Did Mr. Habich say anything to her during this
16    encounter?
17 A.  That I'm not sure.  I don't remember if he did or not.
18 Q.  When you were at Mr. Habich's house or the house in
19    Romulus, not necessarily Mr. Habich's house --
20         MS. DOWNEY:  Objection as to form.
21 BY MR. STELLA:
22 Q.  Okay.  Same question.  At the house in Romulus is the
23    question.
24 A.  At the --
25 Q.  Did you see any security cameras at that location?



Page 66

1  A. No, I did not notice any security cameras there.
2  Q. Did you know that your encounter with Mr. Habich was
3     being surreptitiously recorded?
4         MS. DOWNEY: Objection to form.
5  A. No.
6  BY MR. STELLA:
7  Q. And have you had a chance to review the video that was
8     provided to you about the incident?
9  A. Yeah, I looked at them.
10 Q. And was there any audio with that video?
11 A. I didn't hear no audio.
12 Q. Does the video's depiction of the events conform with
13    your memory today of what occurred?
14 A. Yeah, uh-huh.
15 Q. Was there anything on the video that you saw that jogged
16    your memory as to something you didn't remember about it
17    before?
18 A. I don't think anything jogged my memory at all.
19    Basically, it was cut and dry, I thought.
20 Q. Okay. So after you made the -- so did you make the
21    decision to impound the vehicle?
22 A. Yes, I did.
23 Q. Did Deputy Mittlestat have any input into that?
24 A. No. We don't go to a house as a single unit so that's
25    why he was -- I don't want to say summons. Why he was

Page 67

1     told to be there.
2  Q. At some point during the encounter, did you call
3     Sergeant Glatfelter?
4  A. Yes.
5  Q. At what point did you call Sergeant Glatfelter?
6  A. I think I called him -- I drove by the house, then I
7     drove by again, and I think after that I said -- I
8     called him and I told him I thought, I think I found the
9     car.
10 Q. Did you talk to him at all any more after that
11    conversation?
12 A. I believe after the car was impounded.
13 Q. So during this encounter with Mr. Habich, where was the
14    main location, you know, at which you were speaking with
15    him? On the driveway?
16 A. I would say most of our conversation between him and me,
17    I was either, like, on the driver's side in front of the
18    vehicle or on the driver's side of the vehicle outside
19    the vehicle. So it would be, like, the south side of
20    the vehicle. I remember it was a north-south street.
21 Q. When you informed Mr. Habich of the decision to impound
22    the vehicle, did he protest?
23 A. No.
24 Q. And did you give him information about how he could
25    contact the Wayne County Sheriff's Office about it?

Page 68

1  A. Yes, I did.
2  Q. To your knowledge, did he ever call you about this?
3  A. I have never talked to him since the conversation in the
4     driveway.
5  Q. And would you know if he had tried to call the number
6     you had given him?
7  A. No, I would have no knowledge of that.
8  Q. Did you see Mr. Habich's vehicle again after the initial
9     towing?
10 A. No.
11 Q. And you said that before the -- so you said you
12    performed an inventory search of the vehicle. Would
13    that occur before or after the tow truck arrived?
14 A. That was before, as we were waiting for a tow truck.
15 Q. Do you know how long it took the tow truck to show up?
16 A. No, I don't. I'm not even going to guesstimate on that.
17 Q. I mean, would you think it was under an hour or, I mean,
18    is there a -- 30 minutes?
19 A. I would say under an hour.
20 Q. And do you know where Martin's tow yard is for vehicles?
21 A. It's in Brownstown.
22 Q. And have you been there before?
23 A. Yes.
24 Q. Was the trunk opened at any time when you were doing the
25    inventory search?

Page 69

1  A. He -- well, he wanted to get some personal items out of
2     there, and I believe he said he had tools in the trunk.
3     That's when the trunk was opened.
4  Q. Did he open the trunk or did you open the trunk?
5  A. I think Deputy Mittlestat opened it. We did not let him
6     open the trunk, I can guarantee that.
7  Q. Do you know if the trunk had a key or was it a button?
8  A. I could not remember that.
9  Q. And what happened after the trunk was opened?
10 A. I believe some tools were taken out of the trunk, and
11    then after we allowed him to get his personal belongings
12    that were left -- we walked around with him, just like I
13    said, because it was a safety thing. We don't want
14    nobody pulling out a gun or anything like that. Even
15    though it was checked, we don't know if there's a hidden
16    compartment. He walked around to the trunk and there
17    was a hard drive, I believe they call it, like, for a
18    computer and he took out some discs out of that and he
19    either put them in his pocket or started to put them in
20    his pocket and I told him that he could not take them.
21 Q. Did you ask him to turn over the memory cards to you?
22 A. He handed them to me, yeah.
23 Q. Did he make any protest about that?
24 A. No, he didn't.
25 Q. Corporal, so do you understand the difference between a



