# EXHIBIT 5

**Christopher Mittlestat**
**11/03/2021**

1  IN THE DISTRICT COURT OF THE UNITED STATES
2  FOR THE EASTERN DISTRICT OF MICHIGAN
3  SOUTHERN DIVISION
4
5  EUGENE HABICH,
6           Plaintiff,
7  vs.                    Civil Action
8                         No. 2:20-cv-12528
9                         Hon. David M. Lawson
10                        Magistrate Judge Anthony Patti
11 WAYNE COUNTY, CORPORAL JOHN WOJCIECHOWSKI,
12 and DEPUTY CHRISTOPHER MITTLESTAT, in
13 their individual and official capacities,
14           Defendants,
15 _____/
16 PAGE 1 TO 58
17
18     The Deposition of CHRISTOPHER MITTLESTAT,
19     Taken at 500 Griswold,
20     Detroit, Michigan,
21     Commencing at 12:50 p.m.,
22     Wednesday, November 3, 2021,
23     Before Jill Sickels, CSR 0162.
24
25



Page 18

1   make your formal report?
2   A. I don't -- I mean, it stays in there with the incident.
3       I don't know what happens 2 months, 3 months, 5 months
4       later to that. But that's for me if I need -- say I
5       didn't do my report that night and I want to do it the
6       next day, I could access my notes.
7   Q. Good to take notes, right?
8   A. Yes. Usually.
9   Q. Okay. Fair enough. We're here today about an incident
10      that took place in Romulus on August 1st, 2020 and that
11      was a while back. What did you do to refresh your
12      recollection to be ready to testify about that today?
13  A. I viewed my supplemental report from that day. I was
14      handed the -- what is this called, the affidavit? Is
15      this an affidavit?
16          MR. STELLA: It's a declaration --
17  A. The declaration of what I did on that day. I was
18      handed that this morning. I've read over it. I also
19      received the video from the residence yesterday and I
20      reviewed that.
21  BY MS. DOWNEY:
22  Q. Did that refresh your recollection?
23  A. I was there.
24  Q. Okay. Fair enough.
25  A. Clearly, I was there.

Page 19

1   Q. You say, Clearly, I was there. Was that a comment on
2       the video?
3   A. That was -- that would be me on the video. I was
4       there.
5   Q. Okay. Fair enough. When was the first time you heard
6       anything about this matter?
7   A. It would be when I went to the Dearborn address first.
8   Q. Why did you go to the Dearborn address?
9   A. Corporal Wojciechowski, he wanted me to back him up at
10      that location.
11  Q. Did you get the call directly from the corporal or did
12      it go through the sergeant?
13  A. It would be from the corporal.
14  Q. When you got to the Dearborn address, what did you do?
15  A. Me and Corporal Wojo -- can I say Wojo? Is that okay
16      for --
17  Q. That's fine. We'll understand who you mean.
18  A. Me and Corporal Wojo went to the house. Corporal Wojo
19      knocked on the door. I stayed on the side of the
20      house. And there was no answer.
21  Q. What did you do after that?
22  A. Went back to my car.
23  Q. What was the next thing that happened as far as this
24      vehicle that we're talking about?
25  A. At the Dearborn?

Page 20

1   Q. Okay. After the Dearborn address, did you hear from
2       the corporal at any other time that day?
3   A. Yeah, later.
4   Q. Okay. What did he tell you then?
5   A. To make the Olive address.
6   Q. Okay. That's --
7   A. In Romulus.
8   Q. -- in Romulus?
9   A. Correct.
10  Q. So when you went to the Romulus address, what did you
11      do? What's the first thing that happened?
12  A. I parked my car.
13  Q. Where did you park?
14  A. In the front.
15  Q. Then did you see anything on the driveway when you were
16      on the street or going past or parking the car?
17  A. There was multiple cars in the driveway.
18  Q. Did you notice anything about them?
19  A. It was a white Charger in the front, facing the street.
20  Q. Did you notice anything in particular about the
21      Charger?
22  A. It had police lights on.
23  Q. Where were they?
24  A. They were located on the front push bumper, and as I
25      got closer, I could see it on the windshield.

