# EXHIBIT 10

Sharon Thalacker
12/09/2021

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MICHIGAN
 2                   SOUTHERN DIVISION

 3

 4       EUGENE HABICH,

 5              Plaintiff,

 6       -vs-                          CASE NO. 20-cv-12528
                                       HON. DONALD M. LAWSON
 7       COUNTY OF WAYNE,              MAG. ANTHONY P. PATTI
         JOHN DOE #1, JOHN DOE #2,
 8
                Defendants.
 9
     _____/
10

11       PAGE 1 TO 79

12

13          The Deposition of SHARON THALACKER,

14          Taken via Hanson Remote,

15          Commencing at 3:06 p.m.,

16          Wednesday, December 9th, 2021,

17          Before Catherine Bradley, CSR 2255

18

19    Court Reporter, attorneys & witness appearing remotely.

20

21

22

23

24

25
```



Sharon Thalacker
12/09/2021                                          Pages 26..29

Page 26

1    handle well in the snow.
2  Q.  Have you ever driven -- have you ever driven that
3    Dodge Charger?
4  A.  Yes.
5  Q.  And how many times would you estimate you've driven
6    that car?
7  A.  Five maybe.
8  Q.  Okay.  Can you tell me what -- on what occasions you
9    would drive the car or why you would drive it?
10 A.  Once it was because he was driving a truck following
11   his sister's car back to his house so I had to drive
12   his.
13 Q.  Okay.
14 A.  Where we got in some situation where we had two cars
15   to drive.
16 Q.  Okay.  And how about the other times?
17 A.  Similar situations.  I think once might have been just
18   to the store because his car was parked behind mine.
19 Q.  So besides situations where you needed -- you needed
20   to drive two cars back and maybe a time where you went
21   to the store are there any other times you've driven
22   that car?
23 A.  Not that I recall.
24 Q.  Have you ever been a passenger in the Dodge Charger?
25 A.  Yes.

Page 27

1  Q.  Okay.  How many times can you estimate you've been a
2    passenger?
3  A.  Hundreds.
4  Q.  Okay.  So is it fair to say when the two of you
5    traveled together it would be in the Charger and not
6    your car?
7  A.  Up until it was seized, yes.
8  Q.  Okay.  And is there any reason why the Charger was
9    taken and not your car?
10 A.  We would take my car in the summer because mine has
11   air-conditioning.  It took him a while to get his
12   air-conditioning working in that.
13 Q.  So is it your understanding that when he bought the
14   car the air conditioning was not working?
15 A.  If I remember correctly, yes, it was not working.
16 Q.  Was there anything else not working on the car when he
17   bought it?
18 A.  There were several --
19         COURT REPORTER:  I can't -- I didn't
20   understand you.  You broke up.
21         THE WITNESS:  There were several trouble
22   lights on when he purchased the vehicle that were
23   fixed, that he fixed.
24 BY MR. STELLA:
25 Q.  So besides the lights anything else?

Page 28

1  A.  Not that I recall, but I know he spent a lot of time
2    fixing things on it.
3  Q.  Okay.  Are you aware of what types of things he fixed
4    on it?
5  A.  No, not in detail.  I usually wasn't there when he was
6    working on it.
7  Q.  So you said you've been -- you've probably been driven
8    as a passenger in that car at least maybe hundreds of
9    times?
10 A.  Probably, yes.
11 Q.  Okay.  Have you ever been in the Dodge Charger when
12   the police lights were turned on?
13 A.  Once, yes.
14 Q.  Okay.  What was that incident?
15 A.  Maybe twice.  Once he was showing them to me when he
16   first bought it but that was in the driveway, not as a
17   passenger.  And at one point he flipped on his lights
18   for a motorcyclist who was weaving in and out of
19   traffic.  It was a two second on and off.
20 Q.  Okay.  And do you know the approximate date of that
21   incident with the motorcycle?
22 A.  No idea.
23 Q.  Would it have been '17?  '18?  '19?
24 A.  Summertime maybe 2018.
25 Q.  So besides those incidents you've never seen those

Page 29

1    police lights activated?
2  A.  Never.
3  Q.  Do you know how to activate them if you wanted to?
4  A.  I know there's switches on the center console but I
5    don't know which ones.
6  Q.  Do you have any reason -- do you know of any reason
7    why Mr. Habich if he says he purchased the car like
8    that why he didn't remove those lights at some point?
9  A.  He didn't see a need to.
10 Q.  Have you ever been -- have you ever been a passenger
11   in the vehicle, whether it was stationary or not,
12   where Mr. Habich used the PA system in his car?
13 A.  Possibly when he first bought it sitting in the