**John Wojciechowski**
11/03/2021                              Pages 70..73

### Page 70

1    civil forfeiture and a seizure for a criminal
2    investigation?
3  A. I believe I do.
4  Q. Do you work in a division that does anti-prosecution
5    work?
6  A. Me personally?
7  Q. Yeah.
8  A. No. No.
9  Q. So are you aware of the paperwork that has to be served
10   if civil forfeiture is sought?
11 A. Yes.
12 Q. And were you intending to effectuate a civil forfeiture
13   on this vehicle?
14 A. I was not, no.
15 Q. Okay. How long do you think your -- I mean, if you can
16   guess, how long do you think the whole, entire incident
17   with Mr. Habich at the Romulus address lasted?
18 A. I wouldn't think -- I don't know. I wouldn't say we
19   were -- we weren't there probably more than 45 minutes
20   to an hour. That might even be a stretch.
21 Q. Was Sergeant Glatfelter working the night that this
22   occurred?
23 A. Yes.
24 Q. And did you speak with him when you returned to the
25   station? Well, let me back up for a second. Where did

### Page 71

1    you go after --
2  A. Me? I just went back on patrol, I believe.
3  Q. Did you return to your station that night?
4  A. Yes.
5  Q. And did you see Sergeant Glatfelter?
6  A. Yes.
7  Q. I'm going to ask you about a couple of these exhibits
8    real quick just to clarify some things. On Exhibit 6,
9    which was the last thing you were asked about --
10 A. I don't have them exhibits no more.
11 Q. Here, I'll give you my copy.
12 A. Am I supposed -- I don't keep them, do I?
13      MS. DOWNEY: No, not at all. The lawyers keep
14   them.
15 BY MR. STELLA:
16 Q. Okay. Don't worry about the Mittlestat one, okay. So
17   what document are you looking at here?
18 A. Declaration of Corporal Wojciechowski.
19 Q. Did you review this document, you know, back when it was
20   signed last year?
21 A. Did I review it?
22 Q. Yeah.
23 A. Tell you the truth, I don't remember this.
24 Q. But that is your signature, correct?
25 A. Yeah, it is.

### Page 72

1  Q. And if you'd signed that document, does that mean you
2    have reviewed it?
3  A. Correct. Yeah.
4  Q. On Exhibit Number 3, which is the inventory form, do you
5    know what Sergeant Glatfelter's handwriting looks like?
6  A. For the most part, yeah.
7  Q. Does that look like Sergeant Glatfelter's handwriting to
8    you?
9  A. It could be.
10 Q. And on that form, typically, is the person doing the
11   actual search of the car the person responsible for
12   filling that out?
13 A. Yes, he would have did this.
14 Q. And did you have anything to do with the search of the
15   vehicle?
16 A. No.
17 Q. Okay. You can hand that back. And you said that the
18   fact that there are 2 different case numbers, one on the
19   Sergeant Glatfelter form and one, I guess, on Exhibit 2,
20   which is the document about the memory cards, --
21 A. Correct.
22 Q. -- you think that might be just because the case numbers
23   got associated with different incidents?
24      MS. DOWNEY: Objection to form.
25 A. My case number is based off me impounding the vehicle.

### Page 73

1  BY MR. STELLA:
2  Q. Okay. And so was --
3  A. It wasn't, like, a carry-over from the original case
4    number. I don't even know what that number is, so.
5  Q. All right. So in terms of the Declaration of Deputy
6    Mittlestat, have you ever seen that document before?
7  A. His document?
8  Q. Yeah.
9  A. No, I don't remember seeing it.
10 Q. On Exhibit Number 1, which is the impounded vehicle
11   report, can you read what it says in the narrative
12   writing below just to make sure the handwriting is clear
13   for everyone?
14 A. Vehicle set up -- and I can't even read my own writing.
15   Vehicle was set up like a police vehicle, has police
16   lights and CAD, 3 chips taken out of security camera
17   mounted in vehicle.
18 Q. So when you were at the Romulus address, were you able
19   to walk around the car?
20 A. I could walk around it, yeah.
21 Q. Were you able to see anything inside the car?
22 A. You could see -- when I walked up the driver's side, we
23   could see in it.
24 Q. So in terms of what was actually in the -- where the
25   radio normally is in the car?