Page 21

1   Q. When you got closer. How close?
2   A. After I got out of my car. After walking, approaching
3       it.
4   Q. Okay. How far away would you say you were?
5   A. I don't, I don't recall. As I got closer, it was
6       easier.
7   Q. Would that be, like, within a car length of the car?
8   A. Roughly.
9   Q. Okay. Fair enough. Could you see -- well, I'm sorry.
10      Let me start again. Were the lights going at that
11      time?
12  A. No.
13  Q. So could you see the color of the lights?
14  A. They were clear.
15  Q. All right. You said you walked up. Where was the
16      corporal at that time?
17  A. Walking with me.
18  Q. 2 of you walking abreast?
19  A. Roughly.
20  Q. Is it customary when you're walking up to a scene of
21      potentially impounding a car for you guys to put your
22      hand on your holster?
23  A. Depends on the situation. Do we see who -- what the
24      person is doing? Do we know what's near him? Or it
25      could be a comfort thing. I usually drop my elbow on



Christopher Mittlestat
11/03/2021                                         Pages 26..29

Page 26

1  Q.  So if he put up a fuss, what would you have done?
2  A.  He probably would have been arrested, depending on what
3      he did.  If he's verbally -- which happens.  Someone
4      could be upset, which I get, but if it got violent,
5      then yeah, he would have been arrested.
6  Q.  Was there a point when you looked inside the car?
7  A.  Yes.
8  Q.  What led to you looking inside the car?
9  A.  To -- I advised -- I believe either me or Corporal Wojo
10     advised him that he can take anything out of personal
11     items from the car, and there was tools, some
12     mechanic -- it was mostly mechanic stuff, from my
13     recollection.
14 Q.  And what did you look at inside the car?
15 A.  It was set up as a police car in my opinion.  There was
16     a laptop that was attached to the car.  When you opened
17     up the trunk, there was -- it looked like video
18     recording equipment that -- like, a -- yeah, like, a
19     video recording equipment that a police would use on
20     the passenger, back passenger side.
21 Q.  Who opened the trunk?
22 A.  I don't recall.
23 Q.  Did you turn on the computer to see what it really was?
24 A.  No.
25 Q.  Did you turn on the radio to see what it really was?

Page 27

1  A.  No.
2  Q.  Were there any police logos on the outside of the car?
3  A.  There was a security logo on the bottom -- from my
4      recollection, the bottom driver side and it would have
5      been -- are you familiar with ghost writing or stealth
6      writing?
7  Q.  No, I'm not.
8  A.  Can I expand on that?
9  Q.  Please do.
10 A.  Okay.  Some police cars and you'll -- you might notice
11     it after I talk about it, it'll be a black car and
12     it'll have black writing, but at night when lights hit
13     it, it reflects.  So on this car, it was a white car
14     with white writing, and I don't know if it reflected or
15     not.  But I noticed it was -- it could have been old.
16     It could have been new.  I don't know.
17 Q.  Did you have any way of knowing what equipment was
18     already on the car when Mr. Habich bought it?
19 A.  I would have no way of knowing that.
20 Q.  When you rolled up to this address in Romulus, did it
21     look like a residence?
22 A.  Like a home, a house?
23 Q.  Like a home?
24 A.  Yeah.
25 Q.  Did you have any way of knowing who lived there?

Page 28

1  A.  No.
2  Q.  Did it matter?
3  A.  I mean, no.
4  Q.  Did you conduct any kind of an inventory search of this
5      vehicle?
6  A.  No.
7  Q.  Did you search the vehicle at all?
8  A.  For weapons and contraband.
9  Q.  Did you fill out any kind of an inventory search
10     report?
11 A.  No.
12 Q.  Did you fill out any report other than your short
13     supplemental report on that date?
14 A.  No.
15 Q.  What does primary file class number mean?  Perhaps --
16     here, let me just mark it and then you can know what
17     I'm talking about.
18 A.  That is actually -- that's the number we use depending
19     on the crime.
20 Q.  That's supposed to indicate what kind of a crime you're
21     investigating?
22 A.  Correct.
23 Q.  What does 9900 mean?
24 A.  Miscellaneous.
25 Q.  Did the corporal instruct you to do the search of the