14   driveway.
15 Q.  Okay.  So are you saying that you've never been in the
16   car at any point where he had -- where he had made
17   sounds out of the vehicle's PA?
18 A.  Not while it was moving, no.
19 Q.  Okay.  How about did he ever use the spotlight that's
20   on the car while you were in it?
21 A.  Not -- not that I recall.
22 Q.  Does the car have a siren?
23 A.  Not that I'm aware of.
24 Q.  Do you know whether or not the car has an in-vehicle
25   recording system?



Sharon Thalacker
12/09/2021
Pages 42..45

Page 42

1  city was it?
2  A. Livonia. It was speeding.
3  Q. This is Livonia Police Department?
4  A. Yes.
5  Q. Okay. And what -- back to August 1st. At what point
6     did you first notice Wayne County Sheriff's deputies
7     in the area?
8  A. When they pulled up at the end of the driveway, out in
9     the street.
10 Q. Okay. And what did you see? Was it one car? Two
11    cars? What did you see?
12 A. Well, it was a car and a truck if I remember
13    correctly.
14 Q. Did you -- did you see them arrive at the same time or
15    was it a different time?
16 A. I am not sure. I noticed when they were both there.
17    I don't know if they arrived together or within
18    minutes of each other.
19 Q. Are you aware of whether Mr. Habich has a home
20    surveillance system installed in his house?
21 A. Yes, he does.
22 Q. Okay. Do you know when he installed that?
23 A. No, I don't.
24 Q. Have you ever watched footage taken from that home
25    surveillance system?

Page 43

1  A. Yes.
2  Q. Okay. And what footage have you watched from that
3     home surveillance system?
4  A. I watched the footage on the day that the sheriff's
5     deputies came and there's been other times that we've
6     looked trying to see animals who walk through the
7     property.
8  Q. Would the animals automatically trigger the camera
9     system?
10 A. Any movement will, yes.
11 Q. And how many times have you looked for animals on the
12    video?
13 A. Four or five times.
14 Q. Okay. Have you ever watched it for any other purpose
15    besides reviewing the security footage from this
16    incident and animals?
17 A. Not that I recall, no.
18 Q. Okay. At some point did the deputies approach the
19    house?
20 A. Yes.
21 Q. Okay. And how did they approach the house?
22 A. They walked up the driveway, one of them with his hand
23    on his gun.
24 Q. Okay. Were you sure it was on his gun as opposed to
25    something else on his belt?

Page 44

1  A. It appeared to be his gun but I don't know that for
2     certain.
3  Q. So it could have been a taser? Pepper spray?
4  A. Possibly.
5  Q. Phone?
6  A. Possibly yes.
7  Q. Okay. Did -- can you describe physically what the two
8     deputies looked like?
9  A. There was a heavyset older man and a younger man.
10 Q. Okay. And what happened after they walked up the
11    driveway?
12 A. They started looking at the car, at least one of them
13    did. The older heavyset man kind of stood back in the
14    driveway a little bit and yelled at my dog.
15 Q. What did he yell at your dog?
16 A. He wanted us to get the dog under control. She was
17    already tethered. She wasn't going anywhere.
18 Q. What kind of dog breed is it?
19 A. She's a Lab mix.
20 Q. And how many pounds is this dog approximately?
21 A. 80.
22 Q. Was the dog barking?
23 A. Yes.
24 Q. And what happened? Was -- so when the deputies
25    indicated to secure the dog what happened?

Page 45

1  A. I had a hold of her collar. I had a hold on her
2     collar from the minute they started walking up the
3     driveway.
4  Q. Is your dog the type of dog that barks at strangers?
5  A. Yes.
6  Q. So it would have barked at virtually any stranger
7     walking up the driveway?
8  A. Yes, and generally her tail is wagging because she
9     thinks they're coming to pet her.
10 Q. Would somebody that didn't know your dog think that?
11 A. Probably not unless they really knew dogs and
12    understood the wagging tail thing.
13 Q. Okay. So after the dog thing what happened next?
14 A. The one -- the younger man walked around the car. At
15    some point the older gentleman was talking to Gene and
16    asked him about an incident on the expressway with a
17    red pickup truck.
18 Q. Okay. Did you hear that conversation?
19 A. Part of it, yes.
20 Q. Okay. How far away from this conversation were you
21    standing approximately?
22 A. Maybe ten feet.
23 Q. Okay. What did you overhear about that conversation?
24 A. That there was a red truck driving erratically on the
25    expressway at an excessive rate of speed.