**John Wojciechowski**
11/03/2021

Pages 82..85

### Page 82

1  A.  No.
2  Q.  Have you ever encountered someone with a -- with what I
3      would, you know, let's say colloquially as an imitation
4      police car?
5  A.  Actually, I think it was a couple weeks later we had
6      another guy, almost the same incident.
7  Q.  Were you involved in the investigation of that incident?
8  A.  Actually, what happened with that one is somebody called
9      and said it looked like a police car had somebody pulled
10     over, and actually, when we got there, it was actually a
11     security car and the guy -- the person was actually
12     broke down.  He was actually blocking traffic so they
13     wouldn't get creamed.
14 Q.  Okay.  But that was a -- but you were saying that that
15     other car, that looked like a police car?
16 A.  Yeah, it did, actually, tell you the truth.
17 Q.  You said it was a security car?
18 A.  Right.  But it didn't have police lights, though.  It
19     had flashing lights but there wasn't the blue and red
20     lights.
21 Q.  So are you familiar with the different types of lights
22     that are installed on Wayne County Sheriff's Department
23     vehicles?
24 A.  I know what's installed on our road patrol vehicles.
25 Q.  Are you familiar with what's installed on Detroit Police

### Page 83

1      Department vehicles?
2  A.  Not all of them, no.
3  Q.  You have a marked car, correct?
4  A.  Yes.
5  Q.  You normally drive a marked car?  Do you ever have to
6      drive unmarked cars?
7  A.  I have.
8  Q.  Do unmarked cars have lights in them?
9  A.  Yes.  They have light bars.
10 Q.  And where are the lights normally located on an unmarked
11     car?
12 A.  On an unmarked car, you either have them in the back
13     window, mounted in the inside in the back window, in the
14     front window.  You may have them in the grilles.  The
15     taillights might be connected to them lights.
16 Q.  And what about a marked car?
17 A.  Marked car is basically the same thing but also, like,
18     nowadays they also -- we have lights mounted on the
19     sides of our cars inside and outside the vehicle.  In
20     the grille.  Still, like, connected to the taillights
21     and the headlights.
22 Q.  So are you familiar with how these lights are operated
23     on marked cars?
24 A.  How they work?
25 Q.  Yes.

### Page 84

1  A.  Yes.
2  Q.  And are you familiar with how they work on unmarked
3      cars?
4  A.  Yeah.  For the most part, they're predominantly all
5      operated by a switch.  It all depends on how many
6      switches.
7  Q.  So when you arrived at the Romulus address on August
8      1st, what could you see about the vehicle?  No, did you
9      see a white Dodge Charger in the driveway?
10 A.  Yes.
11 Q.  And was there anything about that white Dodge Charger
12     that looked like it had police equipment on it?
13 A.  Yes.
14 Q.  And what were those things that you could see?
15 A.  It had a push bar, but push bars aren't -- there's
16     regular cars that have push bars on them.  Why they have
17     them, I have no idea.  But as you look closer, you can
18     see lights on the side of the push bar and also in the
19     grille area.  And I think -- I don't remember if it was
20     on my way back, because I went by it twice, or it was
21     when I actually walked up where I seen them inside the
22     window.  The windshield.
23 Q.  When you arrived at the Romulus address, did you think
24     that this was Mr. Habich's home address?
25 A.  No.

### Page 85

1  Q.  In your mind, did you have any guess to what you might
2      have thought who lived there?
3  A.  At that time, I didn't even think about who was living
4      there.
5  Q.  Do you remember anything about the condition of the
6      Dodge Charger when you looked at it in terms of, like,
7      the physical shape of it?
8  A.  Basically, take everything off of it, it looked like a
9      regular Dodge, white Dodge Charger.
10 Q.  Well, in terms, I'm saying, was there -- were you seeing
11     any, like, paint loss or damage or --
12 A.  I don't remember.
13 Q.  -- did it look like well used or brand new?  Do you have
14     any sense of that?
15 A.  It looked clean but it didn't look like -- I don't
16     remember any damage on the vehicle or anything like
17     that.  I'm pretty sure if there was damage, I would have
18     put it on the tow tag.
19 Q.  I don't know if I asked you this before.  Do you know
20     how long it took between the time you called Deputy
21     Mittlestat and how long it took him to arrive?
22 A.  I want to say within 10 or 15 minutes from the time that
23     dispatch dispatched him to me.
24 Q.  I want to show Exhibit 1 to you one last time.  On this
25     document -- can you tell us what this document is?