Page 29

1      interior of the car?
2  A.  I don't recall, or if I did it on my own.  Because at
3      that point, the subject was allowed to retrieve
4      anything out of the car that he needed.  Before he did
5      that, I wanted to go into the car and see -- before he
6      started grabbing around for things, to make sure there
7      was nothing that would hurt anyone.
8  Q.  Did you see him take any memory cards out of the video
9      equipment in the trunk?
10 A.  Yes.
11 Q.  Where was he going to put those cards?
12 A.  Where did he put them or where --
13 Q.  Where did he put them?
14 A.  In his pocket.  His front pocket.
15 Q.  Front right pocket?
16 A.  I believe so.
17 Q.  What did the corporal say about that?
18 A.  That those were part of the vehicle.  They were in the
19     recording.
20 Q.  Okay.  And --
21 A.  To not remove them.
22 Q.  He told the subject not to remove them?
23 A.  Correct.
24 Q.  What did the corporal do then?
25 A.  He put his hand out and Mr. Hab -- is it Haboch?



Christopher Mittlestat
11/03/2021
Pages 30..33

Page 30

1 Q. Habich.
2 A. Habich placed them in his hand.
3 Q. If he had not handed them over, were they going to be
4    taken from him?
5 A. That would be up to Corporal Wojo.
6 Q. I understand that the corporal was in charge of the
7    scene and that you were assisting. Is that a good way
8    to put it?
9 A. I would put it that way, yes.
10 Q. In the course of your duties as a deputy, do you ever
11    disagree with the officer in charge of a scene?
12 A. It would depend.
13 Q. If you disagreed about whether there was a need for a
14    warrant, would you just defer to whoever was in charge
15    of the scene or would you make an issue of it?
16 A. If I thought there was a need for a warrant?
17 Q. Yes.
18 A. I would advise it in my report, yeah.
19 Q. And I take it you did not disagree at this point.
20 A. No.
21 Q. Is it your understanding that it's Wayne County policy
22    that if you see the car from the street and you believe
23    that it needs to be impounded, you can impound it
24    without a search warrant?
25 A. If it was involved in a felony, like, for the purposes

Page 31

1    of our reason of being there?
2 Q. For your reason of being there, if you could see the
3    car from the street, are you allowed to seize it
4    without a search warrant?
5 A. Yes.
6 Q. Does it matter where on the driveway it is?
7 A. As long as it's in plain view.
8 Q. If it was parked a hundred feet back of the house but
9    still on the driveway and still visible from the
10    street, you could still seize it without a warrant,
11    correct?
12 A. Do I know it's that particular car?
13 Q. If you know it's the car.
14 A. How do I know it's the car?
15 Q. That's very good. If you have a car, it's parked on a
16    driveway, and you can see the car from the street, and
17    you go up a hundred feet past the house and look at the
18    license plate and you see that it's the right car, can
19    you seize it right then and there without a search
20    warrant?
21 A. That would be up to a judge. In my opinion, yeah.
22 Q. When you're out on the street and there's no judge,
23    would you seize it?
24 A. Yes.
25 Q. Without a warrant.

Page 32

1 A. And for under the plain view exception, yes.
2 Q. What if the car is parked right next to the house?
3    Does that make any difference?
4 A. To me, no.
5 Q. Okay. I'm just going to review a couple things and see
6    if I have anything else here, okay, because I'm not
7    going to make you come back a second time, as fun as --
8 A. Hey, this is my work and I'm done.
9 Q. Okay.
10 A. It's getting me out of training.
11 Q. In your experience as a Wayne County Deputy, are you
12    aware of any written materials that are given to any of
13    the owners of a car that's impounded to tell them what
14    their rights are or how to get the car back?
15 A. The answer would be no. And can I expand on that?
16 Q. Okay. Go ahead.
17 A. So for hypothetically, I impound a car. The process is
18    you give them a card with where the car will be with
19    Mar -- we use Martin's Towing. So it's usually a
20    little business card, and on there it says call between
21    9:00 and 4:30, Monday through Friday. That's where
22    their car will be. So I would give them that.
23 Q. But if you're holding the car for investigation?
24 A. I've never held a car for investigation.
25 Q. So you wouldn't know the procedure for getting it back