Sharon Thalacker
12/09/2021
Pages 46..49

Page 46

1  Q. Is that what Mr. Habich said or is that what the
2     deputy said?
3  A. That's what Mr. Habich said. That's what Gene said to
4     the deputy. The deputy asked if there was an incident
5     with a red truck on the expressway or with anyone on
6     the expressway. That I'm not positive of. I don't
7     remember exactly.
8         COURT REPORTER: Or anybody on the
9     expressway?
10        THE WITNESS: Yes. If there was an incident
11    with anyone on the expressway or with somebody in a
12    red truck. I'm not sure exactly who brought up the
13    red truck.
14        You're going out again.
15 BY MR. STELLA:
16 Q. Okay. Anything else -- anything else on that topic
17    that you overheard?
18 A. That the red truck was -- that Gene had said that the
19    red truck was riding him very closely on the
20    expressway, was tailgating.
21 Q. And did the deputy say anything back to him?
22 A. Probably, but I don't recall what.
23 Q. So after that conversation occurred -- how long did
24    that conversation last approximately?
25 A. Minute or two.

Page 47

1  Q. And what happened after that conversation?
2  A. The older deputy informed Gene that they were taking
3     his car and that he could either turn over his keys or
4     they would drag the car out of the driveway.
5  Q. Did he use the word drag?
6  A. Yes. Yes, they did. They had -- the tow truck was on
7     its way and they were going to take it whether he
8     turned over his keys or they would drag it out of the
9     driveway.
10 Q. Okay. But what happened next?
11 A. I'm not sure 100 percent of the order. They let us
12    take some of the stuff out of the car because he
13    wasn't willing to let them to drag it out of the
14    driveway and damage his car. So he did give them the
15    keys and they let us take some of the personal
16    belongings out of the vehicle.
17 Q. Okay. Let me stop you for one second. When you say
18    that he didn't want them to drag the car out and
19    damage it, did he say that to the officers or is that
20    what he told you?
21 A. He may have said that to the officers. I'm not 100
22    percent positive.
23 Q. But you know he said it to you?
24 A. Yes.
25 Q. Okay. So I'm sorry I cut you off. Sorry. So they

Page 48

1     allowed him to go in the car to retrieve his
2     belongings. Does he get his belongings?
3  A. We got a few things out of the car. Some things they
4     wouldn't let us take.
5  Q. When you say us were you both taking things out of the
6     car?
7  A. Yes. I was helping.
8  Q. What -- did you take anything specifically out of the
9     car?
10 A. There was nothing of mine in the car but I helped take
11    some of the stuff out of the trunk.
12 Q. Okay. So what did he take out of the trunk?
13 A. Just some tools and I don't remember what all was in
14    there.
15 Q. Was there a lot of stuff in the trunk?
16 A. There was a few things, yeah.
17 Q. Did you see Mr. Habich take anything out of the car or
18    trunk?
19 A. I know he tried to. He was going to take his laptop
20    and they wouldn't let him take that. I don't
21    remember. There was some stuff in the back seat that
22    he was taking out.
23 Q. Okay. Do you know -- did you see the handicapped
24    sticker in the back seat somewhere?
25 A. No. The handicapped sticker was in the glove

Page 49

1     compartment. I was the one who put it in there.
2  Q. Okay. Did either of you think to go in the glove
3     compartment and get the handicapped sticker?
4  A. No. We weren't given a whole lot of time.
5  Q. Did the deputies say you have 30 seconds? I mean why
6     did you think --
7  A. No. He did not give us a time frame but he had a tow
8     truck there waiting and he was rushing us along.
9  Q. Okay. So after the belonging retrieval out of the car
10    what happened next?
11 A. Well, I think that's when the tow truck driver drove
12    the car out to the street to put it on the flatbed.
13 Q. Okay. What happened next?
14 A. We tried on several -- we made several attempts to get
15    a case number from the deputies and they said one was
16    not available. We wanted business cards from the
17    deputies and they would not give us those either. He
18    did eventually give us a case number and a phone
19    number on the back of the card of the tow truck
20    driver.
21 Q. Okay. So do you know if Wayne County Sheriff's
22    deputies have business cards?
23 A. That I'm aware of most officers have business cards
24    but I'm not certain of that.
25 Q. So you wouldn't be surprised if Wayne County Sheriff's