Page 33

1    when you're holding it as evidence?
2 A. I would inform the person, There's a hold on your car
3    for investigation purposes and you'll be contacted by
4    whoever is in charge of that case.
5 Q. Do you know how long that's allowed to go on?
6 A. I do not know.
7 Q. Have you ever had any experience with that?
8 A. No.
9 Q. You know, deputy, I think that's the questions I have
10    right at this time, but Mr. Stella is going to have
11    some follow-ups for you.
12 A. Okay.
13 EXAMINATION BY MR. STELLA:
14 Q. Hi, deputy.
15 A. Hi.
16 Q. I thought I'd ask a couple of questions to get --
17    hopefully, this won't take too long.
18 A. Sure.
19 Q. So is it fair to say that the first time you heard of
20    Mr. Habich or this Dodge white Charger, either of these
21    things, was when Corporal Wojo contacted you on August
22    1st?
23 A. Correct.
24 Q. Okay. And is there any sort of policy or practice or
25    procedure about how many officers need to approach a



Page 34

1  house if you're coming up to a house?
2  A.  No.
3  Q.  So do you guys often work in pairs when you're
4      investigating things?
5  A.  Normally.
6  Q.  So why did Corporal Wojo -- in your opinion, did
7      Corporal Wojo call you?
8          MS. DOWNEY:  Objection to form.
9  BY MR. STELLA:
10 Q.  Why did he need your assistance to go to Dearborn?
11         MS. DOWNEY:  Same objection.  Oh, I'm sorry.
12     When we take --
13 A.  Oh, okay.
14 BY MR. STELLA:
15 Q.  Yeah, go ahead.
16         MS. DOWNEY:  I'm so sorry.
17 A.  No, that's okay.
18         MS. DOWNEY:  I beg your pardon.  Again,
19     there's no judge here and that's just for the record
20     and we'll take your answer.
21 A.  I thought he could have resaid it.  It's a safety
22     thing.  You're going to an unknown address.  You don't
23     know what's going to happen.  So for purposes of that,
24     it's better to call someone else or another party.
25

Page 35

1  BY MR. STELLA:
2  Q.  Have you, on other occasions, had to back up an officer
3      when they requested it?
4  A.  All the time.
5  Q.  And do you ever call other officers to back you up?
6  A.  Yeah, of course.
7  Q.  How did you -- so you said that Corporal Wojo called
8      you?
9  A.  Correct.
10 Q.  Do you remember if it was Corporal Wojo or dispatch?
11     Do you remember which one it was?
12 A.  No.  From my recollection, it was Corporal Wojo.  I
13     don't recall dispatch calling me.
14 Q.  Okay.  So did you walk up the driveway of the Dearborn
15     address?
16 A.  Or the grass.  I don't remember if there was a driveway
17     at that residence or it was a dirt driveway.  I don't
18     recall.
19 Q.  Did you notice any security cameras on that property?
20 A.  I remember seeing it.  I don't know if it was operable
21     or not.
22 Q.  But did you see what appeared to be cameras on the
23     outside of the house?
24 A.  Yes.
25 Q.  Did you walk up to the front door of that house?

Page 36

1  A.  I don't recall.
2  Q.  Do you know if anyone was home, ultimately?
3  A.  No one answered the door.
4  Q.  Do you remember if there were any cars in the driveway?
5  A.  I don't recall.
6  Q.  Do you recall a neighbor having a conversation with
7      Corporal Wojo about Mr. Habich?
8  A.  Vaguely, yes.  It was a Middle Eastern gentleman.  I
9      don't know if it was across the street, what neighbor
10     it was.  I don't recall what.
11 Q.  But you saw a person talking with Corporal Wojo?
12 A.  Yes.
13 Q.  Did you overhear any part of that conversation?
14 A.  No.
15 Q.  And what did you guys do after you left the Dearborn
16     address?
17 A.  I went back on my regular patrol.
18 Q.  And did you hear from Corporal Wojo again?
19 A.  Yes.
20 Q.  And when's the next time you heard from him?
21 A.  Whenever he got -- whenever he was at the Romulus
22     address.  I don't recall if it was minutes, hours.  I
23     can guess and I don't want to guess.
24 Q.  Okay.  You don't have to guess for sure.  So do you
25     remember who called you about that?  Do you know if it

Page 37

1      was Corporal Wojo or dispatch?
2  A.  I don't recall.  I would assume Corporal Wojo.
3  Q.  So do you know what -- around the time of day you
4      arrived there?
5  A.  Daylight.
6  Q.  And you said you parked right in front of the house?
7  A.  Yeah.
8  Q.  Where was Corporal Wojo at this time?
9  A.  In his car.
10 Q.  And was he in front of the house, too, or was his car
11     somewhere else?
12 A.  When I pulled up, he was pulling -- he was approaching.
13     We approached together.
14 Q.  And were you in a marked car?
15 A.  Yes.
16 Q.  And that's one of the brown Wayne County Sheriff cars?
17 A.  Black.
18 Q.  Black?
19 A.  Durango.
20 Q.  Fancy ones.
21 A.  Yeah, it was brand new then.
22 Q.  So they were marked cars?
23 A.  Yes.
24 Q.  And did they have all the -- did they have police
25     lights on them?



Christopher Mittlestat
11/03/2021
Pages 38..41

Page 38

1  A.  Yes.
2  Q.  Did you activate those lights?
3  A.  No.
4  Q.  Okay. And what happened after you guys pulled up
5      towards the residence?
6  A.  We approached the subject.
7  Q.  And then how did you approach him?
8  A.  By walking.
9  Q.  I mean, but via the driveway?
10 A.  Yeah.
11 Q.  And do you remember who said what to whom first?
12 A.  No.
13 Q.  And so did you observe Corporal Wojo talking to Mr.
14     Habich?
15 A.  Yes.
16 Q.  Did you hear the entirety of their conversation or just
17     parts of it?
18 A.  Parts.
19 Q.  Do you remember Mr. Habich talking -- any talking about
20     an incident that occurred with a Corporal Paul
21     Spaulding a few days earlier?
22 A.  Yes.
23 Q.  What do you remember Mr. Habich saying about that?
24 A.  It was early in the morning. They said they were --
25     he, Mr. Habich, said that he was on his way to work and

Page 39

1   he got into what I characterize as a road rage incident
2   with a red F-150. He said that the truck was following
3   too close on him and that's when he activated his
4   emergency lights on the Dodge Charger.
5  Q.  Did Mr. Habich say what happened after he activated the
6      lights?
7  A.  Yeah. The truck got over, the truck changed lanes, and
8      that's when the truck slowed down to get next to
9      the Charger and they had some kind of interaction, I
10     don't recall what, and Mr. Habich then went to work.
11 Q.  Did you hear Mr. Habich say anything confirming that
12     the vehicle he was talking about in the story with
13     Corporal Spaulding was the same vehicle you were
14     looking at?
15 A.  I don't -- can you rephrase that or --
16 Q.  Okay.
17 A.  -- say it again.
18 Q.  Did Mr. Habich indicate that the car that was involved
19     with the incident with Corporal Spaulding was the same
20     car sitting on his driveway?
21 A.  I don't recall.
22 Q.  Do you remember anything else that Mr. Habich said to
23     Corporal Wojo?
24 A.  He stated that he was the one that was in the
25     interaction, that he did activate his police lights or

Page 40

1   his emergency equipment, and that's all I recall.
2  Q.  Was there another person, another civilian on the scene
3      when you guys pulled up?
4  A.  Yes, a female. A white female.
5  Q.  Did anybody speak with her? Did you see anybody speak
6      with her?
7  A.  No.
8  Q.  Did either of you attempt to ask her any questions?
9  A.  I don't recall. She was moving in and out.
10 Q.  In terms of moving in and out, what do you mean?
11 A.  She went in the house. She went in the garage. She
12     was kind of just -- she wasn't part of the
13     conversation.
14 Q.  Do you remember what she looked like?
15 A.  Middle-aged, light hair, Caucasian, 5'6. 5'9.
16 Q.  That's pretty good, a pretty good description. So at
17     some point, did Corporal Wojo make a decision to
18     impound the vehicle?
19 A.  After speaking with Mr. Habich.
20 Q.  So did anyone go into -- did Mr. Habich say anything
21     about getting anything out of his car at that point?
22 A.  Yeah.
23 Q.  Or did -- well, let me rephrase it. Who brought the --
24     did the subject of getting personal property out of the
25     car come up?

Page 41

1  A.  Yes.
2  Q.  And was it brought up by you two or was it brought up
3      by Mr. Habich?
4  A.  I don't recall.
5  Q.  Did you permit him to retrieve personal items?
6  A.  After I searched the vehicle for weapons.
7  Q.  And at that time, were you performing an inventory
8      search or just sweeping for weapons?
9  A.  Just sweeping for weapons so that he could -- so Mr.
10     Habich could retrieve anything out of the car that he
11     needed.
12 Q.  And did you say that inventory searches can occur at
13     the scene or at the tow yard?
14 A.  Yeah. Yes. Or at the station.
15 Q.  Or at the station. And no one asked you to do an
16     actual inventory search at the scene?
17 A.  No.
18 Q.  Do you remember if Mr. Habich took out any personal
19     items?
20 A.  Yes.
21 Q.  And do you remember what those items were?
22 A.  They were tools. Mechanic's type stuff. I think there
23     was a thing of -- a couple things of gloves. He took
24     them out and I recall him putting them -- from the
25     video, he put them in the garage, if I recall



Christopher Mittlestat
11/03/2021    Pages 42..45

Page 42

1   correctly.
2 Q. Did you find any weapons in the car?
3 A. No.
4 Q. Was there anything that Mr. Habich wanted to take out
5   of -- excluding the memory cards, was there anything
6   Mr. Habich wanted out of the car that you did not let
7   him take?
8 A. Not to my knowledge, no.
9 Q. Do you know how long after you did a sweep of the
10  vehicle before the tow truck arrived, approximately?
11 A. 10, 15 or -- I don't recall. Approximately -- it
12  wasn't long after.
13 Q. Did you see Corporal Wojo provide any cards or any
14  other written information to Mr. Habich?
15 A. I didn't witness that or I don't recall it.
16 Q. You said earlier that it's normally the practice if a
17  vehicle is impounded that the driver be provided a card
18  of Martin's Towing?
19 A. Correct.
20 Q. Did you give that to Mr. Habich or was that given to
21  Mr. Habich?
22 A. To my -- yeah.
23 Q. Do you know who gave it to him?
24 A. No. It would have been me or Corporal Wojo. I don't
25  recall.

Page 43

1 Q. Do you know whether Mr. Habich was provided with the
2   name of your agency and a telephone number to contact?
3 A. I wouldn't have provided that so I don't know.
4 Q. Okay. So when you pulled up to the scene, when could
5   you first -- when you get out of your car when you
6   arrive at the scene, when could you first discern with
7   your own eyes the police vehicle -- the police
8   equipment, the police lights on the car?
9 A. From when I pulled up.
10 Q. And you said as you got closer, that just got clearer?
11 A. As I was walking up, the windshield lights got -- you
12  could visually see them better because you're getting
13  closer, but the ones on the push bumper were visible as
14  I pulled up.
15 Q. And do you know whether Michigan law makes it a crime
16  to possess such police lights?
17 A. To possess? I'm unaware of that law.
18 Q. Do you know if Michigan law makes it illegal to use
19  them?
20 A. Yes.
21 Q. But you're unsure about the possession?
22 A. I'm unsure about the possession.
23 Q. You know, earlier in the questioning Ms. Downey asked
24  you some hypotheticals about what you might do in cases
25  of closed garages and open garages and contraband at

Page 44

1   the side.
2 A. Yes.
3 Q. You know, what is your general -- what is your normal
4   practice when you encounter a situation where it might
5   be unclear to you?
6 A. To contact someone that would know.
7 Q. And is there somebody at the Wayne County Sheriff's
8   office you would normally contact about that?
9 A. On the street? If I'm working?
10 Q. Yes.
11 A. I would contact my supervisor.
12 Q. Would that be Sergeant Glatfelter?
13 A. Correct.
14 Q. Are there any other supervisors you work under?
15 A. I had a K-9 supervisor but he's not my patrol sergeant.
16 Q. So is it fair to say that if you had a question about
17  the legal vaguery of a situation, you might call your
18  supervisor for advice?
19 A. Absolutely.
20 Q. Did you talk to Sergeant Glatfelter during the incident
21  itself?
22 A. No.
23 Q. Did you see Corporal Wojo speak with him?
24 A. I didn't see it or hear it.
25 Q. Do you know either way whether he did?

Page 45

1 A. I have no idea.
2 Q. And you did a pretty good job of listing exceptions to
3   the warrant requirement. I think the only thing you
4   missed might have been a school thing. I can't --
5   might have been administrative search. I don't know.
6   I have to think back to law school.
7 A. Did I say administrative?
8 Q. You might have said it. I don't know. I'm just going
9   back to reference that question.
10 A. Safety search is one, too.
11 Q. So if you were to put Mr. Habich -- your experience
12  with Mr. Habich's vehicle in one of these exceptions,
13  which exception would you put it in?
14 A. Plain view.
15 Q. So did you have a chance to walk around the vehicle?
16  Or look through windows, let's say. Did you have a
17  chance to look through the windows of the vehicle while
18  you were on the scene?
19 A. I looked at the plate. I don't recall looking into the
20  car until I did the weapon search.
21 Q. Had Mr. Habich -- in your opinion, did Mr. Habich do
22  anything to try to cover or hide the car from view from
23  the street?
24 A. No.
25 Q. Did you have any involvement in any subsequent formal



Christopher Mittlestat
11/03/2021
Pages 46..49

Page 46

1  inventory search of the vehicle?
2  A. No.
3  Q. Did you have any involvement in the subsequent criminal
4     investigation of this incident?
5  A. No.
6  Q. Do you recall anybody trying to get ahold of you at
7     work about this incident?  Did Mr. Habich -- were you
8     ever made aware of Mr. Habich trying to contact you
9     about this?
10 A. No.
11 Q. Does your station maintain a number that the public can
12    call to inquire or to speak with your staff?
13 A. Do we have a telephone?
14 Q. Yes.
15 A. Yes.
16 Q. And is there someone assigned to answer that telephone?
17 A. I wouldn't know.
18 Q. Are members of the public allowed to visit, to come by
19    the station and request to speak with somebody?
20 A. Yes.
21 Q. Do you recall if Mr. Habich ever came by the station
22    itself --
23 A. No.
24 Q. -- to try to talk to you?
25 A. I wouldn't know.

Page 47

1  Q. But you were not personally aware of that happening?
2  A. No.  I work later.  I work at 4:00.  I assume they
3     close because no one's ever there when I get there.  So
4     I don't know that answer.
5  Q. You were asked some questions about -- I might have
6     missed all this, but you were asked some questions
7     about where the position of your hands might have been
8     on weapons or tasers?
9  A. Uh-huh.
10 Q. Was your hand on your weapon or taser as you were
11    walking up the driveway?
12 A. I don't recall.
13 Q. Do you normally keep your hands on your weapons as you
14    approach people or does it depend on the situation?
15 A. I don't even think of it.  I don't know.
16 Q. When you approached the Romulus address, did you have
17    any idea what to expect there?
18 A. No.
19 Q. So it could have been a complete peaceful situation,
20    right?
21 A. Yeah.
22 Q. Or it could have been a dangerous situation?
23 A. It could have been anything.
24 Q. Did you notice any security cameras at the Romulus
25    address?

Page 48

1  A. No.
2  Q. So since you said you've seen the video, you were
3     unaware that the whole encounter was recorded?
4  A. Correct.
5  Q. At the scene, did you ever place Mr. Habich under
6     arrest?
7  A. No.
8  Q. Did you ever tell him he wasn't free to leave the
9     scene?
10 A. No.
11 Q. Did Mr. Habich ever tell you to leave his property?
12 A. No.
13 Q. Did he ever tell you that he didn't want to speak with
14    you?
15 A. No.
16 Q. Did the conversation -- and from your vantage point and
17    in your opinion, did the conversation at any point ever
18    get heated or argumentative between Corporal Wojo and
19    Mr. Habich?
20 A. No.
21 Q. Deputy, you say you normally operate, when you're on
22    shift, a marked patrol car?
23 A. Always.
24 Q. So you don't typically drive unmarked ones?
25 A. No.

Page 49

1  Q. Are you familiar with, like, what police lights are
2     installed on a marked vehicle?
3  A. Yes.
4  Q. And how about are you familiar with how other police
5     departments in the area configure their lights?
6  A. Yeah.
7  Q. What kind of lights does a marked patrol car have?
8  A. It depends.
9  Q. How about your car?  Let's start there.
10 A. My car has overheads, front push bar, mirrors, rears,
11    and on the sides.
12 Q. Do they have an under dash -- like, under the
13    windshield lights?
14 A. Mine?
15 Q. Yeah.
16 A. No.
17 Q. Do other Wayne County Sheriff patrol vehicles have
18    those type of lights?
19 A. Yes.
20 Q. Do other police departments that you've encountered
21    have lights like that?
22 A. Yes.
23 Q. So is it fair to say that you can recognize police
24    lights, police style lights when you see them?
25 A. Yes.

